UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**In re:**                                             **CASE NO. 6:09-14833-KSJ**

**THE VUE-ORLANDO, LLC,**            **CHAPTER 11**

             **Debtor.**
_____/

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND (B) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

       **THE VUE-ORLANDO, LLC** (the "Debtor"), as the debtor and debtor-in-possession, by and through its undersigned counsel, hereby moves, pursuant to sections 105, 363 and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of (i) an Order (a) approving bidding procedures and bidder protections for the sale of substantially all of the Debtor's assets and property, including the Real Property, as more particularly described on **"Exhibit A"** hereto and defined herein, and (b) scheduling a final sale hearing and approving the form and manner of notice thereof; and (ii) an Order (a) authorizing the sale of the Assets, free and clear of liens, claims, interests and encumbrances in connection therewith, and (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases, and granting certain related relief (the "Procedures Motion") as more fully described herein. In support of the Procedures Motion, the Debtor states as follows:

# I. INTRODUCTION

## Background

1.      The Debtor is a Delaware limited liability company and the owner and operator of the condominium tower development commonly known as "The Vue" at Lake Eola and the real property, including but not limited to the Debtor's Units, located at 150 East Robinson Street, Orlando, Florida (collectively, the "Real Property"), more particularly described on **"Exhibit A"** attached hereto and incorporated herein. The Real Property, together with all assets and property of the Debtor shall be referred to herein as the "Assets."

2.      On or about October 1, 2009, certain Pre-Petition Note A Lenders, namely, Sovereign Bank, Charter One Bank, N.A., Comerica Bank, Mercantil Commercebank, N.A., Mega International Commercial Bank Co., LTD, New York Branch, Great American Financial Resources, Inc., as successor in interest to Great American Life Insurance Company, and Great American Insurance Company (collectively referred to herein, along with KeyBank National Association, the "Pre-Petition Note A Lenders") commenced an involuntary petition against the Debtor under chapter 7 of title 11 of the Bankruptcy Code (Doc. No. 1). On or about November 3, 2009 (the "Petition Date"), the Debtor consented to the chapter 7 filing and converted the chapter 7 case to a case under chapter 11 of the Bankruptcy Code (Doc. No. 12). On or about November 4, 2009, the Court entered an Order granting the Debtor's conversion request. (Doc. No. 16).

3.      The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      As of the date hereof, no Official Committee of Unsecured Creditors (the "Committee"), trustee or examiner has been appointed in this case.

5. On or about November 12, 2009, the Debtor filed a motion to authorize the Debtor's entry into a secured debtor-in-possession credit facility. The hearing on such motion is scheduled for November 18, 2009.

**Jurisdiction and Venue**

6. This Court has jurisdiction over this Procedures Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

**The Pre-Petition Loans**

7. On or about September 21, 2005, KeyBank National Association ("KeyBank") made a loan to the Debtor in the original principal amount of $124,000,000.00 (the "Loan").

8. The Loan was advanced by KeyBank, pursuant to that certain Construction Loan Agreement, dated September 21, 2005, by and between the Debtor and KeyBank (the "Original Loan Agreement").

9. The Loan was evidenced by that certain Original Note, executed by the Debtor in favor of, and delivered to KeyBank, dated September 21, 2005, in the original principal amount of $124,000,000.00 (the "Original Note").

10. The Original Note is secured by, among other things: (1) that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of September 21, 2005, between the Debtor and KeyBank (sometimes hereinafter referred to as the "Security Agreement") encumbering the Real Property and all other personal and other property described in the Security Agreement, (2) that certain Conditional Assignment of Condominium Unit Sale

3

Contracts, Condominium Documents, and Condominium Developer Rights dated as of September 21, 2005 executed by the Debtor in favor of KeyBank as the Administrative Agent and that certain Assignment of Plans and Contracts dated as of September 21, 2005, executed by the Debtor in favor of the Administrative Agent (collectively, referred to as the "Assignment Agreement"); (3) and other documents executed or delivered to KeyBank in connection with the Loan. The documents referenced in clauses (1) through and including (3) above and the other documents that evidence and secure the Loan, excluding the Original Loan Agreement and the Original Note are collectively referred to as the "Other Loan Documents."

