# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                    CASE NO.  6:09–bk–14833-KSJ

THE VUE-ORLANDO, LLC,                     CHAPTER 11

                    Debtor.

_____/

## DISCLOSURE STATEMENT PURSUANT
## TO 11 U.S.C. §1125, FOR THE VUE-ORLANDO, LLC

COUNSEL FOR DEBTOR

R. SCOTT SHUKER, ESQ.
VICTORIA I. MINKS, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
390 N. ORANGE AVENUE, SUITE 600
ORLANDO, FLORIDA, 32801

February 2, 2010

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                    CASE NO. 6:09–bk–14833–KSJ

THE VUE-ORLANDO, LLC,                     CHAPTER 11

                    Debtor.
_____/

DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125
FOR THE VUE-ORLANDO, LLC

## I.    INTRODUCTION AND SUMMARY

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of § 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy case ("Bankruptcy Case") to make informed judgments about the Plan of Liquidation (the "Plan") submitted by The Vue-Orlando, LLC ("The Vue" or "Debtor"). The Debtor is soliciting votes to accept the Plan. The overall purpose of the Plan is to provide for the restructuring of the Debtor's liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtor believes that the Plan provides the best means currently available for its emergence from Chapter 11 and the best recoveries possible for holders of claims and interests against the Debtor, and thus strongly recommends that you vote to accept the Plan.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT, IN TURN, IS QUALIFIED IN ITS ENTIRETY BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM**

OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY, IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.

NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMAITON CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD-LOOKING STATEMENTS BASED LARGELY ON THE DEBTOR'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITY AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

The Vue is a debtor under Chapter 11 of the Code in the Bankruptcy Case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Federal Rules of Bankruptcy Procedure (the "Rules"), claims asserted against, and equity interests in, the Debtor are placed into classes. The Plan designates four (4) separate classes of claims and interests (the "Classes"). The Plan contemplates paying these Classes at the closing of the sale of the assets of the estate, occurring simultaneously with the Effective Date.

To the extent the legal, contractual, or equitable rights with respect to any claim or interest asserted against the Debtor are altered, modified or changed by treatment proposed under the Plan, such claim or interest is considered "Impaired," and the holder of such claim or interest is entitled to vote in favor of or against the Plan. A ballot for voting in favor or against the Plan ("Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE <u>RECEIVED</u> AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

### <u>VOTING DEADLINE</u>

The last day to vote to accept or reject the Plan is _____, 2010. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Court will

schedule a hearing (the "Confirmation Hearing") to consider whether the Debtor has complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtor has expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.   DESCRIPTION OF DEBTOR'S BUSINESS

A.   In General

The Vue is a Delaware limited liability company and the owner and operator of a 36-story, 375 unit luxury residential condominium building comprised of studio, one-bedroom, two-bedroom and penthouse units (the "Units") and located in the heart of downtown Orlando, which is known as The Vue at Lake Eola (the "Project"). The Vue boasts a variety of amenities, including, but not limited to: a roof-top pool, tennis court, observation deck, large fitness center (the "Amenities"), as well as a concierge and 24-hour doorman. The Units were originally forecast to sell at the approximate price of $494,000 or $395 per square foot.

On or about July 20, 2004, the Debtor was formed through the execution of an operating agreement establishing Liberty Place-Orlando, LLC as its managing member and Orlando Vue Limited Partnership as its PC Member. The purpose of the Debtor was to execute the Project by: (i) acquiring the land (the "Property"); (ii) causing the Project to be constructed on the land; (iii) causing the Units (defined below) to be sold; and (iv) accounting for and distributing profits derived from the sale of the Units.

The Debtor acquired the Property and oversaw the construction of the Project. On or about September 21, 2005, the Debtor executed and delivered to KeyBank National Association ("Key Bank") an original note in the original principal amount of $124,000.000.00 (the "Original Note"). The Original Note was made pursuant to a construction loan agreement dated September 21, 2005 (the "Original Loan Agreement"). The Original Note and the obligations under it are secured by, among other things: (1) that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated September 21, 2005, between the Debtor and KeyBank as the Administrative Agent, as described in Schedule C of the Co-Lender Agreement, and all other personal and other property described in the Security Agreement (the "Security Instrument"); (2) that certain Conditional Assignment of Condominium Unit Sale Contracts, Condominium Documents, and Condominium Developer Rights, dated September 21, 2005, executed by the Debtor in favor of KeyBank as the Administrative Agent and that certain Assignment of Plans and Contracts dated September 21, 2005, executed by the Debtor in favor of Key Bank as the Administrative Agent (the "Assignment Agreement"); and (3) other documents executed or delivered to Key Bank as the Administrative Agent in connection with the Original Loan Agreement. The documents referenced in clauses (1) through (3) above and the other documents that evidence and secure this loan, excluding the Original Loan Agreement and the Original Note are collectively referred to as the "Other Loan Documents."

The Original Note was replaced pre-petition with the following: (1) First Tier Substitute Promissory Note-A in the amount of $104,900,000.00, dated February 2006; and (2) First Tier Substitute Promissory Note-B in the amount of $19,100,000.00, dated February 2006. The First Tier Substitute Note-A and the First Tier Substitute Note-B are referred to, collectively, as the "First Tier Substitute Notes."

First Tier Substitute Note-A was thereafter replaced pre-petition with Second Tier Substitute Promissory Notes A-1, A-2, A-3, A-4, A-5a, A-6, A-7 and A-8 (collectively, "Note A") dated February 2006 in the aggregate principal amount of $104,900,000, executed by the Debtor in favor of Charter One Bank, NA ("Charter One"), Comerica Bank ("Comerica"), CommerceBank, NA, Great American Financial Resources, Inc. ("GAFR"), Great American Insurance Co., Key Bank, Mega International Commercial Bank of China, NY Branch ("Mega"), and Sovereign Bank ("Sovereign"), (collectively, the "Note A Lenders").

First Tier Substitute Note-B was likewise replaced with Second Tier Substitute Promissory Notes B-1 and B-2 (collectively, "Note B") dated February 2006, in the aggregate principal amount of $19,100,000, executed by the Debtor in favor of Key Bank and First Bank & Trust of Illinois, (collectively, the "Note B Lenders"). Note A and Note B (the "Substitute Notes") continue to be secured pursuant to the Original Loan Agreement and the Other Loan Documents (collectively, the "Loan Documents").