11. The Original Note was replaced pre-petition with the following: (1) First Tier Substitute Promissory Note-A in the amount of $104,900,000.00 dated February 2006 (the "First Tier Substitute Note-A") and (2) First Tier Substitute Promissory Note-B in the amount of $19,100,000 dated February 2006 (the "First Tier Substitute Note-B") (the First Tier Substitute Note-A and the First Tier Substitute Note-B, collectively, the "First Tier Substitute Notes").

12. First Tier Substitute Note-A was thereafter replaced pre-petition with Second Tier Substitute Promissory Notes A-1, A-2, A-3, A-4, A-5a, A-6, A-7, and A-8 (collectively, "Note A") dated February 2006 in the aggregate principal amount of $104,900,000, executed by the Debtor in favor of the Pre-Petition Note A Lenders and First Tier Substitute Note-B has been placed with Second Tier Substitute Promissory Notes B-1 and B-2 (collectively, "Note-B") dated February 2006, in the aggregate principal amount of $19,100,000 executed by the Debtor in favor of the Note B Lenders (collectively, the "Substitute Notes"). The Substitute Notes continue to be secured by, and pursuant to, the Original Loan Agreement, the Agreement and the

Other Loan Documents. The Original Loan Agreement, the Substitute Notes and the Other Loan Documents are collectively referred to as the "Loan Documents."[1]

13. The Debtor defaulted pre-petition under the Loan Documents, by, among other things, failing to pay the monthly payments that were due under the Loan Documents. As a result, the Pre-Petition Note A Lenders (as hereinafter defined) accelerated the remaining payments owing under the Loan Documents.

14. As of the Petition Date, the Debtor owes the Pre-Petition Note A Lenders and the lenders under the Note B obligations the aggregate sum of approximately $53,525,139.88, plus accrued interest, late fees, costs, and attorneys' fees (the "Indebtedness"), with $31,411,319.05, plus accrued interest, late fees, costs and attorneys' fees being owed to the Pre-Petition Note A Lenders as of the Petition Date (the "Note A Indebtedness). The Note A Indebtedness is owing to the Pre-Petition Note A Lenders without any offset, deduction, counterclaim or defense.

### Assets of the Debtor to be Sold

15. The Debtor's Real Property is a 35-story, 375 unit, urban high-rise condominium tower located in downtown Orlando, of which 210 have been sold to private individuals or entities (the units, having an average size of 1,249 feet, owned by the Debtor shall hereinafter be referred to as the "Debtor's Units"). As of the filing of this Procedures Motion, 165 units that are including in the Debtor's Assets, remain unsold. The Assets set forth on **"Exhibit A"**, along with any and all assets of the Debtor will be sold under the terms of the proposed Sale.

16. The Real Property offers a full amenity package, including a 5,000 square foot health club, a 3,000 square foot bar/lounge/cyber café, meeting rooms and boardroom, Olympic

---

[1] The Guarantors of the Debtor's obligations under the Loan Documents include Charles Johanns, Erik Moskowitz, Warren Crews and Richard Swanson.

5

size pool and sundeck, full sized tennis courts, outdoor picnic areas and BBQ grills, storage rooms, a 24-hour doorman, and private, secured parking.

### The Marketing Efforts

17. Prior to the Petition Date (and the commencement of the involuntary chapter 7 case), the Debtor aggressively marketed the Assets for sale, and collaborated with the Pre-Petition Note A Lenders in an effort to market and sell the Debtor's Units by private or bulk sale. The marketing efforts were largely executed through the Debtor's internal marketing staff, without separate brokerage agreements with third parties, except as described herein.