B.    Significant Developments and Events Leading to Bankruptcy Filing

In 2008, sales of Units slowed considerably and the Debtor's cash flow was unable to keep up with its loan obligations. Furthermore, and as a result of a variety of lawsuits that resulted in judgments, the Debtor was hindered from selling additional Units. The Debtor defaulted pre-petition under the Loan Documents for, among other defaults, failing to pay the monthly payments that were due under the Loan Documents. As a result of the defaults, Sovereign, Comerica, Mega, Charter One and GAFR (collectively, the "Petitioning Creditors") accelerated the remaining payments owing under the Loan Documents. On October 1, 2009 (the "Petition Date"), the Petitioning Creditors filed a Chapter 7 involuntary petition for relief for the Debtor, pursuant to 11 U.S.C. § 303(b) (the "Involuntary Petition") (Doc. No. 1).

C.    Events Subsequent to Chapter 7 Filing

Subsequent to the filing of the Involuntary Petition, the Debtor determined it was in the best interests of creditors to have the case converted to a case under Chapter 11. Consequently, on or about November 3, 2009, the Debtor consented to the Chapter 7 filing and converted the Chapter 7 case to a case under Chapter 11 of the Code (Doc. No. 12). On November 4, 2009, the Court entered an Order granting the Debtor's conversion request. (Doc. No. 16).

Since the Petition Date, the Debtor has continued to operate its business as a debtor-in-possession under Section 1107 and 1108 of the Code. No Official Committee of Unsecured Creditors (the "Committee"), trustee or examiner has been appointed in this case. On December 28, 2009, this Court entered an Order authorizing the Debtor's entry into a secured debtor-in-possession credit facility. (Doc. No. 105).

As of the Petition Date, the Debtor owes the Note A Lenders the aggregate sum of approximately $30,977,680.60, plus accrued interest, late fees, costs, and attorneys' fees (the "Note A Indebtedness"). The Debtor owes the Note B Lenders the aggregate sum of approximately $29,538,333.32, plus accrued interest, late fees, costs and attorneys' fees (the "Note B Indebtedness"). The Note A Indebtedness and the Note B Indebtedness is owing to the Note A Lenders and Note B Lenders without any offset, deduction, counterclaim or defense.

Of the 375 Units comprising the Project, 210 have been sold to private individuals or entities (the Units still owned by the Debtor, shall hereinafter be referred to as the "Units"). As of November 20, 2009, 165 of the Units remain unsold. On or about November 20, 2009, the Debtor filed a motion, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for (I) an Order (A) Approving Bidding Procedures and Bidder Protections for the Sale of Substantially all

of the Debtor's Assets and (B) Scheduling a Final Sale Hearing and Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Authorizing the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Certain Related Relief (the "Bidding and Sale Motion") (Doc. No. 55). The Bidding and Sale Motion was approved on December 28, 2009. (Doc. No.106) (the "Sales Procedures Order"). The sale of the Debtor's assets (the "Sale") will be conducted pursuant to the Sales Procedure Order, which is attached hereto as **Exhibit "A."**

Prior to the Petition Date (and the commencement of the involuntary Chapter 7 case), the Debtor aggressively marketed its assets for sale, and collaborated with its Lenders in an effort to market and sell the Debtor's Units by private or bulk sale. The marketing efforts were largely executed through the Debtor's internal marketing staff, without separate brokerage agreements with third parties.

On December 28, 2009, this Court entered its Order Approving Application to Employ/Retain Fisher Auction Com, Inc. as Real Estate Auctioneer for the Property (Doc No. 108). The Debtor has worked with the Auctioneer to develop reasonable bidding procedures to maximize potential recoveries resulting from the sale of the assets. The Debtor believes that the procedures set in the Sales Procedures Order provide for the best opportunity to maximize the value of the Debtor's assets for the benefit of the estate and its creditors.

### III.   THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTOR'S PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    Overview.

In summary, the Debtor shall sell its real and personal property on the Closing Date and pursuant to the Sales Procedures Order. The Allowed Secured Claims will be paid and treated as set forth below and under the Plan. Allowed Priority Claims will also be paid from the Sale, and Allowed Unsecured Claims will receive their pro rata distribution of Causes of Action and Lien Free assets. The Equity Interest in Debtor are being extinguished and such Class is Impaired.

All Claims against the Debtor shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains four (4) classes of Claims and Interests. There are two (2) classes of Secured Claims, one (1) class of Unsecured Claims, and one (1) class of Interests.

Overall, the Plan provides that the Sale will be approved at Confirmation and the Closing Date will occur on the Effective Date. Except as noted in the Sales Proceedings Order, the Property will be sold free and clear of any and all encumbrances. The assets subject to the Sale are set forth in the Sales and Procedure Order.

Holders of Allowed Administrative Claims and Allowed Priority Claims will be paid in full from the Sales Proceeds. The Holder of the Allowed Secured Class 2 Claim will also be paid in full from the Sales Proceeds. The Holder of the Allowed Secured Class 1 Claim will be paid through the Sales Proceeds.

Holders of Allowed Unsecured Claims shall receive, in full satisfaction of their Allowed Unsecured Claims, Pro Rata Distribution from the Causes of Action and from liquidation of lien free assets.

Holders of Interests in Class 4 will be extinguished.

B.    Classification and Treatment of Claims.

    1.    Priority Claims.

        a.    Administrative Expense Claims.

Holders of all allowed Administrative Expense Claims of the Debtors shall be paid in full on the Effective Date, or, if the Claim does not become Allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Court. However, nothing in this provision of the Plan shall preclude the Debtor from paying any holder of a Nonordinary Course Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date, provided that such Claim holder consents to different payment terms. Debtor estimates Administrative Claims to be less than $50,000.00.

        b.    Priority Tax Claims.

Except to the extent that the Holders and the Debtor have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall be paid by the Purchaser, in an amount equal to the Allowed Priority Tax Claim. The Payment shall occur at Closing. Payments will commence on the later of the Effective Date or on such date as a respective Priority Tax Claim becomes Allowed. The Debtor estimates that the filed amount of Priority Tax Claims, other than the Class 2 Claims, is less than $5,000.00.

        c.    Priority Deposit Claims.