18. Prior to the Petition Date (and the commencement of the chapter 7 proceeding), the Debtor entered into an Agreement (the "Agreement") with the Pre-Petition Note A Lenders, pursuant to which the Debtor agreed to hire, subject to the Court's authorization discussed below, Fisher Auction Company, Inc. as sales agent, auctioneer and/or broker ("Auctioneer"), to market and offer the Assets for sale for a period of sixty (60) days. The Debtor also worked with the Auctioneer to develop reasonable bidding procedures to maximize the potential recoveries resulting from the sale of the Assets. While the Debtor does not currently have a stalking horse bidder in place, it believes that the procedures provided herein provides for the best opportunity to maximize the value of the Debtor's assets for the benefit of the estate and its creditors.

### II. RELIEF REQUESTED

19. The Debtor has determined in its business judgment the hiring of an Auctioneer, and the bulk sale and/or auction of the Assets is in the best interest of the Debtor's estate, and is consistent with the Debtor's Agreement with the Pre-Petition Note A Lenders. Based upon current local as well as national market conditions for the sale of residential condominium units and the lack of credit available to potential buyers, the Debtor believes that the sale of the Assets as proposed herein is the most effective disposition method available for the estate's creditors.

20. Accordingly, through this Motion, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors hereby seek the entry of two orders. <u>First</u>, a hearing (the "Bidding Procedures Hearing") to be held on December 9, 2009, the Debtor requests the entry of an Order (the "Bid Procedures Order") substantially in the form attached hereto as **"Exhibit B"**, among other things:

> (a) scheduling a hearing (the "Sale Hearing") on an expedited basis on or about March 17, 2010 (or as soon as the Court is available to consider (i) approval of the sale of the Assets (the "Sale") to the Successful Bidder (as such term is defined in the Bidding Procedures), if any;
>
> (b) authorizing and approving (i) the Debtor's proposed procedures for (A) the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder and (B) curing defaults under those executory contracts and unexpired leases; and (ii) notice of assumption and assignment of the executory contracts and unexpired leases and the proposed cure amounts relating thereto (the "Assignment Notice"); and
>
> (c) authorizing and approving (i) the proposed procedures for the submission and consideration of competing bids for the Assets (the "Bidding Procedures"); and (ii) the form and manner of notice of these matters, including (A) notice and manner of the Sale Hearing to be served on parties in interest, and (B) the publication version of the Auction Notice ("Publication Notice").

21. <u>Second</u>, upon the conclusion of the Sale Hearing, the Debtor requests the entry of an Order, authorizing the sale of the Assets free and clear of all liens, claims (as such term is defined by section 101(5) of the Bankruptcy Code, encumbrances, rights, remedies, restrictions, interests, liabilities and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, including all rights or claims based on any successor or transferee liability, all environmental claims, all change of control provisions, all rights to object or consent to the effectiveness of the transfer of the Assets to the Successful Bidder to be excused from accepting performance by the Successful Bidder or performing for the benefit of the Successful Bidder under any assumed agreement and all rights

at law or in equity, and (b) the assumption and assignment of certain executory contracts and unexpired leases intended to be acquired by the Successful Bidder. The secured claims of the Pre-Petition Note A Lenders shall attach to the proceeds of the Sale.

## THE PROPOSED SALE, NOTICE, BIDDING AND OTHER PROCEDURES

**A.  Notice and Other Procedures**

22.  The Debtor requests the approval of the following notice and other procedures:

(a)  <u>Date, Time and Place of the Sale Hearing.</u>  The Debtor proposes that the Sale Hearing be held in the United States Bankruptcy Court for the Middle District of Florida (Orlando) on March 17, 2010, at 2:00 p.m. or such other date and time that the Court may direct. The Sale Hearing may be adjourned from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket (each such adjournment shall be subject to the consent of the Pre-Petition Note A Lenders).