Except to the extent that the Holder and the Debtor have agreed or may agree to a different treatment, each Holder of an Allowed Priority Deposit Claim shall be paid, by the Purchaser, payments equal to the Allowed Priority Deposit Claim, which in no event, shall exceed $2,425 as delineated under 11 U.S.C. § 507(a)(7). The Allowed Deposit Claims will

be paid from the Sale at Closing. The Debtor estimates that the filed amount of Priority Deposit Claims is approximately $25,000.00; however, the Debtor believes that the total amount of Allowed Priority Deposit Claims will be significantly reduced or not allowed in their entirety. To the extent a Holder of an Allowed Priority Deposit Claim has an Allowed Claim in excess of the priority amount of $2,425.00, such Allowed Claim shall be included in Class 3.

     2.    <u>Secured Claims.</u>

     a.    <u>Class 1 – Note A Lenders and Note B Lenders.</u> Class 1 consists of the Allowed Secured Claims of Note A Lenders and Note B Lenders. These Claims are secured by Liens on all assets of the Debtor, except Causes of Action (the "Note A and Note B Lenders' Property"). The Note A and Note B Lenders shall retain their first priority lien on the Note A and Note B Lenders' Property. In full satisfaction of their Allowed Class 1 Claims, the Note A and Note B Lenders shall be paid at Closing. If the Note A and Note B Lenders are not the Purchasers, they shall receive, in full satisfaction of their Allowed Class 1 Claim, the net proceeds of the Sale at Closing after payment of all closing costs, all Allowed Priority Claims, and the payments required to the holders of Allowed Claims of Class 2. If the Note A and Note B Lenders are the Purchasers, their credit bid will be deemed in full satisfaction of their Allowed Class 1 Claim.

     b.    <u>Class 2 – Orange County Tax Collector</u>

     Class 2 consists of the Allowed Secured Claim of the Orange County Tax Collector ("Orange County"), which is secured by a first priority Lien on the following Debtor's real property: 150 East Robinson Street, Orlando, Florida 32801 (the "Real Property").

In full satisfaction of its Allowed Secured Claim, Orange County shall be paid at Closing from the Sales Proceeds.

3.      Unsecured Claims

a.      Class 3 – Unsecured Claims.

Class 3 consists of all Allowed Unsecured Claims against the Debtor. In full satisfaction of the Allowed Class 3 Claims, holders of such claims shall receive a pro rata share of any net proceeds of the Causes of Action or any assets which are not encumbered by Liens and not acquired by the Purchaser. Distribution to Holders of Allowed Class 3 Claims is speculative and it is possible such parties will receive no distribution.

4.      Equity Interests

a.      Class 4 – Equity Interests

Class 4 consists of all equitable interests in the Debtor. All currently issued and outstanding Equity Interests in the Debtor shall be extinguished on the Effective Date.

C.      Means of Implementation.

1.      Sale.

The Plan is premised upon, and will be fully funded by, the Sale. Confirmation will be contemporaneous with Bankruptcy Court approval of the Sale, and Debtor will cease all active operations at Closing.

2.      Funds Generated During Chapter 11.

All cash in excess of operating expenses generated from operations until the Effective Date will be used for Plan Payments.

3.     Liquidating Debtor.

After Confirmation, the common stock of the Equity Holder shall be extinguished and the Liquidating Debtor will exist only to carry out remaining duties under the Plan.

4.     Operation of Liquidating Debtor.

On the Effective Date, and for the benefit of the Holders of Allowed Claims in Class 3, Mr. Terry Soifer shall be appointed as the manager of the Liquidating Debtor. All inner-company claims will be extinguished on the Effective Date. The Liquidating Debtor shall make any payments to Class 3 under the Plan. Debtor has not performed an analysis as to Causes of Action under Bankruptcy Code §§ 544-550 and have no estimate of potential recoveries. Any net proceeds from the Causes of Action will be paid *pro rata* to the Allowed Class 3 Claims. After such time, the Liquidating Debtor shall have no further obligation and relinquishes all powers and authority. Mr. Soifer shall be paid at the rate of $250.00 per hour from the first proceeds of the Causes of Action or Lien Free assets.

D.     Other Provisions.

1.     Leases and Executory Contracts.

The Plan provides that the Debtor shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not rejected by such date, then such unexpired lease or executory contract shall be deemed rejected. It is the position of the Debtor that the executory contracts listed in the respective Schedules of Executory Contracts filed pursuant to Rule 1007, are the only executory contracts to which the Debtor was a party on the Petition Date. To the extent the Purchaser desires to take assignment of any

executory contracts, Debtor will assume and assign such to Purchaser and the economic cure on any assigned contract will occur at Closing.

 2. Procedures for Resolving Disputed Claims.

 a. Prosecution of Objections to Claims.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, the Debtor shall have the exclusive right to make and file objections to all Claims. All objections commenced prior to the Confirmation Date shall be finished by Reorganized Debtors.

Pursuant to the Plan, unless another time is set by order of the Bankruptcy Court, all objections to Claims and Equity Interests shall be filed with the Court and served upon the Holders of each of the Claims and Equity Interests to which objections are made within 90 days after the Confirmation Date.

Except as may be specifically set forth in the Plan, nothing in the Plan, the Disclosure Statement, the Confirmation Order or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that, the Debtor had immediately prior to the commencement of this Bankruptcy Case, against or with respect to any Claim or Equity Interest. Except as set forth in the Plan, upon Confirmation, the Debtor shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtor had immediately prior to the commencement of its Bankruptcy Case as if the Bankruptcy Case had not been commenced.

b.    Estimation of Claims.

Pursuant to the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent, disputed or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.   In the event that the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

c.    Cumulative Remedies.

In accordance with the Plan, all of the aforementioned Claims objections, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.   Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.   Until such time as an Administrative Claim, Claim or Equity Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim or Disputed Equity Interest for purposes related to allocations, Distributions, and voting under the Plan.

d.    Payments and Distributions on Disputed Claims.