(b)  <u>Auction Notice</u>.  At least twenty (20) days prior to the Auction, notice shall be served on (i) counsel to any Committee appointed in this case, (ii) the Stalking Horse, if any, and its counsel, (iii) any party who, in the past six months, expressed in writing to the Debtor an interest in acquiring the Assets or any party who the Debtor, upon consultation with the Auctioneer, believes may otherwise have an interest in acquiring the Assets, (iv) any party with a lien of record on, or other written asserted interest in, the Assets, (v) the U.S. Trustee and all parties who have filed a notice of appearance and request for service of documents filed in this case pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (collectively referred to herein as the "Auction Notice Parties").

(c)  <u>Information Provided to Interested Parties</u>.  The Auction Notice will include (i) a description of the Assets to be sold, (ii) the date, time and location of the Auction, (iii) a deadline for submitting bids on the Assets, and, if applicable (iv) a deadline to object to the selection of the Stalking Horse, if any, and any proposed Break-Up Fee that is at least five business (5) days after the serving (which shall be deemed upon mailing) of the Auction Notice. If applicable, the Debtor will attach a copy of the Stalking Horse Agreement to the Auction Notice and shall include in the Auction Notice (i) the identity of the Stalking Horse, (ii) the price agreed to by the Stalking Horse, (iii) the amount of any Break-Up Fee and (iv) the amount of the deposit provided by the Stalking Horse. Finally, the Debtor will attach a copy of the Bidding Procedures to the Auction Notice. If no party objects to the Debtor's request for authority to pay the Stalking Horse a Break-Up Fee within five (5) business days after the serving of the Auction Notice, the Stalking Horse break-up fee will be deemed approved under the Bidding Procedures Order, and the Debtor will be authorized to pay the Break-Up Fee on the terms and conditions set forth in the Stalking Horse Agreement, without further order of the Court.

(c)     Publication Notice.  Concurrently with this Procedures Motion, the Debtor will be filing its Application to Employ Auctioneer (the "Auctioneer Motion") seeking Court approval of the Debtor's retention of the Auctioneer for the marketing and sale of the Assets pursuant to the terms outlined in this Procedures Motion.  As more fully discussed in the Auctioneer Motion, the Debtor expects that the Auctioneer will solicit prospective purchasers and act as a liaison between interested parties and the Debtor.  The Auctioneer will also coordinate all due diligence and information requests from the interested parties.  Additionally, the Auctioneer will be responsible for advertising the sale and/or auction of the Assets through print media such as the *Wall Street Journal*, the *Orlando Sentinel*, and *USA Today*, and over the internet via email blasts to all appropriate addresses available through the Auctioneer's email database.

**B.     The Proposed Bidding Procedures**

23.     The Debtor crafted the Bidding Procedures to permit an expedited sale necessitated by the circumstances faced by the Debtor, while simultaneously fostering an orderly and fair sale process that will confirm that the Successful Bidder's is the best and highest bidder for the Assets and promptly identify any other higher and better alternatives.

24.     The Bidding Procedures are set forth in detail in **"Exhibit A"** to the Bidding Procedures Order and are not restated herein.  The Bidding Procedures describe, among other things, the requirements for prospective purchasers to participate in the sale process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a competing bid, the method and criteria for bids to become "qualified", the manner in which bids will be negotiated, clarified, and improved and the criteria for selecting the Successful Bidder.  The Debtors will consider all proposals that are deemed qualified in accordance with the Bidding Procedures.  The Bidding Procedures establish (a) the initial bid consideration and (b) any terms and conditions the Successful Bidder must satisfy to acquire the Assets.

**C.     Certain Related Relief and Provisions**

25.     In conjunction with the procedures and Sale as contemplated herein, the Debtor requests approval of the following (see **"Exhibit B"**):

- Credit Bidding: The Pre-Petition Note A Lenders shall he entitled to credit bid for the Assets at the Auction pursuant to section 363(k) of the Bankruptcy Code.