As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Reorganized Debtor's Cash and Assets, such that

the Holder of such Allowed Claim receives all payments and Distributions to which such Holder is entitled under the Plan in order to bring payments to the affected Claimants current with the other participants in the particular Class in question. Except as otherwise provided in the Plan, no partial payments and no partial Distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a Distribution until such dispute is resolved by settlement or Final Order.

e.      Allowance of Claims and Interests

(i).      Disallowance of Claims

According to the Plan, all Claims held by entities against whom the Debtor has obtained a Final Order establishing liability for a cause of action under Sections 542, 543, 522(f), 522(h), 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code ("Causes of Action") shall be deemed disallowed pursuant to Section 502(d) of the Bankruptcy Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Entity have been settled or resolved by a Final Order and all sums due the Debtor by that Entity are turned over to the Debtor. The Debtor reserves and shall have the exclusive right and authority to bring any Causes of Action.

(ii).      Allowance of Claims

Except as expressly provided in the Plan, no Claim or Equity Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in this Cases, unless and until such Claim or Equity Interest is deemed allowed

under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Bankruptcy Case allowing such Claim or Equity Interest.

      f.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Equity Interests or any Class of Claims or Equity Interests are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date.  If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

      3.      Effect of Confirmation.

      a.      Authority to Effectuate the Plan.  Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court.  The Confirmation Order will act as an order modifying the Debtor's by-laws such that the provisions of this Plan can be effectuated.  The Reorganized Debtor shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve Consummation and carry out the Plan.

      b.      Post-Confirmation Status Report.  Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtor will file status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report will be served on the United States Trustee, and those parties who have requested special notice post-confirmation.  The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## IV.   **CONFIRMATION**

### A.   Confirmation Hearing.

Section 1128 of the Code requires the Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing.  Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for the Debtor:

R. Scott Shuker, Esquire
Latham Shuker Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801

Debtor:

The Vue-Orlando, LLC
Attn: Eric Moskowitz
Westminster Partners II, LLC
P.O. Box 624
Mundelein, Illinois 60060

### B.   Financial Information Relevant to Confirmation.

Attached as an Exhibit to the original of the Disclosure Statement filed with the Court, and incorporated herein, is the following:

**Exhibit "B"** is a copy of the Debtor's Chapter 7 liquidation analysis ("Liquidation Analysis") establishing that Creditors of the Debtor will fair materially poorer in the event the Debtor was forced into Chapter 7 as compared to the Plan.

C. Confirmation Standards

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and complies with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. The Debtor believes that the Plan satisfies all of the requirements for Confirmation.

1. Best Interests Test.

Before the Plan may be confirmed, the Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtor believes that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if the Debtor was liquidated, the Court must determine how the assets and properties of the Debtor would be liquidated and distributed in the context of a Chapter 7 liquidation case.

The Debtor's costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by the Debtor during the Chapter 11 Case, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors and holders of Equity Interests would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Debtor has carefully considered the probably effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

a.       the possible costs and expenses of the Chapter 7 trustee or trustees;

b.       the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtor's assets caused by the forced Chapter 7 liquidation; and

c.       the possible substantial increase in Claims, which would rank prior to or on parity with those of Unsecured Creditors.

2.       <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization,

of the Debtor, unless the liquidation is proposed in the Plan. Because the Plan contemplates Liquidation, this aspect is not relevant.

        3.      <u>Acceptance by Impaired Classes</u>.

        The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

        A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

        4.      <u>Confirmation Without Acceptance by all Impaired Classes; "Cramdown."</u>

        The Code contains provisions that enable the Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims. Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable
>
> requirements of subsection (a) of this section other than paragraph

(8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and had not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**THE DEBTOR BELIEVES THAT, IF NECESSARY, IT WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

a. <u>Consummation</u>.

The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Court, the Effective Date occurs, and the Reorganized Debtor and applicable parties reach agreement on any required documents. It will not be necessary for the Reorganized Debtor to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

b. <u>Exculpation from Liability</u>.

The Debtor, the Reorganized Debtor, their respective members, managers, and executive officers, and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken

in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Reorganization Case; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to the Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtor, and their respective agents have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law, or any agreement, including the Post Confirmation Credit Facility. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Debtor's members, managers, executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

    c.   <u>Police Power</u>.

Nothing in this Article IV shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtor for any act, omission, or event occurring prior to the Confirmation Date to the extent such monetary claims are discharged pursuant to Section 1141 of the Code.

G.    <u>Revocation and Withdrawal of this Plan</u>.   The Debtor reserves the right to withdraw this Plan at any time before entry of the Confirmation Order. If (i) the Debtor revokes and withdraws this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (iv) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.    <u>Modification of Plan</u>.   The Debtor may seek to amend or modify this Plan in accordance with § 1127(b) of the Bankruptcy Code, or remedy and defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

On or before substantial consummation of the Plan, the Debtor may issue, execute, deliver, or file with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## V.     **ALTERNATIVE TO THE PLAN**.

If the Plan is not confirmed and consummated, the Debtor believes that the most likely alternative is a liquidation of the Debtor under Chapter 7 of the Code. In a liquidation or sale, the Debtor believes the deficiency claims from the secured lenders could be as much as $40,000,000.00, and, as such, the pool of Allowed Unsecured (Class 3) Claims would be increased and the dividend to such group greatly diminished. The Debtor believes that liquidation of all real and personal property in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to Creditors in accordance with the priorities established by the Code. The Debtor's analysis of the probable recovery to Creditors and holders of equity Interest is set forth in the Liquidation Analysis.

## VI.     **CONCLUSION**

The Debtor recommends that holders of Claims and Interests vote to accept the Plan.

**DATED** this 2nd day of February 2010 in Orlando, Florida.

/s/ R. Scott Shuker
R. Scott Shuker, Esquire
Florida Bar No. 0984469
Justin Luna, Esquire
Florida Bar No. 0037131
Victoria I. Minks, Esquire
Florida Bar No. 0064388
Latham Shuker Eden & Beaudine, LLP
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800

EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:                                              **CASE NO. 6:09-14833-KSJ**

**THE VUE-ORLANDO, LLC,**                           **CHAPTER 11**

                        **Debtor.**

_____

## ORDER GRANTING DEBTOR'S MOTION FOR ORDER
## APPROVING BID PROCEDURES, SALE PROCEDURES AND BID PROTECTIONS

**THIS CASE** came on for final evidentiary hearing on December 9, 2009 ("Hearing"), on the

motion of **THE VUE-ORLANDO, LLC** (the "Debtor"), for entry of an order: authorizing and

approving bid procedures, sale procedures and bid protections (the "Motion") (Doc. No. 55). The

Hearing was scheduled as a final evidentiary hearing and notice of the Hearing was provided by

electronic transmission, facsimile, and/or United States first class mail to the secured creditors, the

twenty largest unsecured creditors, all parties in interest, and the United States Trustee.