- Modifications of Bidding Procedures or Conducting an Auction: The Debtor, with the approval of the Pre-Petition Note A Lenders, or the Pre-Petition Note A Lenders may independently at their sole discretion extend an Auction deadline and/or adjourn, continue or suspend the Auction and/or the applicable Sale Hearing for any reason by filing a notice with the Bankruptcy Court and serving such notice on the Auction Notice Parties. At or prior to the Auction, the Debtor with the consent of the Pre-Petition Note A Lenders, may adopt other rules for the Auction that, in the Debtor's reasonable judgment, will better promote the goals of the Auction.

- Closing with Alternative Back-Up Bidders: If, for any reason, the Successful Bidder fails to close the Sale contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtor shall be authorized, with the approval of the Pre-Petition Note A Lenders, to close the Sale with the Bidder that submitted the Next Highest Bid (the "Next Highest Bidder") in accordance with the foregoing procedures.

- Pre-Petition Note A Lenders' Rights: The Pre-Petition Note A Lenders shall have the right to reject the Sale results and/or any auction bid and/or forthwith cancel the Auction sale in the event the sale results prove to be unacceptable to the Pre-Petition Note A Lenders. Pre-Petition Note A Lenders reserve all rights and remedies provided for under the Pre-Filing Agreement, dated in our about October, 2009, which Agreement shall be assumed by the Debtor herein immediately upon entry of the Bid Procedures Order.

**D.    Proposed Stalking Horse Protections**

26.    The Debtor expects that a Stalking Horse will likely require, that in the event a transaction with a different bidder is consummated, a Break-Up Fee. To help ensure that a potential buyer is willing to be the Stalking Horse for the Assets, thereby establishing a floor for the subsequent Auction, the Debtor seeks authority to include a reasonable Break-Up Fee in the Stalking Horse Agreement, subject to the consent from the Pre-Petition Note A Lenders, and in accordance with the amount of typical Break-Up Fees approved for the sale of similar assets under Section 363 of the Bankruptcy Code and/or through a plan of reorganization or liquidation. The amount of the Break-Up Fee will be set forth in the Auction Notice for the Assets. Under

the Bidding Procedures Order, if a party in interest objects to the proposed Break-Up Fee, then it is required to file an Objection with the Court and serve such objection on the Auction Notice Parties within five (5) business days after the serving (which shall be deemed upon mailing) of the Auction Notice.

**E.     Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases**

27.     The following procedures, which may be modified as necessary by further Order of the Court (the "Contract Procedures"), shall govern the assumption and assignment of the certain executory contracts and unexpired leases (the "Designated Agreements") in connection with the sale of the Assets to the Successful Bidder:

(a)     Not less than 13 days prior to the Sale Hearing, the Debtor shall file with this Court and shall serve an Assignment Notice by overnight delivery service upon each non-debtor counterparty to an executory contract or unexpired leases with the Debtor (each a "Non-Debtor Counterparty") that the Debtor intends to assume and assign to the Successful Bidder (the "Designated Agreements"). The Debtor shall attach to the Assignment Notice a list of identifying Non-Debtor Counterparties to the Designated Agreements and the corresponding Cure Costs under the Designated Agreements as of the Closing Date (a date to be set, subject to the approval of the Pre-Petition Note A Lenders) and any additional terms and conditions of assumption or assignment.

(b)     Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the Designated Agreements, including, but not limited to, objections relating to adequate protection of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Notice Parties so as to be received no later than ten days after service of an Assignment Notice (the "Designation and Cure Objection Deadline"). Where a Non-Debtor Counterparty to a Designated Agreement files an objection meeting the requirements of this subsection, objecting to the assumption by the Debtors and assignment to the Purchaser of such Designated Agreement (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), the Debtor, Successful Bidder and Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such

objection without Court intervention. If the Debtor, Non-Debtor Counterparty and Successful Bidder determine that the objection cannot be resolved without judicial intervention, then the determination will be determined by the Court at the Sale Hearing or such earlier date as may be affixed by the Court. If the Court determines at this hearing that the Designated Agreement will not be assumed and assigned, then such executory contract or unexpired lease shall not longer be considered a Designated Agreement, provided, however, that after such determination is made by the Court, the Debtor may redesignate such Designated Agreement and propose a new Cure Cost in accordance with these Contract Procedures, including providing the applicable Non-Debtor Counterparty with the Assignment Notice setting forth the redesignation and proposed Cure Cost of the Designated Agreement.