Upon consideration of the Motion, the objections filed by Becky Kwitowski and Clifford

Kwitowski (the "Kwitowski Objection")(Doc. No. 83), First Bank and Trust Company of Illinois

("First Bank")(Doc. No. 88), and The Vue At Lake Eola Condominium Association, Inc. (Doc. No.

93)(collectively, the "Objections"), the Response of KeyBank, N.A. to the First Bank objection (Doc.

No. 92), the *ore tenus* modifications to the Motion announced by the Debtor at the Hearing (the

"Modifications"), the evidence taken at the Hearing, and the position of the United States Trustee

and all creditors and parties in interest present at the Hearing, and to the extent the Objections were

filed, all such objections have been compromised, withdrawn or overruled, and having found due and

proper notice of the Motion and Hearing, IT IS HEREBY FOUND AND DETERMINED AS FOLLOWS:

A.    This Court has subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334.

B.    Consideration of the Motion and the relief requested therein in a core proceeding pursuant to 28 U.S.C. §157(b)(2).

C.    Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Sufficient notice of the Motion and the Hearing was given in accordance with the applicable Bankruptcy Rules and Local Bankruptcy Rules of this Court and as otherwise required by applicable law.  No other or additional notice is required.

E.    The findings and conclusions set forth in this Order constitute the Court's findings of facts and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

F.    The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED:**

1.    The Motion and the Modifications are granted to the extent provided herein, the Kwitowski Objection is overruled, and all other objections are denied as moot based on the Modifications as set forth herein.

2.    The Bidding Procedures, Notice Procedures, and Sale Procedures are approved as set forth in **Exhibit "A"** attached hereto.

3.    Any party who intends to submit an offer to purchase the Assets must comply with the procedures set forth in **Exhibit "A"** of this Order, to be considered at the Auction and Sale Hearing.

EXHIBIT A

4.      The Debtor and/or the Debtor's Auctioneer shall have the bid packages, including the marketing materials, available for distribution in electronic form no later than January 10, 2010.

5.      All interested parties and potential bidders have until 4:00 pm on March 10, 2010 (the "Bid Deadline") to submit a Qualified Bid to the Notice Parties, as defined in the attached **Exhibit "A"**.

6.      All interested parties shall have the right to review Qualified Bids after such time that the Debtor and/or the Debtor's Auctioneer deems a bid a Qualified Bid, as defined in the attached **Exhibit "A", but such time shall be no later than March 11, 2010**. The Auction shall be held on or before March 15, 2010 at 11:00 A.M. The Auction shall not be delayed, cancelled or moved without an order from this Court.

7.      The initial minimum bid at the Auction must represent a purchase price of Twenty Million Dollars and No Cents ($20,000,000.00).

8.      Any bidder shall keep any information obtained from the Debtor, any other party, or their respective attorneys, representatives, employees, or affiliates, in connection with due diligence conducted related to the sale of the Assets, confidential.

9.      First Bank and Trust Company of Illinois and Keybank N.A. (collectively, the "Note B Lender") and the Pre-Petition Note A Lenders entered into a co-lender Agreement in February 2006 (the "Co-Lender Agreement"). The outstanding balance due to the Pre-Petition Note A Lenders under the Pre-Petition Secured Loan Document totals $31,411,319.05 as of the Petition Date, plus any interest, fees or other charges accruing thereon as authorized under the Pre-Petition Secured Loan Documents (the "Note A Pre-Petition Indebtedness"). The outstanding balance due to the Note B Lender totals $29,538,333.32 as of the Petition Date, plus any interest, fees or other charges accruing thereon (the "Note B Pre-Petition Indebtedness").

10.     KeyBank, N.A., as the administrative agent under the Co-Lender Agreement, as further defined by the DIP Credit Agreement (the "Agent"), and pursuant to Section 363(k), shall have the exclusive right to credit bid on behalf of the Pre-Petition Note A Lenders and the Note B Lender.

11.     However, the entry of this Order shall have no impact on any and all rights and obligations of the parties under any enforceable agreement executed by and between the Pre-Petition Note A Lenders and the Note B Lender, including but not limited to the Co-Lender Agreement.

12.     The sale of the Assets shall include any and all personal property of the Debtor which shall be disclosed on the Debtor's schedules and shall be disclosed in bid packages to potential bidders.

13.     Within ten (10) days of entry of this Order, the Debtor shall amend its schedules identifying with specificity, any and all personal property which the Debtor intends to sell at the Auction.  Within ten (10) days after the filing the schedule, the Vue at Lake Eola Condominium Association (the "Association") may file its objections related solely to the inclusion of designated personal property, if any, with this Court.  If any objections are filed by the Association, a hearing shall be scheduled on the objections.  Notwithstanding the foregoing, the Assets shall not include common elements or Association property as defined in Section 718.103, Florida Statutes. common areas, property of the existing unit owners or of the Association, personal property of the Association or which a unit owner (other than the Debtor) has an undivided interest or which may constitute an appurtenance, or such items which are required to be delivered to the Association at turnover in accordance with Section 718.301(4), Florida Statutes.

14.    The sale of the Assets shall be free and clear of any and all security interests, mortgages, judgments, encumbrances, interests, restrictions of any kind and liens (collectively, "Interests"), except for 2009 and subsequent years' *ad valorem* taxes and except for: covenants, rights, and obligations arising from or out of that certain Declaration of Condominium of The Vue at Lake Eola, a Condominium recorded in Official Records Book 09444, Page 3009, Public Records of Orange County, Florida, any timely and duly recorded amendments thereto and the Association's by-laws, articles of incorporation and rules and regulations (the "Condominium Declarations"), the provisions of the provisions of the Florida Condominium Act, Chapter 718, Florida Statutes ("Act"); the provisions of Chapter 61B, Florida Administrative Code ("Administrative Rules"); The Interests, after the sale of the Assets and entry of a final Sale Order, shall attach to the proceeds of the purchase price paid by the Successful Bidder of the Assets in the order of their priority, with the same validity, force and effect which they now have as against the Debtor, subject to any claims and defenses of the Debtor may possess with respect thereto.