(c) Any Non-Debtor Counterparty to a Designated Agreement who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Designated Agreement by the Designation and Cure Objection Deadline is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreements, and such party shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtor, its estate, or the Successful Bidder.

(d) If the Non-Debtor Counterparty to a Designated Agreement fails to timely object to the assumption and assignment of a Designated Agreement or the proposed Cure Costs relating thereto by the Designation and Cure Objection Deadline, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtor and assigned to the Successful Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to (f) below.

(e) The Debtor's decision to assume and assign the Designated Agreements is subject to Court approval and consummation of a Sale. The Debtor shall be deemed to have assumed and assigned each of the Designated Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtor under the Bankruptcy Code. Upon entry of the Bid Procedures Order and the assumption of the Pre-Filing Agreement, the parties to the Pre-Filing Agreement shall agree that the deadline for the entry of the Sale Order as provided for under the Pre-Filing Agreement shall be extended through and including March 17, 2010, or such later date as otherwise agreed to by the Pre-Petition Note A Lenders, in writing.

## III. THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED

### A. The Bidding Procedures Should Be Approved

28. Approval of bidding procedures will allow the Debtor to act quickly on market interest in the Assets while also providing interested parties sufficient notice of the proposed sales to submit competing bids, object to the sale, or otherwise be heard as appropriate, as required by Bankruptcy Rules 6004 and 2002 and discussed in more detail below.

29. The proposed Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the sale of the Assets. The Bidding Procedures are designed to attract the maximum number of bidders while allowing the Debtor the flexibility to select the bid that optimizes the value to the Debtor's estate from the sale. Further, the Bidding Procedures are fair and open and do not unfairly favor the Stalking Horse or any other potential purchaser of any of the Assets. Finally, the Bidding Procedures, when combined with the extensive marketing conducted by the Auctioneer prior to and after the execution of a Stalking Horse Agreement, set out a time frame that will allow potential purchasers sufficient time to conduct due diligence, arrange financing, and construct and submit informed competing bids, while still providing for the expeditious sale of the Assets. Based upon the foregoing, the Debtor submits that the Bidding Procedures will help ensure that the highest and best bids are received for the Assets, thereby optimizing the value of the Debtor's estate, and accordingly warrant Court approval.

### B. The Debtor Should Be Granted the Authority to Set and Pay a Reasonable Break-Up Fee

30. The Debtor submits that entering into a Stalking Horse Agreement furthers the purpose of the Auction by ensuring a sale to a contractually committed Stalking Horse purchaser

13

at a price the Debtor believes is fair while also providing the Debtor a chance to enhance the price through an auction process. Accordingly, the Debtor requests authority, in the exercise of its business judgment, to offer any Stalking Horse a Break-Up Fee in an amount to be determined by the Debtor, with the consent of the Pre-Petition Note A Lenders, and in accordance with the amounts of typical Break-Up Fees approved for the sale of similar assets under section 363 of the Bankruptcy Code and/or through a confirmed plan of liquidation or reorganization.

31. The Debtor will exercise prudent business judgment before offering or entering into a Stalking Horse Agreement and will only do so if such agreement, in the Debtor's reasonable business judgment and the consent of the Pre-Petition Note A Lenders, will likely result in the realization of greater value for the Debtor, its estate, and its creditors. The Debtor's ability to offer potential purchasers this protection will likely benefit its estate and creditors as, absent such an incentive, potential purchasers may not be sufficiently induced to submit or increase purchase offers prior to the Auction. Absent a floor, the Auction could produce offers that substantially undervalue the Debtor's assets. Not only may entry into a Stalking Horse Agreement prevent such undervaluation, a Stalking Horse Agreement will establish a higher floor for further offers. Thus, even if a Stalking Horse entitled to a Break-Up Fee is not the Successful Bidder, the Debtor will have benefited from the higher floor established by the Stalking Horse.

32. Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtor and perform the necessary due diligence attendant to the acquisition of the Debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to

the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See. e.g,. In re* 995 *Fifth Ave. Assocs., LP.,* 96 B.R. 24, 28 (Bankr. SD.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

33. The Debtor's election to offer a Break-Up Fee satisfies the "business judgment rule" because the Break-Up Fee will encourage competitive bidding and ultimately result in a benefit to the Debtor's estate. The proposed Break-Up Fee is fair and reasonable in amount, and is reasonably intended to compensate for the risk to the purchaser of being used as a Stalking Horse Bidder. Moreover, the Break-Up Fee will only be paid for the sale of the Assets that solicits a higher and better bid than the Stalking Horse Bid, and ultimately leads to a closing of a sale of the Assets that results in a greater recovery to the Debtor's estate.

34. Bankruptcy courts in this District have approved protections similar to the proposed protections requested herein as reasonable and consistent with the type and range of bidding protection typically approved. *See In re: Clarklift of Orlando, Inc., Case No. 6:07-bk-03154-KSJ; see also In re: Airnet Communication Corporation, Case No. 6:06-bk-01171-ABB.*

C. **The Proposed Manner of Providing Notice for The Auction and the Sale Hearing Is Reasonable and Should Be Approved**

35. Bankruptcy Rule 6004 prescribes the notice that must be given of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code. Pursuant to Bankruptcy Rule 6004(a), notice of a proposed use, sale or lease of property not in the ordinary course of business must satisfy the requirements of Bankruptcy Rule 2002(a)(2), (c)(I), (i) and (k) (as well as section 363(b)(2) of the Bankruptcy Code, which is not applicable here). Bankruptcy Rule

2002(a) requires that "the clerk, or some other person as the court may direct," give "the debtor, the trustee, all creditors and indenture trustees at least 20 days' notice by mail of: ... (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business ...." Subsections (i) and (k) of Bankruptcy Rule 2002 require that the same twenty (20) day notice be given to the Committee and the U.S. Trustee.

36. As described above, the Auction Notice Parties include all of the parties required to be served under the Bankruptcy Rules. In addition, the Debtor proposes providing notice to U.S. Trustee, any Committee appointed in this case, all parties who have filed a notice of appearance and request for service, and certain parties whose rights may he affected by the sale (such as parties with liens on or other interests in the Assets to be sold). The Auction Notice Parties will receive twenty (20) days' notice of the Auction of the Assets, the form of purchase agreement, the Sale Hearing, as well as the terms of the Stalking Horse Bid, if any. Fed. R. Bankr. P. 2002(c)(I).

37. Bankruptcy Rule 6004(c) requires that a motion pursuant to section 363(b) or the Bankruptcy Code for authority to sell property free and clear of liens or other interests "shall be served on the parties who have liens or other interest in the property to be sold." Fed. R. Bankr. P. 6004(c). As noted above, the Auction Notice Parties include holders of liens or other interests in the Assets to be sold. As such, any interest holder in the Assets will be served with copies of the Auction Notice applicable to the Assets in which they hold an interest, the Bidding Procedures, notice of the Sale Hearing, the proposed purchase agreement and sale order, and the Stalking Horse Agreement, if any, at least twenty (20) days prior to the Auction and will be given five (5) business days to object to the selection of the Stalking Horse or the proposed Break-Up Fee amount. Given the ample notice provided by these proposed procedures, any

party failing to object to the proposed sale should be deemed to consent to the treatment of its interest under section 363(f)(2) of the Bankruptcy Code and this Procedures Motion. *See, e.g., FutureSource LLC v. Reuters Ltd., 312* F.3d 281,285 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent."); *Hargrave* v. *Township of Pemberton (In re Tabone, Inc.),* 175 B.R. 855, 858 (Bankr. D.NJ. 1994) (same); *In re Elliot,* 94 B.R. 343 (E.D. Pa. 1988) (same).