15.    The approval of the sale of the Assets to the Successful Bidder shall be heard on March 17, 2009 at 10:15 A.M. (the "Sale Hearing").

16.    The Pre-Filing Agreement referenced in Exhibit B to the Motion shall not be assumed by the Debtor by entry of this Order and the Court makes no determination as to the validity of or any rights of any parties regarding the Pre-Filing Agreement.

EXHIBIT A

17.     This Court finds that notice of the Hearing was sufficient and that this Court has jurisdiction over this matter.  This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**DONE and ORDERED** on December 28, 2009.

_____
**KAREN S. JENNEMANN**
United States Bankruptcy Judge

## EXHIBIT A

Copies to:

The Vue-Orlando, LLC, Attn: Eric Moskowitz, WESTMINSTER PARTNERS II LLC, PO Box 624, Mundelein, IL 60060;

R. Scott Shuker, Esq. and Justin M. Luna, Esq., Latham, Shuker, Eden & Beaudine, LLP (attorneys for Debtor), P.O. BOX 3353, Orlando, FL 32802-3353;

Sovereign Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Sovereign Bank, c/o Louis T. DeLucia, Schiff Hardin LLP, 900 Third Avenue, 23rd Floor, New York, NY 10022;

Comerica Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Christopher G. Daniel, Charter One Bank, 53 State Street – MBS 970, Boston, MA 02109;

Mega International Commercial Bank Co., Ltd., NY Branch, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Jack Rubenbauer, Director, Great American Insurance Company, One East 4th St., 3rd Floor, Cincinnati, OH 45202;

Key Bank, c/o James S. Grodin, Foley & Lardner, P.O. Box 2193, Orlando, FL 32802-2193;

Churchill Development Group, c/o Robert S. Hoofman, P.O. Box 3146, Orlando, FL 32802-3146;

Richard B. Webber II, Zimmerman Kiser & Sutcliffe, 315 East Robinson St., Ste. 600, Orlando, FL 32801-4341;

First Bank & Trust Company, Attn: Jeffrey W. Warren, P.O. Box 3913, Tampa, FL 33601-3913

All Creditors; and

U.S. Trustee, 135 West Central Boulevard, Suite 620, Orlando, FL 32801.

## EXHIBIT A

## BIDDING PROCEDURES FOR THE ASSETS

### BID PROCEDURES

Set forth below are the bidding procedures (the "Bid Procedures") to be employed with respect to the selection of the highest and best bids for the sale by the Debtor, The Vue -Orlando, LLC "Seller" or the "Debtor") of certain personal property and real property located in 150 East Robinson Street, Orlando, Florida, as more particularly described on **Exhibit A** attached to the original of the Bid Procedures Motion and the schedule of personal property as disclosed on Schedule B of the Debtor's filed schedules and any amendments thereto (collectively, the "Assets").   As set forth in more detail below, the Debtor will conduct an auction (the "Auction") for the sale (the "Sale") of the Assets if one or more Qualified Bids (as defined below) are timely submitted, which Sale is subject to the Order Granting Debtor's Motion for Order Approving Bid Procedures, Sale Procedures and Bid Protections ("Bid Procedures Order")(Doc. No.    ).

### BREAK-UP FEE

The Debtor has retained the right, subject to the prior approval of the Agent, as defined in the Bid Procedures Order, to enter into a "stalking horse" agreement (the "Stalking Horse Agreement"), with a bidder to be selected by the Debtor, with the prior written approval of the Agent (the "Stalking Horse Bidder"), governing the purchase of the Assets by the Stalking Horse Bidder.  The Stalking Horse Agreement may provide for a break-up fee plus fees and expenses incurred by the Stalking Horse Bidder in connection with the Auction and Sale to be paid to the Stalking Horse Bidder in the event that the Stalking Horse Bidder is not the purchaser of the Assets (the "Break-Up Fee").  The amount of the Break-Up Fee may be considered by the Debtor in determining the highest and best bid and the net value that the Debtor and their estates will realize at any Auction.

### OBTAINING DUE DILIGENCE ACCESS

The Debtor (or a broker retained by the Debtor) shall afford each Bidder reasonable due diligence information, including, without limitation, the due diligence information provided to the Stalking Horse Bidder.  Upon request, the Debtor shall provide site access to each potential bidder to the extent requested to conduct reasonable due diligence.  The due diligence period will end on the Bid Deadline (as defined below).

The Debtor shall give each potential bidder reasonable access to all written due diligence information provided to another potential bidder, and shall provide substantially the same site access to each bidder.  The Debtor reserves the right to require that potential bidders sign a form of nondisclosure agreement approved by the Debtor and the Agent as a condition to receiving due diligence information.  The Debtor shall coordinate all reasonable requests for additional information and due diligence access from potential bidders through its court approved Auctioneers and other professionals.

No conditions relating to the completion of due diligence shall be permitted to exist after the Bid Deadline.

## BID DEADLINE

The deadline for submitting bids by a Bidder shall be March 10, 2010 at 4:00 p.m. (Eastern Time) (the "Bid Deadline").

Prior to the Bid Deadline, a Bidder that desires to make a bid shall deliver written copies of its bid to (i) the Debtor, c/o The Vue-Orlando, LLC, 150 East Robinson Street, Orlando, Florida; Attn: Charles Johanns; (ii) the Debtor's Auctioneer, Fisher Auction Company Inc., 619 East Atlantic Boulevard, Pompano Beach, Florida 33060; Attn Lamar Fisher; Fax: 954-782-8143; (iii) the Debtor's bankruptcy counsel, Latham, Shuker, Eden & Beaudine, LLP, 390 N. Orange Avenue, Suite 600, P.O. Box 3353, Orlando, Florida, 32802-3353; Attn: R. Scott Shuker and Justin M. Luna; Fax: 407-481-5801; (iv) counsel to the Agent, KeyBank National Association, Foley & Lardner, LLP, 111 North Orange Avenue, Suite 1800, Orlando, Florida 32801; Attn: James Grodin, Esq.; Fax: 407-648-1743; (v) counsel for all other Pre-Petition Note A Lenders, Schiff Hardin LLP, 900 Third Avenue, Twenty-Third Floor, New York, NY 10022, Attn: Louis T. DeLucia and Alyson M. Fiedler, Fax: 212-753-5044; (vi) counsel for First Bank and Trust Company of Illinois, Bush Ross, P.A., 1801 N. Highland Avenue, Tampa, Florida 33602, Attn: Jeffrey Warren and Adam Lawton Alpert, Fax: 813-223-9620; and  (vii) counsel for any committee appointed in these cases (the "Notice Parties").