### D. The Court Should Waive or Reduce the Stay Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure

38. Pursuant to Rule 6004(h) of the Bankruptcy Rules, unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code arc automatically stayed for ten (10) days after entry of the order. Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for ten (10) days, unless the court orders otherwise, Fed. R. Bankr. P. 6006(d).

39. The Sale Order approving the Bidding Procedures should be effective immediately by providing that the ten (10) day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived. Bankruptcy courts in this District have waived the stay provisions of the Bankruptcy Rules in similar sale situations. *See In re: L.L. Swor, Inc. d/b/a Furniture Country Galleries, Case No. 6:08-bk-12173-ABB.*

17

# NOTICE

40. Notice of this Procedures Motion has been given to the following parties or, in lieu thereof; to their counsel, if known: (i) the Office of the United States Trustee and (ii) the Debtor's pre-petition and post-petition lenders. The Procedures Motion will be served on (a) creditors holding the thirty-five (35) largest unsecured claims against the Debtor as identified in Debtor's business records or their legal counsel (if known); (b) all known holders of Liens against the Debtor's Assets; and (c) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtor respectfully request entry of an order authorizing the relief requested herein and such other and further relief this Court deems just and proper.

**DATED** this 20th day of November 2009

/s/ R. Scott Shuker
R. Scott Shuker, Esquire
Florida Bar No. 984469
Justin M. Luna, Esquire
Florida Bar No. 0037131
**LATHAM, SHUKER, EDEN**
**& BEAUDINE, LLP**
390 N. Orange Avenue, Suite 600
P.O. Box 3353
Orlando, Florida 32802-3353
Telephone: 407-481-5800
Facsimile: 407-481-5801
Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:  CASE NO. 6:09-bk-14833-KSJ

THE VUE-ORLANDO, LLC, a  CHAPTER 11
Delaware limited liability company,

        Debtor.
_____/

### CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the **MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION, PURSUANT TO SECTIONS 105, 363 AND 365 of the bankruptcy code FOR (i) AN ORDER (a) APPROVING BIDDING PROCEDURES AND BIDDER PROTECTIONS FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND (b) SCHEDULING A FINAL SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (ii) AN ORDER (a) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF** has been furnished either electronically and/or by U.S. First Class, postage prepaid mail to: The Vue-Orlando, LLC, Attn: Eric Moskowitz, WESTMINSTER PARTNERS II LLC, PO Box 624, Mundelein, IL 60060; Sovereign Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131 a/f petitioning creditor; Sovereign Bank, c/o Louis T. Delucia, Schiff Hardin LLP, 900 Third Avenue, 23rd Floor, New York, NY 10022 a/f petitioning creditor; Comerica Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131 a/f petitioning creditor; Christopher G. Daniel, Charter One Bank, 53 State Street – MBS 970, Boston, MA 02109; Mega International Commercial Bank Co., Ltd., NY Branch, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131 a/f petitioning creditor; Jack Rubenbauer, Director, Great American Insurance Company, One East 4th St., 3rd Floor, Cincinnati, OH 45202; Jack Rubenbauer, Director, Great American Financial Resources, Inc., One East 4th St., 3rd Floor, Cincinnati, OH 45202; Key Bank, c/o James S. Grodin, Foley & Lardner, PO Box 2193, Orlando, FL, 32802-2193; the U.S. Trustee, 135 West Central Boulevard, Suite 620, Orlando, Florida 32801, and all creditors, as shown on the matrices attached to the original of this motion filed with the Court, this 20th day of November 2009.

                                              /s/ R. Scott Shuker
                                              R. Scott Shuker, Esquire