## QUALIFIED BID REQUIREMENTS

A bid must be a written irrevocable offer (i) stating that the bidder offers as a starting bid of at least $20,000,000 (the "Initial Bid") to consummate a Sale; (ii) confirming that the offer shall remain open and irrevocable until the closing; of a Sale to the Successful Bidder or the Next highest Bidder (both as defined below); (iii) enclosing a copy of the proposed bid; and (iv) enclosing a certified or bank check, wire transfer, or letter of credit reasonably acceptable to the Debtor and the Agent equal to a percentage of the amount of the Qualified Bid to be set by the Debtor (after consultation with the Agent)(the "Minimum Deposit"). No liens of any creditors of the Debtor shall attach or be deemed to attach to the Minimum Deposit until and unless a Sale to the bidder making the Minimum Deposit occurs or the bidder forfeits its deposit in accordance with the procedures set forth herein.  All bids will be considered, but the Agent reserves its right to reject any or all bids.

To be a Qualified Bid, any bid for the Assets must:

(a)    be a written irrevocable offer from a bidder (i) stating that the bidder offers to consummate a Sale; (ii) confirming that the offer shall remain open and irrevocable until the closing of a Sale to the Successful Bidder or the Next Highest Bidder (as defined below); (iii) enclosing a copy of the proposed bid; and (iv) enclosing a certified or bank check,

2

EXHIBIT A

wire transfer, or letter of credit reasonably acceptable to the Debtor and the Agent equal to the Minimum Deposit;

(b)     provide for the purchase of all of the Assets and such purchase may not have any conditions to close not present in the Stalking Horse Agreement or Asset Purchase Agreement provided by the Debtor (whichever is applicable), unless waived by the Debtor and the Agent;

(c)     not be conditioned on due diligence or financing;

(d)     not request or entitle the subsequent bidder to any break-up fee or expense reimbursement;

(e)     disclose the identity of each person and/or entity bidding for the Assets or participating in connection with a bid, and the terms of any such participation;

(f)     contain written evidence that the bidder has the requisite corporate or similar authority to consummate the proposed Sale;

(g)     offer a cash amount set by the Debtor, or other consideration acceptable to the Debtor and the Agent;

(h)     be accompanied by an acknowledgement that the Bidder has had an opportunity to conduct due diligence, does not require further due diligence and has relied solely upon its own independent review in making its bid; and

(i)     be accompanied by a signed contract substantially in the form of the Stalking Horse Agreement and marked to show any changes made thereto.

A bid received from a Bidder that meets the requirements set fourth above will be considered a "Qualified Bid," and the highest and best such bid, the "Highest Qualified Bid." A Qualified Bid shall not be a bid of an "insider" or "affiliate" of the Debtor under section 101 of the Bankruptcy Code unless otherwise consented to by the Agent, in writing. All Qualified Bids shall be available for review by any party in interest, subject to the terms of confidentiality set forth in the Order of the Bankruptcy Court approving the Bid Procedures.

## AUCTION

If at least one Qualified Bid by a bidder other than the Stalking Horse Bidder is received by the Bid Deadline, the Auction with respect to the Assets shall take place at the date and time designated by the Debtor or the Debtor's Auctioneer (but no later than March 15, 2010 at 11:00 a.m. (Eastern Time). The Debtor, with the consent of the Agent, may extend the Auction deadline and/or adjourn, continue or suspend the Auction and/or the Sale Hearing, only after approval by the Bankruptcy Court and

3

EXHIBIT A

serving such notice on all Auction Notice Parties (as such term is defined in the Procedures Motion). The Debtor will provide appropriate notice to each of the bidders and other invitees of the, date, time, and place for the Auction.

If no Qualified Bid other than the Stalking Horse bid is received by the Bid Deadline, then the Auction will not be held, and, pursuant to the Stalking Horse Agreement, but subject to the entry of the Sale Order, the Stalking Horse Bidder shall purchase, acquire and accept from Seller, and the Seller shall sell, transfer, assign, convey and deliver to the Stalking Horse Bidder (or its designated affiliate or affiliates) all of Seller's right, title and interest in, to and under the Assets, free and clear of all liens (except for the Permitted Exceptions as defined in the Stalking Horse Agreement) to the extent permissible under section 363(f) of the Bankruptcy Code, and free and clear of any claims or interests the Debtor may have had, except for the obligations, rights, and covenants expressly provided in the Bid Procedures Order.

A party may participate at the Auction only if it is a bidder who has submitted a Qualified Bid. The Debtor will evaluate all Qualified Bids received and, with the consent of the Agent, may select the Qualified Bid that reflects the highest and best offer, as determined by the Debtor and the Agent as the "Starting Auction Bid" for the Assets.

The bidding at the Auction shall start at the Initial Bid as disclosed by the Debtor to all bidders prior to commencement of the Auction. The bidding will continue in incremental amounts of not less than $100,000 (unless otherwise agreed to in writing by the Agent), until there is a Successful Bid (as defined below) and a Next Highest Bid (as defined below). At the Auction, Bidders will be permitted to increase their bids. All bids subsequent to the Starting Auction Bid, whether oral or written, shall be deemed to constitute valid modifications or amendments to the signed contract previously submitted by such bidder. Any party holding a valid lien against the Assets shall be entitled to credit bid at the Auction pursuant to section 363(k) of the Bankruptcy Code, and the Agent shall have the exclusive right to credit bid on behalf of the Pre-Petition Note A Lenders and Note B Lender as defined in the Bid Procedures Order, provided, however, that to the extent applicable, such credit must be accompanied by a cash payment equal to (a) the amount necessary to pay liens senior to the liens of the secured lender that is credit bidding; and (b) the amount necessary to pay the excess cash portion of the Stalking Horse Bid and the Break-Up Fee. The Agent shall have the exclusive right to credit bid up to the full amount permitted by the Bankruptcy Code on behalf of the Debtor's Pre-Petition Note A Lenders[1] and Note B Lenders, as defined by the Bid Procedures Motion. Any credit bid submitted at the Auction will be on substantially the same terms as contained in the Stalking Horse Agreement.

Prior to concluding the Auction, the Debtor shall (i) review each Qualified Bid on the basis of its financial and contractual terms and the factors relevant to the sale process and the best interests of the Debtor's estates and creditors and (ii) determine, subject to the approval of the Agent, which bid is the highest and best bid (the

EXHIBIT A

"Successful Bid") and the next highest and best offer after the Successful Bid (the "Next Highest Bid"). In evaluating bids, the Debtor may consider bids for less than all of the Assets, as well as bids for all of the Assets, so as to maximize the value received for the Assets.

At or prior to the Auction, the Debtor, with the consent of the Agent, may adopt other rules for the Auction that, in their reasonable judgment, will better promote the goals of the Auction. All such rules shall be fully disclosed to all bidders and will provide that the procedures must be fair and open. Nothing herein shall prohibit the Debtor from meeting privately with any bidders to negotiate the terms of the bids.

Immediately upon selection of the Successful Bid, the bidder making the Successful Bid (the "Successful Bidder") shall provide the Debtor with the Minimum Deposit in immediately available funds to be placed in escrow.

Any bid submitted after the conclusion of the Auction shall not be considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be considered. Neither the Debtor nor any other person shall have any obligation to seek such an order from the Bankruptcy Court.

## ACCEPTANCE OF THE SUCCESSFUL BID

Following the Auction or a determination that the Stalking Horse, if any, is the Successful Bidder, but not later than March 17, 2010, the Sale Hearing will be held. If a timely objection to the Auction Notice is received, the Debtor will present the results of the Auction to the Bankruptcy Court at the Sale Hearing, at which the Debtor will seek certain findings from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was conducted in a fair and reasonable manner, (ii) the Successful Bidder was selected in accordance with the Bid Procedures, and (iii) consummation of the Sale contemplated by the Successful Bid will provide the highest and best value for the Assets and is in the best interests of the Debtor and their estates.

The Debtor shall have accepted a Qualified Bid only when the Bankruptcy Court has approved the Successful Bid and entered the Sale Order and the Agent has accepted a Qualified Bid. Upon the closing of the Sale, (i) the Debtor shall promptly receive the Minimum Deposit held in escrow in connection with that Successful Bid and (ii) the Successful Bidder shall pay directly to the Debtor the balance of the Successful Bid.

Notwithstanding anything herein to the contrary, the transfer of the Assets shall not be free and clear, and will remain subject to: that certain recorded Declaration of Condominium of The Vie at Lake Eola, a Condominium, recorded in Official Records Book 09444, Page 3009, Public Records of Orange County, Florida and any timely and duly recorded amendments thereto and the Association's by-laws, articles of incorporation and rules and regulations (the "Condominium Declarations"); the provisions of the Florida Condominium Act, Chapter 718, Florida Statutes (the "Act");

EXHIBIT A

and the provisions of Chapter 61B, Florida Administrative Code ("Administrative Rules"); and the 2009 and subsequent years' county *ad valorem* taxes.

In the event that, for any reason, the Successful Bidder fails to close the Sale contemplated by its Successful Bid, then, without notice to any other party or further Bankruptcy Court order, the Debtor shall be authorized to close the Sale with the Bidder that submitted the Next Highest Bid (the "Next Highest Bidder") in accordance with the foregoing procedures.

## RETURN OF MINIMUM DEPOSIT

The Minimum Deposits of all Bidders other than the Successful Bidder and the Next Highest Bidder required to submit a, deposit under these Bid Procedures shall be returned upon or within three (3) business days after the Auction. The Minimum Deposit of the Successful Bidder and the Next Highest Bidder shall be held until the closing of the Sale and the deposit of the Successful Bidder, or the Next Highest Bidder if the Assets are sold to it, will be applied to the amount of the Successful Bid.

Notwithstanding the above, if the Successful Bidder (or the Next Highest Bidder, if applicable) fails to close the Sale, such party's Minimum Deposit shall be forfeited to the Debtor.

Except as otherwise provided in the Purchase Agreement, the Seller will not be required to maintain any Minimum Deposit in an interest bearing account, but any interest earned on any Minimum Deposit will be remitted to the appropriate Bidder if the Minimum Deposit is returned to the Bidder pursuant to the above or applied to the amount of the Successful Bid. Minimum Deposits may only be used in accordance with the terms of these Bidding Procedures. Neither the Seller nor the Purchaser shall have any liability with respect to any Minimum Deposit.

## PAYMENT OF AUCTIONEER FEE

The Debtor shall pay the fee of the Auctioneer upon the closing of the Sale to the Successful Bidder. The Auctioneer's fee shall be deducted from the proceeds of the Sale.

## RESERVATION OF RIGHTS

Except as otherwise provided herein, the Debtor reserve the right to (i) determine which Bids are Qualified Bids; (ii) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (iii) reject any bid that is (a) inadequate or insufficient or (b) not in conformity with the requirements of the Bid Procedures Order or the requirements of the Bankruptcy Code.

## JURISDICTION

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the Assets, the Bidding Procedures, the Sale Hearing, the

EXHIBIT A

Auction, the stalking Horse Agreement, and/or any other matter that in any way relates to the foregoing.

* * *

**EXHIBIT "B"**

**THE VUE-ORLANDO, LLC**
**Case No. 6:09-bk-14833-KSJ**

**LIQUIDATION ANALYSIS**

|  | **Estimated Liquidation Value as of  2/2/2010** |
|---|---|
| **Asset** |  |
| Cash | $ 0.00[1] |
| Personal Property | $ 0.00[2] |
| Accounts Receivable | $ 0.00[3] |
| Real Property | $ 20,000,000.00[4] |
| **TOTAL LIQUIDATION** | $ 20,000,000.00 |
| Secured Debt | $ 53,000,000.00 |
| Administrative Chapter 7 | $ 1,500.00 |
| Administrative Chapter 11 | $ 10,000.00 |
| Priority and Secured Tax Claims | $ 300,000.00 |
| **TOTAL DEBT** | $ 53,311,500.00 |
| AVAILABLE FOR GENERAL UNSECURED CREDITORS | $ 0.00 |

---

[1] No Funds on hand. Operations funded by a debtor-in-possession loan.
[2] All personal property is subject to a lien.
[3] All personal property is subject to a lien.
[4] Minimum Bid Amount