ASSET PURCHASE AGREEMENT

BETWEEN

THE VUE-ORLANDO, LLC

AS

"SELLER"

AND

Blue Key Investments, LLC

AS

"PURCHASER"

_____, 2010

EXHIBIT "A"

### ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made as of the ____ day of _____, 2010, by and between Blue Key Investments LLC , a Florida limited liability company , as Purchaser (hereafter referred to as "Purchaser"), and **THE VUE-ORLANDO, LLC,** a Delaware limited liability company, as Seller ("Seller").

## W I T N E S S E T H

**WHEREAS,** Seller is in the business of owning, operating and holding for sale units in the 36-story, 375 unit luxury residential condominium building located at 150 East Robinson Street, Orlando, Florida, all as more particularly described on Schedule 2.1(a) (the "Real Property") (such business as currently conducted, together with all ancillary functions and services performed by Seller being the "Business");

**WHEREAS,** in connection with its operation of the Business and ownership of the Real Property, Seller owns certain personal property assets, all as more fully described on Schedule 2.1(b) (the "Personal Property");

**WHEREAS,** pursuant to its Emergency Motion to Convert Case to Chapter 11, Seller has sought relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Florida ("Bankruptcy Court") at Case No. 6:09-bk-14833-KSJ ("Bankruptcy Case");

**WHEREAS,** in connection with the Bankruptcy Case, on December 28, 2009 the Bankruptcy Court issued an Order Granting Debtor's Motion for Order Approving Bid Procedures, Sale Procedures and Bid Protections (the "Bid Procedures Order");

**WHEREAS,** pursuant to the Bid Procedures approved in the Bid Procedures Order (the "Bid Procedures"), Purchaser is submitting this Agreement as part of Purchaser's attempt to submit a Qualified Bid (as that term is defined in the Bid Procedures);

**WHEREAS,** in connection with Purchaser's submission of a Qualified Bid, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Acquired Assets (as defined in Section 2.1) upon the terms and subject to the conditions set forth in this Agreement;

**NOW, THEREFORE,** in consideration of the promises and of the mutual covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller do hereby agree as follows:

# ARTICLE 1

## DEFINED TERMS

**Section 1.1** **Defined Terms.** Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Act" shall mean the provisions of the Florida Condominium Act, Chapter 718, Florida Statutes.

"Adequate Assurance Information" shall mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that non-debtor parties to Assigned Contracts are adequately assured of Purchaser's future performance under the Assigned Contracts as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Purchaser's obligations under the Assigned Contracts by a guarantor with sufficient assets to provide adequate assurance of future performance.

"Administrative Rules" shall mean the provisions of Chapter 61B, Florida Administrative Code.

"Affiliate" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Agreement" means this Asset Purchase Agreement including all Schedules hereto.

"Approval Hearing" shall mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

"Assigned Contracts" shall have the meaning set forth in Section 2.1(c).

"Assignment and Assumption Agreement" shall mean an assignment and assumption Agreement pursuant to which Seller will assign and Purchaser will assume, the Assumed Liabilities.

"Association" shall mean The Vue at Lake Eola Condominium Association, a Florida non-profit corporation.

"Assumed Liabilities" shall mean all debts, obligations and liabilities relating to the Business or the Acquired Assets arising after the Closing Date, whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following:

    (a)    all liabilities and obligations of Seller under the Assigned Contracts arising after the Closing Date;

(b) all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to an Acquired Asset and payable after the Closing Date, including but not limited to the Purchaser's prorated portion of the 2010 *ad valorem* taxes and each subsequent years' *ad valorem* taxes;

(c) all covenants, rights, liabilities and obligations arising from or out of the Condominium Declarations, the Act and the Administrative Rules; and

(d) all debts, liabilities and obligations arising out of the ownership or operation by Purchaser of any Acquired Asset or the Business after the Closing Date.

"Bankruptcy Case" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Code" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Court Approval" shall mean the entry by the Bankruptcy Court of the Sale Order with respect to the Acquired Assets.

"Bankruptcy Exceptions" shall have the meaning set forth in Section 8.3.

"Bid Procedures" shall have the meaning set forth in the recitals hereto.

"Bid Procedures Order" shall have the meaning set forth in the recitals hereto.

"Bill of Sale" shall mean a bill of sale transferring from Seller to Purchaser all right, title and interest in the Acquired Assets other than the Real Property and the Assigned Contracts.

"Books and Records" shall have the meaning set forth in Section 2.1(d).

"Business" shall have the meaning set forth in the recitals hereto.

"Business Day" shall mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Orlando, Florida.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall mean the date on which the Closing occurs as provided in, and determined pursuant to, Section 4.1.

"Closing Statement" shall mean a statement in such form as is prepared by Seller and reasonably acceptable to Purchaser reflecting applicable Purchaser's Closing Costs, Seller's Closing Costs, other prorated items and the net amount due Seller at Closing.

"Condominium Declarations" shall mean the Declaration and the Association's by-laws, articles of incorporation and rules and regulations.

"Contract Warranties" shall have the meaning set forth in Section 14.1.

"Declaration" shall mean that certain Declaration of Condominium of the Vue at Lake Eola, a Condominium, recorded at Official Records Book 09444, Page 3009, Public Records of Orange County, Florida, as amended.

"Deed" shall mean the quitclaim deed to be delivered by Seller at Closing transferring the Real Property to the Purchaser.

"Deposit" shall mean the "Minimum Deposit" as defined in, and to be paid pursuant to, the Bid Procedures, payable by certified or cashier's (bank) check, wire transfer or letter of credit reasonably acceptable to Seller and the Agent (as defined in the Bid Procedures).

"Encumbrance" shall mean any mortgage, deed of trust, lien, pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

"Escrow Agent" shall mean Latham, Shuker, Eden & Beaudine, LLP, counsel to Seller, acting as escrow agent and closing agent.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HSR Filing" shall mean the filings, if any, required under the HSR Act related to this transaction.

"Indemnifiable Claim" shall have the meaning set forth in Section 12.3.

"Indemnified Party" shall have the meaning set forth in Section 12.3.

"Indemnifying Party" shall have the meaning set forth in Section 12.3.

"Initial Title Reports" shall mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Real Property that Seller has made available to Purchaser. Purchaser understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

"Intellectual Property" shall mean, if any, all registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, trade names, trade dress, logos and designs, all U.S. copyrights and copyright applications and all copyright renewals and extensions, and all websites and domain names, used or employed exclusively by Seller in the operation of the Business.

"Knowledge" shall mean in the case of Seller, the actual knowledge of Charles Johanns and Eric Moskowitz, both members of the managing member of Seller, without any requirement of investigation or inquiry, and in the case of Purchaser, the actual knowledge of _____[Name]Janne Keskinen_____ [Title]_____of Purchaser, without any requirement of investigation or inquiry.

"Losses" shall mean any and all damages, deficiencies, suits, claims, losses, penalties, expenses, obligations, liabilities, cost and expenses (including interest, penalties and reasonable attorneys' fees and disbursements).

"Permitted Encumbrances" shall mean (a) liens for current taxes and assessments not yet due and payable or that do not materially detract from the value thereof or the use to which such property is presently subject, (b) Encumbrances set forth in the Deed, (c) minor imperfections of title, if any, that, taken as whole, do not materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Business, (d) zoning laws, recorded easements, covenants, utility easements, building restrictions and other land use restrictions that do not impair the present or anticipated use of the Acquired Assets, and (e) subject to the provisions of Section 10.3(b), all other matters set forth in any additional Title Reports.

"Person" shall mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

"Personal Property" shall have the meaning set forth in the recitals hereto.

"Purchase Price" shall have the meaning set forth in Section 3.1(b).

"Purchaser" shall mean Blue Key Investments,LLC, a Florida limited liability company

"Purchaser's Closing Costs" shall mean: (a) fees and costs of Purchaser's counsel relating to the subject transaction; (b) fees and costs incurred by Purchaser to conduct Purchaser's due diligence investigations of the Acquired Assets; (c) recording fees payable in connection with recording any instruments in the appropriate public records; (d) cost of the Initial Title Reports, any additional Title Reports and the Title Policy; (e) any loan closing costs incurred by Purchaser, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; and (f) sales taxes, if any, payable in connection with the purchase and sale of the Acquired Assets.

"Purchaser Indemnified Party" shall have the meaning set forth in Section 12.2.

"Real Property" shall have the meaning set forth in the recitals hereto.

"Sale Order" shall mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

"Seller" shall mean The Vue-Orlando, LLC, a Delaware limited liability company.

"Seller Indemnified Party" shall have the meaning set forth in Section 12.1.

"Seller's Closing Costs" shall mean: (a) fees and costs of Seller's counsel relating to the subject transaction; and (b) commissions payable to Seller's broker and auctioneer as provided in Section 8.7.

"Successful Bid" shall mean the highest or otherwise best offer to purchase the Acquired Assets as determined by Seller in its sole discretion in accordance with the Bid Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

"Title Insurer" shall mean **[First American Title Insurance Company or Lawyers Title Insurance Corporation]** or any other nationally recognized title insurance company designated by Seller.

"Title Policies" shall have the meaning set forth in Section 10.3(b).

"Title Reports" shall mean, collectively, (a) the Initial Title Reports and (b) any additional title reports and/or title insurance commitments with respect to the Real Property that Seller has made available to Purchaser for review.

**Section 1.2    Construction.** Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole, and the word "or" has the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The section and other headings and Table of Schedules contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect. Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

# ARTICLE 2

## SALE AND PURCHASE OF ASSETS

**Section 2.1** **Agreement to Sell and to Purchase**. On the terms and subject to the conditions of this Agreement, and pursuant to Section 363 of the Bankruptcy Code and the Sale Order, Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, at the Closing, as hereinafter defined, free and clear of any Encumbrances except Permitted Encumbrances and the Assumed Liabilities, the assets, rights and properties set forth in this Section 2.1, and any assets, rights and properties described in the categories set forth below in this Section 2.1 which are acquired by Seller prior to the Closing (collectively, the "Acquired Assets"), excepting, however, those assets, rights and properties described as Excluded Assets in Section 2.2 of this Agreement. The Acquired Assets shall be the following (except as aforesaid):

      (a)     All of the Real Property owned by Seller as more fully described on Schedule 2.1(a);

      (b)     All Personal Property owned and used by Seller in the Business and as set forth on Schedule 2.1(b) and the Intellectual Property, if any;

      (c)     All of Seller's rights and incidents of interest in and to the contracts pertaining to the Business generally, which are identified on Schedule 2.1(c) and for which Purchaser has delivered to Seller, no later than ten (10) Business Days prior to Closing, a notice of Purchaser's desire to assume (such contracts to be assumed, collectively, the "Assigned Contracts"); and

      (d)     The books, documents, occupant lists, contacts/prospects list, financial reports, and any other records or files of Seller in the possession of Seller pertaining to the operation of the Business (collectively, the "Books and Records"); *provided, however*, that Seller shall have the right, at its expense, to make and retain copies of any Books and Records.

*Purchaser hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Acquired Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Purchaser pursuant to the terms and conditions of this Agreement.*

**Section 2.2** **Excluded Assets**. Notwithstanding anything to the contrary contained in this Agreement, the following rights, properties and assets of Seller or others ("Excluded Assets") shall be retained by Seller or their rightful owner and shall be excluded from the Acquired Assets sold, transferred, assigned, conveyed and delivered to Purchaser pursuant to this Agreement:

      (a)     All cash, bank balances, monies in possession of any bank, petty cash, other cash items and marketable securities of Seller;

(b) Seller's limited liability company and tax books and records, other than the Books and Records, including, without limitation, Seller's articles of organization and operating agreement, membership certificates, if any, membership transfer records, minute books and Seller's tax returns and tax supporting information; *provided, however*, that Purchaser shall have the right, at its expense, to make and retain copies of any of the foregoing books and records not subject to attorney-client privilege;

(c) All claims under insurance, surety or similar indemnity arrangements to the extent such claims do not relate to loss or liability with respect to the Acquired Assets;

(d) All other claims, demands or causes of action of Seller against any other Person not specifically identified in this Agreement as Acquired Assets, including, without limitation, claims of Seller arising under Sections 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and claims for federal, state or local tax refunds;

(e) common elements or Association property as defined in Section 718.103 of the Act, common areas, property of the existing unit owners or of the Association, personal property of the Association or in which a unit owner (other than Seller) has an individual interest or which may constitute an appurtenance, or such items which are or were required to be delivered to the Association at turnover in accordance with Section 718.301(4) of the Act; and

(f) All other assets listed on Schedule 2.2.

**Section 2.3    Inspections; Warranties as to Condition**. Purchaser will rely on the Sale Order approving this Agreement and authorizing the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code; and, subject to satisfaction of the conditions contained in Articles 5 and 6 of this Agreement, Purchaser will accept the Acquired Assets as they exist on the Closing Date, and will accept the sale, conveyance, assignment, transfer and delivery of the Acquired Assets based upon its own inspection, examination and determination with respect thereto as to all matters, including, without limitation, (a) restrictions on and fitness for use, (b) condition and fitness for particular purposes, and based upon the representations and warranties of Seller set forth in Article 8 of this Agreement, which representations and warranties, and any cause of action based thereon, shall, except as provided in Section 13.2, terminate at the Closing.

**Section 2.4    Assumption of Liabilities**.

(a) Purchaser shall not assume or be liable for any liabilities or obligations of any type or kind of Seller relating to the Business or the Acquired Assets, whenever arising and whether primary or secondary, direct or indirect, absolute or contingent, contractual, tortious or otherwise, and Purchaser shall have no obligation to perform and discharge any liabilities and obligations of Seller except for the Assumed Liabilities.

(b)     Except as otherwise provided in this Agreement or the Sale Order, Seller shall not be responsible for any liabilities or obligations arising out of the ownership, possession, use or operation of the Acquired Assets by Purchaser after the Closing.

## ARTICLE 3

## PURCHASE PRICE AND PAYMENT

**Section 3.1     Purchase Price and Adjustments.**

(a)     On the terms and subject to the conditions of this Agreement, Purchaser shall pay to Seller the Purchase Price.

(b)     The Purchase Price for the Acquired Assets, shall be Twenty Million Two Hundred Fifty Thousand Dollars and No/100 Dollars ($20,250,000.00  ) the ("Purchase Price"), which shall be payable by Purchaser to Seller as follows:

(i)     the Deposit shall be delivered to the Seller for holding by the Escrow Agent at the time of the submission of this Agreement as part of Purchaser's Qualified Bid.

(ii)     the balance of the Purchase Price, as adjusted to take into account the prorations and allocations as provided in Section 3.2 below and disclosed on the Closing Statement, shall be paid at the Closing.

**Section 3.2     Prorations.**  Any and all personal and real property taxes attributable to or measured with respect to any period (or portion thereof) on or prior to the Closing shall be attributable to Seller and payable out of the Purchase Price, and any and all such taxes subsequent to the Closing shall be attributable to Purchaser, and Seller shall furnish, at the request of Purchaser, proof of payment of any personal property taxes. The parties shall prorate the Seller's obligation as the Developer pursuant to Section 14.7 of the Declaration, all relevant rent, utilities and any other expenses to the Closing Date.

**Section 3.3     Allocation of Purchase Price.**  Seller and Purchaser shall agree on an allocation of the Purchase Price among the Acquired Assets prior to the Closing and such allocation shall be set forth on Schedule 3.3 to be delivered at the Closing.

**Section 3.4     Sales Tax.**  Sales taxes, if any, resulting from the transfer of the Acquired Assets, or any particular category thereof, to the extent permitted by law, will be paid by Purchaser, unless such transfer is subject to an available exemption therefrom.

## ARTICLE 4

## CLOSING AND POSSESSION

**Section 4.1** **Closing Date**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place in the offices of the Escrow Agent, 390 North Orange Avenue, Suite 600, Orlando, Florida 32801, at 9:30 AM, Eastern Standard Time, on the first Business Day that the Sale Order is no longer subject to appeal by any party.

**Section 4.2** **Seller's Deliveries at Closing**. At the Closing, in addition to any other documents specifically required to be delivered pursuant to this Agreement, Seller shall deliver or cause to be delivered to Purchaser at or before Closing:

(a) A certified copy of the Sale Order;

(b) A receipt, executed by Seller, acknowledging the receipt from the Escrow Agent of the Deposit and receipt from the Purchaser of the balance of the Purchase Price;

(c) The executed Assignment and Assumption Agreement;

(d) The executed Bill of Sale;

(e) The executed Deed; and

(f) The agreed upon Schedule 3.3. (relating to the Purchase Price allocation).

**Section 4.3** **Purchaser's Deliveries at Closing**. At Closing, Purchaser shall deliver or cause to be delivered to Seller:

(a) The balance of the Purchase Price as provided in Section 3.1(b)(ii);

(b) The agreed upon Schedule 3.3 (relating to the Purchase Price allocation); and

(c) The executed Assignment and Assumption Agreement.

**Section 4.4** **Means of Payment**. Except as otherwise provided with respect to the delivery of the Deposit, all payments required under this Agreement shall be made by certified or cashier's bank check or by wire transfer of immediately available funds to an account designated by the receiving party.

**Section 4.5** **All Proceedings**. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 4.6    Possession.** Seller will turn over to Purchaser exclusive physical possession of the Acquired Assets, including, to the extent in Seller's possession, control or custody, all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Purchaser to transfer to Seller, the entire Purchase Price.

## ARTICLE 5

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BOTH PARTIES

**Section 5.1    Conditions Precedent to Obligations of Both Parties.** The obligations of Seller and Purchaser to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions (unless expressly waived by both parties in writing):

(a)    <u>Order</u>. A final, nonappealable Sale Order approving the transactions as set forth in this Agreement shall have been entered, and any conditions and directions contained in the Sale Order shall have been fully complied with in all material respects.

(b)    <u>Government Action</u>. No court, arbitrator or governmental body, agency or official shall have issued any order, injunction or decree that has not been vacated restraining or prohibiting the effective operation of the Acquired Assets by Purchaser after the Closing.

## ARTICLE 6

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

**Section 6.1    Conditions Precedent to Obligations of Purchaser.** The obligations of Purchaser to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions unless expressly waived by Purchaser in writing:

(a)    <u>Representations and Warranties True at Closing</u>. Each of the representations and warranties of Seller set forth in Article 8 of this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though made on and as of such date (except in the case of representations and warranties made as of a specific date, which shall be true in all material respects as of such date).

(b)    <u>Performance</u>. Seller shall have performed in all material respects each of the obligations of Seller to be performed on or prior to the Closing pursuant to the terms of this Agreement.

(c)    <u>Inspection</u>. Purchaser shall have inspected the Acquired Assets to verify Seller's ownership of the Acquired Assets. Except as provided in Section 10.3(b), within ten (10) days of

execution of this Agreement, Purchaser may in its sole discretion terminate this Agreement if it determines Seller does not have ownership of the Acquired Assets. After such ten (10) day period, such condition will be deemed fulfilled.

**Section 6.2**   **Compliance or Waiver of Purchaser's Conditions**.  Purchaser shall notify Seller at such time as any such condition is satisfied or at such time as Purchaser believes that any such condition cannot be satisfied.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

**Section 7.1**   **Conditions Precedent to Obligations of Seller**.  The obligations of Seller to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions (unless expressly waived by Seller in writing):

(a)   Representations and Warranties True at Closing.  Each of the representations and warranties of Purchaser set forth in Article 9 of this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though made on and as of such date.

(b)   Performance.  Purchaser shall have performed in all material respects each of the obligations of Purchaser to be performed on or prior to the Closing pursuant to the terms of this Agreement.

## ARTICLE 8

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

**Section 8.1**   **Limited Liability Company Existence and Power**.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has full limited liability company power and authority to enter into this Agreement and perform its obligations under this Agreement, subject only to Bankruptcy Court Approval and any further obligations imposed by the Bankruptcy Court.

**Section 8.2**   **Limited Liability Company Authorization**.  Seller's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement, subject to Bankruptcy Court Approval, have been duly authorized by all requisite limited liability company action.

**Section 8.3**   **Binding Effect and Authority**.  This Agreement has been duly executed and delivered by Seller, and subject to Bankruptcy Court Approval, this Agreement constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with the terms hereof

except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) (the "Bankruptcy Exceptions"). When delivered at the Closing, the agreements required to be executed and delivered by Seller will have been duly executed and delivered by Seller, and will be valid and binding agreements of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by the Bankruptcy Exceptions.

**Section 8.4    Governmental Authorization**. Except as set forth in this Agreement, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated by this Agreement require no action by or in respect of, consent from, or filing with, any federal, state or foreign governmental body, agency, official or authority other than (a) those that have been taken, made or obtained, (b) approvals, if any, required under the HSR Act, and (c) Bankruptcy Court Approval.

**Section 8.5    Title to Acquired Assets**. Upon entry of the Sale Order, Seller shall have the ability to convey, and at the Closing Seller shall convey, to Purchaser title to all of the Acquired Assets, free and clear of any Encumbrance other than Permitted Encumbrances.

**Section 8.6    No Actions.** To the Knowledge of Seller, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller, before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller, is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

**Section 8.7    Brokers.** Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except it has engaged Fisher Auction Company, Inc. in connection with Cushman & Wakefield, Inc. as its real estate auctioneer under the Bid Procedures.

## ARTICLE 9

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

**Section 9.1    Existence and Power**. Purchaser is a **[corporation/limited liability company/partnership]** duly organized, validly existing and in good standing under the laws of the State of Florida  , with full power and authority to enter into this Agreement and perform its obligations under this Agreement.

**Section 9.2    Authorization**. The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated by this Agreement

have been duly authorized by all requisite **[corporate/limited liability company/partnership]** action of Purchaser.

**Section 9.3** <u>Binding Effect</u>. This Agreement has been duly executed and delivered by, and constitutes the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with the terms hereof except as enforceability may be limited by the Bankruptcy Exceptions. When delivered at Closing, the Assignment of Assumption Agreement and other agreements required to be executed and delivered by Purchaser will have been duly executed and delivered by Purchaser, and will be valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with the respective terms thereof except as enforceability may be limited by the Bankruptcy Exceptions.

**Section 9.4** <u>Governmental Authorization; Consents</u>.

(a) The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated by this Agreement require no action by or in respect of, filing with, or consent from, any federal, state or foreign governmental body, agency, official or authority other than (i) those that have been taken, made or obtained, and (ii) approvals, if any, required under the HSR Act.

(b) No consent, approval, waiver or other action by any Person (other than the governmental authorities referred to in subsection (a) of this Section 9.4) under any contract, agreement, indenture, lease, instrument or other document to which Purchaser is a party or by which it is bound is required or necessary for the execution, delivery and performance of this Agreement by Purchaser or the consummation of the transactions contemplated by this Agreement.

**Section 9.5** <u>No Action</u>. There is no action, suit or proceeding pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Purchaser is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Purchaser) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the closing documents to which Purchaser is or is to become a party.

**Section 9.6** <u>No Default</u>. Entry into this Agreement or any of the closing documents to which Purchaser is or is to become a party by Purchaser will neither constitute, nor with the giving of notice or lapse of time or both, constitute an event of default or a default by Purchaser under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaw, or other material agreement to which Purchaser is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or any of the closing documents to which Purchaser is or is to become a party.

**Section 9.7    Sufficient Funds.**  As of the date hereof and at all times through and including the Closing Date, Purchaser has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

## ARTICLE 10

## COVENANTS, OTHER AGREEMENTS AND ACKNOWLEDGEMENTS

### Section 10.1    Covenants of Seller.

(a)    <u>Continue Business in Ordinary Course</u>.  From the date of this Agreement until Closing, Seller shall use commercial reasonable efforts to conduct the Business in the ordinary course of business consistent with current practice except as otherwise ordered by the Bankruptcy Court.

(b)    <u>Public Announcements</u>. Except as and to the extent required by applicable law, Seller shall not make any public announcements in respect of this Agreement or the transactions contemplated in this Agreement, or otherwise communicate with any third party, including, without limitation, news media, without prior notification to the Purchaser, and the parties shall cooperate as to the timing and contents of any such announcement.

### Section 10.2    Mutual Covenants.

(a)    <u>Closing Conditions</u>.  Seller and Purchaser shall use all reasonable efforts to cause the conditions precedent to Closing to be fulfilled.

(b)    <u>Consents and Approvals</u>. Prior to and after the Closing, each of Seller and Purchaser shall use all reasonable efforts to obtain the agreements, authorizations, consents, orders and approvals of federal, state and local regulatory bodies and officials, courts (including, without limitation, the Bankruptcy Court) and other third parties that may be or become necessary for the performance of their respective obligations pursuant to this Agreement and the consummation of the transactions contemplated by this Agreement, and shall cooperate fully with each other in seeking promptly to obtain such agreements, authorizations, consents, orders and approvals as may be necessary for the performance of their respective obligations pursuant to this Agreement.  Purchaser shall provide Adequate Assurance Information to Seller, the Bankruptcy Court and parties to the Assigned Contracts as may be reasonably requested.  Seller and Purchaser shall not take any action that is likely to have the effect of delaying, impairing or impeding the receipt of any required agreements or approvals, and shall use all reasonable efforts to secure such agreements or approvals as promptly as possible.

(c)    <u>Consent to Jurisdiction</u>.    THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING BUT NOT LIMITED TO ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT,

ANY RELATED AGREEMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION AND TO THE ENTRY OF FINAL ORDERS OR JUDGMENT BY THE BANKRUPTCY JUDGE IN ANY DISPUTE WITH RESPECT TO SUCH MATTERS.

Each of Purchaser and Seller further agrees that service of any process, summons, notice or document by United States registered mail to such party's respective address, with the required copy to the Persons set forth in Section 13.5 of this Agreement, shall be effective service of process in any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Purchaser and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court or the United States District Court for the Middle District of Florida, Orlando Division, and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. In the event that a court should rule that subject matter jurisdiction is not available in the United States District Court for the Middle District of Florida, Orlando Division, Purchaser and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of any other competent court sitting in Orange County, Florida.

(d)     Further Action. Each of the parties to this Agreement shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions of this Agreement and the transactions contemplated by this Agreement, or at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement. Upon the terms and subject to the conditions of this Agreement, each of the parties to this Agreement shall take or cause to be taken all actions and to do or cause to be done all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, to satisfy the conditions to this Agreement, and to obtain in a timely manner all necessary waivers, consents and approvals, and to effect all necessary registrations and filings.

**Section 10.3  Purchaser's Due Diligence.**

(a)     Acknowledgment. In deciding to acquire the Acquired Assets pursuant to this Agreement, Purchaser acknowledges that it has had the opportunity to conduct due diligence regarding the Real Property and the other Acquired Assets and it has had the opportunity to consult with Purchaser's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Purchaser confirms and acknowledges that Seller has given Purchaser and its representatives the opportunity for access to the Real Property and the opportunity to ask and have answered questions of representatives of Seller with respect to the Real Property and the other Acquired Assets and to acquire such additional information about the Real Property and the other Acquired Assets as Purchaser has reasonably requested. Purchaser agrees that any physical access to or inspection of the Real Property by Purchaser or its representatives shall comply in all respects with the written instructions and requirements of Seller.

(b) <u>Title.</u> Purchaser confirms and acknowledges that Seller has made the Initial Title Reports available to Purchaser, and intends to make additional Title Reports available to Purchaser, and Seller will negotiate with the Title Insurer to obtain title insurance policies with respect to the Real Property (the "Title Policies") at Closing, the cost of which is a Purchaser Closing Cost. Purchaser acknowledges receipt of the Title Reports and hereby waives any objection to title or otherwise to any Encumbrance disclosed thereon. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Real Property, Purchaser may object to such matter by delivery of written notice to Seller within three Business Days of the date such additional Title Report is delivered to Purchaser. If Purchaser timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to the Real Property, and if Seller fails or is unable to cure any such objection, then Seller will have the right to terminate this Agreement at any time thereafter, with no liability to Purchaser, unless Purchaser waives such objection by written notice received by Seller no later than the earlier of (i) one Business Day following Purchaser's receipt of notice from Seller that it will not cure such objection or (ii) the Closing Date. If Purchaser closes the purchase of the Acquired Assets, then Purchaser will be deemed to have waived any objection made under this Section 10.3(b) to any matter and such matter shall constitute a Permitted Encumbrance.

## ARTICLE 11

## TERMINATION

**Section 11.1** <u>Termination by Mutual Consent</u>. At any time on or prior to the Closing, this Agreement may be terminated by the mutual written consent of Seller and Purchaser without liability on the part of Seller or Purchaser, in which case the Deposit shall be disbursed as provided in such written consent, but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement.

**Section 11.2** <u>Termination upon Breach or Default</u>.

(a) If the conditions precedent in Sections 5.1 and 6.1 have been satisfied and Purchaser shall default in any material respect in the observance or in the due and timely performance of any of the agreements or covenants contained in this Agreement, or if there shall have been a material breach by Purchaser of any of its representations or warranties set forth in this Agreement, Seller, provided it is not in material default with respect to any of its obligations under this Agreement, may terminate this Agreement upon five (5) days' written notice to Purchaser, during which time Purchaser shall have an opportunity to cure the default or breach. If such default or breach is not cured, the Deposit with Escrow Agent shall be released to Seller.

(b) If the conditions precedent in Sections 5.1 and 7.1 have been satisfied and Seller shall default in any material respect in the observance or in the due and timely performance of any of the

agreements or covenants contained in this Agreement, or if there shall have been a material breach by Seller of any of its representations or warranties set forth in this Agreement, Purchaser, provided it is not in material default with respect to any of its obligations under this Agreement, may terminate this Agreement upon five (5) days' written notice to Seller, during which time Seller shall have an opportunity to cure the default or breach. If such default or breach is not cured, the Deposit with Escrow Agent shall be released to Purchaser.

**Section 11.3 Termination as a Result of Loss by Fire or Other Casualty; Condemnation**. In the event that, prior to Closing, the Real Property or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property, either party will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice of such damage, destruction or condemnation proceedings, to terminate this Agreement and thereafter neither of the parties will have any further rights or obligations hereunder; *provided, however*, that, if Purchaser is not in breach of this Agreement, Purchaser will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Real Property is sold to Purchaser pursuant to the terms of this Agreement, as Purchaser's sole remedies, Seller will assign to Purchaser any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Purchaser any such proceeds or compensation received by it.

**Section 11.4 Additional Termination**. This Agreement shall terminate if (a) the Bankruptcy Court approves the sale by Seller to any Person other than Purchaser of all or a substantial portion of the Acquired Assets (b) the Bankruptcy Court does not enter the Sale Order by April 15, 2010, or (c) the Bankruptcy Court enters an order converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code or an order appointing a Chapter 11 Trustee. If any of the above termination causes occur, Purchaser shall receive the refund of the Deposit.

## ARTICLE 12

## INDEMNIFICATION

**Section 12.1 Purchaser Indemnification.** Purchaser shall indemnify Seller and its officers, members, directors, Affiliates, employees, and assigns (each a "Seller Indemnified Party") and hold them harmless from and against and in respect of any and all Losses claimed, asserted or assessed against or incurred or suffered by any Seller Indemnified Party that arise after the Closing in connection with any misrepresentation or breach of warranty of Purchaser contained herein or in any certificate, schedule, document, or other writing delivered by the Purchaser pursuant to this Agreement or any breach of, or failure to satisfy, any covenant or obligation of Purchaser in the Agreement or in any other certificate, document, writing or instrument delivered by Purchaser pursuant to this Agreement.

**Section 12.2 Seller Indemnification.** Seller shall indemnify Purchaser and its officers, members, partners or shareholders, directors, Affiliates, employees and assigns (each a "Purchaser

Indemnified Party") and hold them harmless from and against and in respect of any and all Losses claimed, asserted or assessed against or incurred or suffered by any Purchaser Indemnified Party arising from or in connection with any breach of the representation and warranty of the Seller contained in Section 8.5 of this Agreement or any breach of, or failure to satisfy, any covenant or obligation of the Seller in this Agreement or in any other certificate or ancillary agreement delivered by the Seller pursuant to this Agreement, including, without limitation, any Losses arising from any of Seller's liabilities not specifically assumed by Purchaser under the terms of this Agreement, and all actions or omissions of Seller's operation of the Business prior to the Closing.

**Section 12.3** **Indemnification Claims.** If any Seller Indemnified Party or Purchaser Indemnified Party seeks indemnification (the "Indemnified Party") with respect to a claim resulting from the assertion of liability by a third party ("Indemnifiable Claim"), it shall give notice to the party that is to provide the indemnification (the "Indemnifying Party") within fifteen (15) days after the Indemnified Party becomes actually aware of that Indemnifiable Claim. Such notice shall set forth a reasonable summary of such information with respect to the Indemnifiable Claim as is then reasonably available to the Indemnified Party together with copies of any pleadings. If any such liability is asserted against the Indemnified Party, and it notifies the Indemnifying Party thereof, the Indemnifying Party shall be entitled, if it so elects by written notice delivered to the Indemnified Party within twenty (20) days after receiving such notice of the Indemnifiable Claim, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party; *provided, however,* that by electing to assume the defense thereof, the Indemnifying Party will be deemed to have acknowledged its obligation to indemnify the Indemnified Party with respect to such Indemnifiable Claim, and shall thereafter be precluded from denying such obligation. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; and (ii) the rights of the Indemnified Party to be indemnified hereunder in respect of any Indemnifiable Claim shall not be adversely affected by its failure to give notice pursuant to the foregoing, except to the extent that the Indemnifying Party is actually prejudiced by the failure to give such notice. With respect to any assertion of liability by a third party that results in an Indemnifiable Claim, the parties hereto shall make available to each other all relevant information, other than privileged information, in their possession material to any such assertion. In the event that the Indemnifying Party, within twenty (20) days after receipt of the aforesaid notice of an Indemnifiable Claim, fails to assume the defense of the Indemnified Party against such Indemnifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

## ARTICLE 13

## GENERAL

**Section 13.1** **Cooperation in Claims and Litigation**. Purchaser and Seller shall cooperate, to the extent reasonably requested by either of them, in the handling and disposition of any claims and litigation, including, without limitation, claims relating to environmental matters, workers'

compensation claims, labor arbitrations, employee grievances and claims under the Equal Employment Opportunity Act, Civil Rights Act or similar statutes, whether or not listed on any Schedule to this Agreement and whether or not pending or threatened prior to the Closing, that arise out of or are related to any event or occurrence prior to or after the Closing.

**Section 13.2    Survival.** Except Seller's warranties to Purchaser set forth in Section 8.5, the representations and warranties made by Seller in this Agreement shall not survive the Closing, and such representations and warranties, and any cause of action based on such representations and warranties, shall terminate and expire on the consummation of the Closing. Purchaser and Seller acknowledge that, except as aforesaid, all of Seller's representations and warranties contained in this Agreement are solely conditions to Closing, and after Closing there shall be no liability or obligations under this Agreement in respect of a breach or claimed breach thereto. All representations and warranties made by Purchaser in this Agreement shall survive Closing.

**Section 13.3    Binding Effect; Benefits; Assignment.** All of the terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the successors and permitted assigns of Seller and Purchaser. Purchaser may not assign or delegate any duties or obligations under this Agreement without the prior written consent of Seller, which consent may be granted or withheld in the sole discretion of Seller. No assignment by Purchaser in accordance with this provision shall release or relieve Purchaser of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies under or by reason of this Agreement except as expressly indicated in this Agreement.

**Section 13.4    Governing Law.** Except to the extent inconsistent with the Bankruptcy Code, this Agreement shall be governed by the laws of the State of Florida without regard to principles or conflicts of law.

**Section 13.5    Notices.** All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this Section 13.5 and will be deemed to have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's facsimile number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Purchaser at their respective addresses stated below:

(a)    If to Purchaser:

        Blue Key Investments, LLC

        10286 Clubhouse Turn Road

        Lake Worth, FL 33467

        Attn: Janne Keskinen

        Facsimile No.:_____

        With a copy to:

        Gonzalez & Shenkman, P.L.

        12012 South Shore Blvd., Suite 107

        Wellington, FL 33414

        Attn: Francisco J. Gonzalez, Esquire

        Facsimile No.: 561-227-1574

(b)    If to Seller:

        THE VUE-ORLANDO, LLC
        Attention: Charles Johanns
        150 East Robinson Street
        Orlando, FL 32801
        Facsimile No.:_____

        With a copy to:

        LATHAM, SHUKER, EDEN & BEAUDINE, LLP
        ATTN: R. Scott Shuker, Esq.
        390 N. Orange Avenue, Suite 600
        Orlando, Florida 32801
        Facsimile No.: (407) 481-5801

Any party may change its address by prior written notice to the other parties.

    **Section 13.6**   __**Counterparts**__. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

**Section 13.7  Expenses**. Except as otherwise provided in this Agreement, Purchaser and Seller shall pay their own respective expenses, costs and fees (including, without limitation, attorneys' and accountants' fees) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 13.8  Entire Agreement**. This Agreement and Schedules to this Agreement, and the agreements referred to in this Agreement, taken together set forth the entire agreement and understanding of Seller and Purchaser in respect of the transactions contemplated by this Agreement and supersede all prior agreements, arrangements and understandings relating to the subject matter of this Agreement. No representation, promise, inducement or statement of intention has been made by Seller or Purchaser that is not embodied in this Agreement or in the documents referred to in this Agreement, and neither Seller nor Purchaser shall be bound by or liable for any alleged representation, promise, inducement or statement of intention not so set forth. The representations, warranties, covenants and agreements of Seller and Purchaser contained in this Agreement shall be as expressly set forth in this Agreement, and nothing in this Agreement is intended to imply to one party any obligations or responsibilities of any other party.

**Section 13.9  Amendment and Waiver**. This Agreement may be amended, modified, superseded or cancelled, and any of the terms covenants, representations, warranties or conditions of this Agreement may be waived, only by a writing executed by Seller and Purchaser, or in the case of a waiver, by or on behalf of the party waiving compliance. The failure of any party at any time to require performance of any provision of this Agreement shall in no manner affect the right of such party at a later time to enforce the same. No waiver by any party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or of any breach of any such term, covenant, representation or warranty or any other term, covenant, representation or warranty set forth in this Agreement.

**Section 13.10  Headings**. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Agreement.

**Section 13.11  Execution**. This Agreement is being executed by Seller's and Purchaser's duly authorized officers or representatives solely on behalf of Seller and Purchaser, and not in a personal or any other capacity.

**Section 13.12** <u>**No Third-Party Beneficiaries**</u>. Nothing express or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties to this Agreement any rights or remedies under or by reason of this Agreement.

**Section 13.13** <u>**Noncontinuity of Enterprise**</u>. The parties hereto agree that the transaction set forth in this Agreement is not a merger or consolidation of Purchaser and Seller or a continuation of enterprise of Seller's Business by Purchaser. Accordingly, the Purchaser is not a successor corporation for purposes of any liabilities of Seller.

**Section 13.14** <u>**Access and Retention of Records**</u>. Purchaser shall use all reasonable efforts to preserve and keep the Books and Records delivered to it pursuant to this Agreement, and shall make such records available to Seller as may be reasonably requested by Seller from time to time. If Purchaser wishes to destroy such Books and Records at any time, Purchaser shall first give ninety (90) days' prior written notice to Seller, and Seller shall have the right, at Seller's option, upon prior written notice given to Purchaser within such ninety-day period, to take possession of such Books and Records with one hundred eighty (180) days after the date of notice by Seller to Purchaser under this Section 13.14.

**Section 13.15** <u>**Notice of Certain Inquiries**</u>. If any party is contacted, whether before or after Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

**Section 13.16** <u>**Time is of the Essence**</u>. Time is of the essence of this Agreement.

**Section 13.17** <u>**Radon Gas**</u>. **Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to Persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.**

**Section 13.18** <u>**Waiver of Jury Trial**</u>. Purchaser and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Purchaser and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that either of them

may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

Section 13.19 **HSR Filings.** If the transactions contemplated hereby are not exempt from review and filing under the HSR Act, Seller and Purchaser shall each seek regulatory approval or HSR Act clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Purchaser in connection with this Agreement under the HSR Act and the rules and regulations thereunder. Seller and Purchaser shall request expedited treatment of such HSR Filing by the Federal Trade Commission, and/or the Department of Justice, as applicable, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

## ARTICLE 14

## DISCLAIMERS AND WAIVERS

Section 14.1 <u>Disclaimers and Waivers.</u>

(a) <u>No Reliance on Materials, Data and Information.</u> EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED TO PURCHASER BY OR ON BEHALF OF SELLER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING OR IN ELECTRONIC FORMAT) ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES AND AGREES THAT (1) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (2) PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED TO PURCHASER BY SELLER OR ANY, BUT RATHER WILL RELY ON ITS OWN INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT

THERETO, AND (3) NEITHER SELLER, ANY AFFILIATE OF SELLER NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

(b)  <u>Disclaimers</u>.  EXCEPT FOR THE CONTRACT WARRANTIES, PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE TO PURCHASER BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS.  PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." PURCHASER HAS NOT RELIED ON, AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE TO PURCHASER BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER, AUCTIONEER  OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR OTHER THAN THE CONTRACT WARRANTIES.

PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED SUCH INVESTIGATIONS OF THE ASSETS, INCLUDING BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED TO

PURCHASER BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED ALL SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH PURCHASER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER INDEMNIFIED PARTIES AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.

PURCHASER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NO SELLER INDEMNIFIED PARTY SHALL HAVE ANY LIABILITY TO PURCHASER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND PURCHASER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.

PURCHASER FURTHER ACKNOWLEDGES THAT (1) ECXEPT AS SET FORTH IN SECTION 13.2, THE CONTRACT WARRANTIES SHALL NOT SURVIVE THE CLOSING, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF PURCHASER SET FORTH IN THIS AGREEMENT.

PURCHASER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY PURCHASER, AND PURCHASER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OFPURCHASER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES. PURCHASER ACKNOWLEDGES AND WARRANTS THAT PURCHASER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES

IS FREE AND VOLUNTARY.

(c)  Effect and Survival of Disclaimers. Seller and Purchaser acknowledge that the provisions of this Article 14 are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller would not enter into this Agreement but for the provisions of this Article 14. Seller and Purchaser agree that the provisions of this Article 14 shall survive Closing or any termination of this Agreement.

## ARTICLE 15

## ESCROW AGENT

**Section 15.1 Duties.** By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent. Upon its receipt of funds from Purchaser, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

**Section 15.2 Indemnity.** Escrow Agent will not be liable to any party except for claims resulting from the gross negligence or willful misconduct of Escrow Agent. If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all Losses to which Escrow Agent may be subjected or which it may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's gross negligence or willful misconduct. If the indemnity amounts payable hereunder result from the fault of Purchaser or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts. Otherwise, Purchaser and Seller each will be responsible for one-half of such amounts.

**Section 15.3 Dispute.** If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor. In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Purchaser is not the prevailing party in such action or proceeding. If there is no prevailing party, Seller and Purchaser each shall be responsible for one-half of such costs and fees.

**Section 15.4 <u>Execution by Escrow Agent</u>.** Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this Article 15. Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this Article 15 shall not be required. Purchaser acknowledges that Escrow Agent is counsel for the Seller and agrees that its service as Escrow Agent and closing agent will not preclude Escrow Agent from representing Seller in any dispute with Purchaser.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, each of Seller and Purchaser has executed this Agreement as of the day and year first above written.

**SELLER:**

**THE VUE-ORLANDO, LLC, a Delaware limited liability company**

By: _____
Name: _____
Title: _____

**PURCHASER:**

Blue Key Investments LLC,aFlorida limited liability company
By: ADFECTO, LLC, a Florida limited liability company, Its Manager

By: _____
Name: Jarre Koskinen
Title: Managing Member

Acknowledged and agreed this ___ day of _____, 2010 for the limited purposes set forth in Article 15 of this Agreement:

**ESCROW AGENT:**

**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**

By: _____
Name: _____
Title: _____

# TABLE OF SCHEDULES

| **Schedule/Section** | **Title** |
|---|---|
| Schedule 2.1(a) | Real Property |
| Schedule 2.1(b) | Personal Property |
| Schedule 2.1(c) | Contracts |
| Schedule 2.2 | Additional Excluded Assets |
| Schedule 3.3 | Purchase Price Allocation |

**SCHEDULE 2.1(a)**
**REAL PROPERTY**

1.  Each of the parcels identified on the attached list, The Vue at Lake Eola, a Condominium, according to the Declaration of Condominium thereto recorded in Official Records Book 9444, page 3009, Public Records of Orange County, Florida, as amended.

2.  All of the Seller's rights, interests and obligations as the "Developer" pursuant to the Declaration, to the extent any such right, interest or obligation is not an Excluded Asset.

| Parcel Number | Floor | Unit |
|---|---|---|
| 25-22-29-8950-02102 | 2 | A02 |
| 25-22-29-8950-02104 | 2 | A04 |
| 25-22-29-8950-02106 | 2 | A06 |
| 25-22-29-8950-02107 | 2 | A07 |
| 25-22-29-8950-02108 | 2 | A08 |
| 25-22-29-8950-02111 | 2 | A11 |
| 25-22-29-8950-02112 | 2 | A12 |
| 25-22-29-8950-02114 | 2 | A14 |
| 25-22-29-8950-02116 | 2 | A16 |
| 25-22-29-8950-04101 | 4 | A01 |
| 25-22-29-8950-04102 | 4 | A02 |
| 25-22-29-8950-04108 | 4 | A08 |
| 25-22-29-8950-04109 | 4 | A09 |
| 25-22-29-8950-04111 | 4 | A11 |
| 25-22-29-8950-04112 | 4 | A12 |
| 25-22-29-8950-04113 | 4 | A13 |
| 25-22-29-8950-04115 | 4 | A15 |
| 25-22-29-8950-04116 | 4 | A16 |
| 25-22-29-8950-06004 | 6 | S04 |
| 25-22-29-8950-06008 | 6 | S08 |
| 25-22-29-8950-06009 | 6 | S09 |
| 25-22-29-8950-06010 | 6 | S10 |
| 25-22-29-8950-06016 | 6 | S16 |
| 25-22-29-8950-06019 | 6 | S19 |
| 25-22-29-8950-06020 | 6 | S20 |
| 25-22-29-8950-06022 | 6 | S22 |
| 25-22-29-8950-07004 | 7 | S04 |
| 25-22-29-8950-07005 | 7 | S05 |
| 25-22-29-8950-07006 | 7 | S06 |
| 25-22-29-8950-07008 | 7 | S08 |
| 25-22-29-8950-07010 | 7 | S10 |
| 25-22-29-8950-07014 | 7 | S14 |
| 25-22-29-8950-08101 | 8 | A01 |
| 25-22-29-8950-08103 | 8 | A03 |
| 25-22-29-8950-08107 | 8 | A07 |
| 25-22-29-8950-08108 | 8 | A08 |
| 25-22-29-8950-08110 | 8 | A10 |
| 25-22-29-8950-08111 | 8 | A11 |
| 25-22-29-8950-08114 | 8 | A14 |
| 25-22-29-8950-08117 | 8 | A17 |
| 25-22-29-8950-08118 | 8 | A18 |
| 25-22-29-8950-08119 | 8 | A19 |
| 25-22-29-8950-08124 | 8 | A24 |
| 25-22-29-8950-10103 | 10 | A03 |
| 25-22-29-8950-10108 | 10 | A08 |
| 25-22-29-8950-10110 | 10 | A10 |
| 25-22-29-8950-10114 | 10 | A14 |
| 25-22-29-8950-10115 | 10 | A15 |
| 25-22-29-8950-10117 | 10 | A17 |
| 25-22-29-8950-10120 | 10 | A20 |

| Parcel Number | Floor | Unit |
|---|---|---|
| 25-22-29-8950-10122 | 10 | A22 |
| 25-22-29-8950-10123 | 10 | A23 |
| 25-22-29-8950-12102 | 12 | A02 |
| 25-22-29-8950-12106 | 12 | A06 |
| 25-22-29-8950-12107 | 12 | A07 |
| 25-22-29-8950-12114 | 12 | A14 |
| 25-22-29-8950-12116 | 12 | A16 |
| 25-22-29-8950-12117 | 12 | A17 |
| 25-22-29-8950-12120 | 12 | A20 |
| 25-22-29-8950-12121 | 12 | A21 |
| 25-22-29-8950-12122 | 12 | A22 |
| 25-22-29-8950-12123 | 12 | A23 |
| 25-22-29-8950-14105 | 14 | A05 |
| 25-22-29-8950-14106 | 14 | A06 |
| 25-22-29-8950-14107 | 14 | A07 |
| 25-22-29-8950-14108 | 14 | A08 |
| 25-22-29-8950-14109 | 14 | A09 |
| 25-22-29-8950-14111 | 14 | A11 |
| 25-22-29-8950-14112 | 14 | A12 |
| 25-22-29-8950-14117 | 14 | A17 |
| 25-22-29-8950-14119 | 14 | A19 |
| 25-22-29-8950-14120 | 14 | A20 |
| 25-22-29-8950-14122 | 14 | A22 |
| 25-22-29-8950-14123 | 14 | A23 |
| 25-22-29-8950-14124 | 14 | A24 |
| 25-22-29-8950-16204 | 16 | B04 |
| 25-22-29-8950-17202 | 17 | B02 |
| 25-22-29-8950-17205 | 17 | B05 |
| 25-22-29-8950-17207 | 17 | B07 |
| 25-22-29-8950-17208 | 17 | B08 |
| 25-22-29-8950-17301 | 17 | C01 |
| 25-22-29-8950-18202 | 18 | B02 |
| 25-22-29-8950-19201 | 19 | B01 |
| 25-22-29-8950-19301 | 19 | C01 |
| 25-22-29-8950-21207 | 21 | B07 |
| 25-22-29-8950-21209 | 21 | B09 |
| 25-22-29-8950-21301 | 21 | C01 |
| 25-22-29-8950-22203 | 22 | B03 |
| 25-22-29-8950-22204 | 22 | B04 |
| 25-22-29-8950-22207 | 22 | B07 |
| 25-22-29-8950-22208 | 22 | B08 |
| 25-22-29-8950-22301 | 22 | C01 |
| 25-22-29-8950-23202 | 23 | B02 |
| 25-22-29-8950-23203 | 23 | B03 |
| 25-22-29-8950-23205 | 23 | B05 |
| 25-22-29-8950-23207 | 23 | B07 |
| 25-22-29-8950-23301 | 23 | C01 |
| 25-22-29-8950-24302 | 24 | C02 |
| 25-22-29-8950-25301 | 25 | C01 |
| 25-22-29-8950-26201 | 26 | B01 |
| 25-22-29-8950-26203 | 26 | B03 |

| Parcel Number | Floor | Unit |
|---|---|---|
| 25-22-29-8950-26204 | 26 | B04 |
| 25-22-29-8950-26206 | 26 | B06 |
| 25-22-29-8950-26207 | 26 | B07 |
| 25-22-29-8950-26301 | 26 | C01 |
| 25-22-29-8950-26302 | 26 | C02 |
| 25-22-29-8950-27202 | 27 | B02 |
| 25-22-29-8950-27203 | 27 | B03 |
| 25-22-29-8950-27209 | 27 | B09 |
| 25-22-29-8950-27301 | 27 | C01 |
| 25-22-29-8950-28202 | 28 | B02 |
| 25-22-29-8950-28203 | 28 | B03 |
| 25-22-29-8950-28204 | 28 | B04 |
| 25-22-29-8950-28206 | 28 | B06 |
| 25-22-29-8950-28209 | 28 | B09 |
| 25-22-29-8950-28302 | 28 | C02 |
| 25-22-29-8950-29203 | 29 | B03 |
| 25-22-29-8950-29204 | 29 | B04 |
| 25-22-29-8950-29206 | 29 | B06 |
| 25-22-29-8950-29209 | 29 | B09 |
| 25-22-29-8950-29302 | 29 | C02 |
| 25-22-29-8950-30202 | 30 | B02 |
| 25-22-29-8950-30204 | 30 | B04 |
| 25-22-29-8950-30207 | 30 | B07 |
| 25-22-29-8950-30208 | 30 | B08 |
| 25-22-29-8950-30209 | 30 | B09 |
| 25-22-29-8950-30302 | 30 | C02 |
| 25-22-29-8950-30201 | 31 | B01 |
| 25-22-29-8950-31202 | 31 | B02 |
| 25-22-29-8950-31203 | 31 | B03 |
| 25-22-29-8950-31204 | 31 | B04 |
| 25-22-29-8950-31207 | 31 | B07 |
| 25-22-29-8950-31208 | 31 | B08 |
| 25-22-29-8950-31209 | 31 | B09 |
| 25-22-29-8950-31302 | 31 | C02 |
| 25-22-29-8950-32201 | 32 | B01 |
| 25-22-29-8950-32202 | 32 | B02 |
| 25-22-29-8950-32203 | 32 | B03 |
| 25-22-29-8950-32204 | 32 | B04 |
| 25-22-29-8950-32205 | 32 | B05 |
| 25-22-29-8950-32206 | 32 | B06 |
| 25-22-29-8950-32207 | 32 | B07 |
| 25-22-29-8950-32208 | 32 | B08 |
| 25-22-29-8950-32302 | 32 | C02 |
| 25-22-29-8950-33202 | 33 | B02 |
| 25-22-29-8950-33203 | 33 | B03 |
| 25-22-29-8950-33204 | 33 | B04 |
| 25-22-29-8950-33206 | 33 | B06 |
| 25-22-29-8950-33207 | 33 | B07 |
| 25-22-29-8950-33208 | 33 | B08 |
| 25-22-29-8950-33209 | 33 | B09 |
| 25-22-29-8950-33302 | 33 | C02 |

| Parcel Number | Floor | Unit |
|---|---|---|
| 25-22-29-8950-34202 | 34 | B02 |
| 25-22-29-8950-34203 | 34 | B03 |
| 25-22-29-8950-34204 | 34 | B04 |
| 25-22-29-8950-34206 | 34 | B06 |
| 25-22-29-8950-34207 | 34 | B07 |
| 25-22-29-8950-34208 | 34 | B08 |
| 25-22-29-8950-34301 | 34 | C01 |
| 25-22-29-8950-34302 | 34 | C02 |
| 25-22-29-8950-35202 | 35 | B02 |
| 25-22-29-8950-35203 | 35 | B03 |
| 25-22-29-8950-35204 | 35 | B04 |
| 25-22-29-8950-35205 | 35 | B05 |
| 25-22-29-8950-35206 | 35 | B06 |
| 25-22-29-8950-01010 | COMM | 1A |
| 25-22-29-8950-01020 | COMM | 1B |
| 25-22-29-8950-01030 | COMM | 1C |
| 25-22-29-8950-01040 | COMM | 1D |
| 25-22-29-8950-01050 | COMM | 1E |
| 25-22-29-8950-01060 | COMM | 1F |

**SCHEDULE 2.1(b)**
**PERSONAL PROPERTY**
(See attached.)

# VUE Common Areas

## Fitness Center

| | |
|---|---|
| Stack Tower | 1 |
| Adustable Cable Tower | 1 |
| Lat Pulldown | 1 |
| Row | 1 |
| Triceps Pushdown | 1 |
| Dual Adjustable Cable Towers | 1 |
| Seated Leg Press | 1 |
| Seated Leg Curl , | 1 |
| Leg Extension | 1 |
| Chest Press | 1 |
| Shoulder Press | 1 |
| Pulldown | 1 |
| Row/Rear Deltoid | 1 |
| Biceps Curl | 1 |
| Triceps Press | 1 |
| Back Extension | 1 |
| Abdominal | 1 |
| Hip Adduction | 1 |
| Hip Abduction | 1 |
| Ab Crunch Bench | 1 |
| Back Extension Bench | 1 |
| Leg Raise | 1 |
| Strength Olympic Tower | 1 |
| Strength Olympic Adjustable | 1 |
| Smith Machine | 1 |
| Seated Calf Raise | 1 |
| Multi-Adj Bench | 3 |
| Dumbbell Rack | 1 |
| Rubber Grip Set | 1 |
| Olympic Grip Set | 1 |
| Star Trac PRO Treamill | 5 |
| Star Trac PRO Elliptical | 3 |
| Star Trac PRO Recumbant Bike | 2 |
| Star Trac PRO Upright Bike | 2 |
| Star Trac PRO Climber | 2 |
| Broadcastvision Transmitter | 3 |
| Broadcastvision Receiver | 14 |
| Broadcast Vision Cords | 14 |
| 36" TVs | 4 |
| Phones | 2 |

## Cyber Café

| | |
|---|---|
| Pool table | 1 |
| 36" TVs | 4 |
| 24" TVs | 2 |
| Phones | 3 |
| Stacking chairs | 6 |
| Lounge chair | 5 |
| Armchair | 4 |
| Seat sofa | 2 |
| Bird sofa | 4 |
| Section sofa pieces | 10 |
| Sofa tables | 2 |
| Hydra Adjustable Table | 3 |
| Bar stool | 22 |
| Bar tables 27.5" | 6 |
| Bar table 36" | 1 |
| Small turn table | 5 |

## Corporate Unit 3003

| | |
|---|---|
| Queen bed set | 1 |
| Dresser | 1 |
| Nightstand | 1 |
| Lamps aluminum finish | 2 |
| Sheets, two pillows | 1 |
| Comforter with duvet cover | 1 |
| Full size bed | 1 |
| Dresser | 1 |
| Nightstand | 1 |
| Table lamp | 1 |
| Full sheet set | 1 |
| Comfortor Set | 1 |
| Couch | 1 |
| Chair | 1 |
| Round dining table | 1 |
| Dining chairs | 4 |
| Clear glass cocktail table | 1 |
| 42' flat screen "LG" television | 1 |
| TV stand | 1 |
| Patio chairs | 1 |
| Small Table | 1 |
| Cookware | assorted |
| Plates | assorted |
| Dinnerware | assorted |
| Glassware | assorted |
| Bathroom towels | assorted |

## Corporate Unit 2608

| | |
|---|---|
| Double bed | 2 |
| Bar stools | 4 |
| Coffee Table | 1 |
| Leather loveseat | 1 |
| Stirling TV (52") | 1 |
| TV Stand | 1 |

## Model Unit 1705

| | |
|---|---|
| Double bed | 1 |
| Small bookcase | 2 |
| Large bookcase | 1 |
| Armoir | 1 |
| Couch | 1 |
| Chair | 1 |
| Coffee Table | 1 |
| Ottoman | 1 |
| Dining Table | 1 |
| Dining Chairs | 4 |
| Bar stools | 3 |
| Buffet table | 1 |
| Office desk | 1 |
| Office chair | 1 |
| Small coffee table | 1 |
| Foyer table | 1 |
| Deck chairs | 2 |
| Deck table | 1 |
| Potted plants | assorted |
| Model finishes | assorted |

**Lobby**

| | |
|---|---|
| Swan swivelling chair | 4 |
| Swan 2-seat sofa | 1 |
| Egg swivel chair | 4 |
| Millenium table | 1 |
| Felt chair | 4 |
| Felt ottoman | 4 |
| Small, glass round table | 2 |
| Small, white table | 3 |
| Wire chairs | 4 |
| 36" TV | 1 |
| Phones | 4 |

**Media Center**

| | |
|---|---|
| Leather chairs | 10 |
| TV and equipment | 1 |

**Storage Unit - Sales Center Appliances**

| | |
|---|---|
| Subzero fridge | 1 |
| Miele dishwasher | 1 |
| Broan hood | 1 |
| GE dishwasher | 1 |
| GE oven/range | 1 |
| Wolfe microwave | 1 |
| Spacemaker microwave | 1 |
| Wolfe range | 1 |
| Wolfe oven | 1 |

**Misc.**

| | |
|---|---|
| Bike racks | 2 |
| Scissor lifts | 2 |
| Trash compactor | 1 |

**Offices/Business Center/Breakroom**

| | |
|---|---|
| Conf room chairs | 24 |
| Beech café chair | 6 |
| Lateral 3 drawer file | 1 |
| Shelf system - HOA | 2 |
| 42" dining table | 1 |
| Dining chair | 4 |
| Conf table - seats 8 | 1 |
| Conf table - seats 14 | 1 |
| Desking system | 4 |
| Printer workstation | 1 |
| Phones | 8 |

**Amenity Deck**

| | |
|---|---|
| Umbrella table | 13 |
| End tables | 17 |
| Chaise lounge chairs | 44 |
| Umbrellas | 13 |
| Planters - square | 14 |
| Planters - rectangle | 6 |
| Basketball goal | 1 |
| Grills | 3 |
| Chrome bench | 1 |

**Porte Corchere**

| | |
|---|---|
| Chrome bench | 2 |
| Chrome trash cans - large | 2 |
| Planters - square | 2 |

**Artwork**

All artwork excluding pieces identified as Excluded Assets on Schedule 2.2.

**SCHEDULE 2.1(c)
CONTRACTS**


1.    Chilled Water Service Agreement by and between Orlando Utilities Commission
and The Vue-Orlando, LLC for the Vue at Lake Eola.

**SCHEDULE 2.2**
**ADDITIONAL EXCLUDED ASSETS**
(See attached.)

## Artwork

All artwork pieces owned by Eric Moskowitz as identified/labeled on each individual piece of artwork and all artwork listed below :

| Art Title | #/Style | Artist | Cost | |
|---|---|---|---|---|
| Tin Shed Kanji Series | 23 | Pam Louden | $ | 235 |
| Tin Shed Kanji Series | 19 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 9 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 25 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 7 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 2 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 17 | Pam Loudon | $ | 235 |
| Tin Shed Kanji Series | 28 | Pam Loudon | $ | 235 |
| A Woman in Love | Mixed Media | Donna Dowless | $ | 875 |
| Precious Love | Mixed Media | Donna Dowless | $ | 875 |
| Everlasting Love | Mixed Media | Donna Dowless | $ | 975 |
| Heavenly Love | Mixed Media | Donna Dowless | $ | 625 |
| XO Love | Mixed Media | Donna Dowless | $ | 625 |
| Surrounded by Love | Mixed Media | Donna Dowless | $ | 875 |
| Love Story | Mixed Media | Donna Dowless | $ | 1,125 |
| Friends | Mixed Media | Donna Dowless | $ | 875 |
| Follow Your Heart | Mixed Media | Donna Dowless | $ | 725 |
| Love and Happiness | Mixed Media | Donna Dowless | $ | 675 |

**SCHEDULE 3.3**
**PURCHASE PRICE ALLOCATION**
(To be supplied at Closing.)

## FIRST ADDENDUM TO ASSET PURCHASE AGREEMENT

This FIRST ADDENDUM TO ASSET PURCHASE AGREEMENT ("Addendum") is made and entered into as of March ____, 2010 ("Effective Date") by and between THE VUE-ORLANDO, LLC a Florida limited liability company ("Seller") and BLUE KEY INVESTMENTS, LLC, a Florida limited liability company ("Purchaser") (collectively, Seller and Purchaser shall be referred to as the "Parties").

## RECITALS

A.      On March _____, 2010, the Seller and Purchaser executed an Asset Purchase Agreement (the "Asset Agreement") for the sale of the Acquired Assets (collectively, Asset Agreement and Addendum shall be referred to as the "Agreement"); and

B.      The Agreement is subject to (i) approval of the Bankruptcy Court and (ii) overbids pursuant to certain Bid Procedures approved by the Bankruptcy Court in connection with the sale of the Acquired Assets to Purchaser or some other third party.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the terms and conditions of this Addendum, and the mutual covenants herein contained, the Parties hereby agree as follows:

1.      **Assignment by Purchaser**. This Agreement shall be freely assignable by Purchaser to one or more newly created entities of the Purchaser upon provision of written notice to Seller.

2.      **Intentionally Deleted**.

3.      **Stalking Horse Bidder and Break-Up Fee**. This Agreement is being entered into as the Stalking Horse Agreement with the Purchaser qualifying as the Stalking Horse Bidder as such terms are defined in the Bid Procedures. If Purchaser makes the highest and best offer and is the Successful Bid, then this Agreement shall remain in force (except that the Purchase Price shall be increased to Purchaser's highest offer pursuant to the Bid Procedures) and Seller shall seek the Bankruptcy Court Approval with respect to this Agreement. However, if Purchaser did not make the highest and best offer and is not the Successful Bid, and if such higher and better offer is accepted by Seller, approved by the Bankruptcy Court and closed, then (i) this Agreement shall be terminated as of the date of such closing, (ii) the Deposit and any accrued interest shall be paid to Purchaser upon such closing and neither party shall have any further obligations under this Agreement, except Purchaser shall not be relieved of any obligation hereunder which by its terms survives the termination, and (iii) Seller shall pay to Purchaser from the proceeds of such sale of the Acquired Assets upon such closing a fee in the amount of $75,000.00 ("Breakup Fee"), which fee is not a penalty, but is an amount the Parties have agreed is fair reimbursement and/or compensation to Purchaser for its due diligence, legal, consulting and other expenditures relating to this Agreement. In the event that (i) a party other than Purchaser is determined by Bankruptcy Court Approval to be the highest and best offeror for the Acquired Assets (such party, the "First Offeror"), (ii) Purchaser is determined to have made the second highest and best offer for the Acquired Assets, (iii) the First Offeror defaults in its obligation to purchase the Acquired Assets, and (iv) Seller is satisfied in its sole and absolute discretion, or due to an order from the Bankruptcy Court, that (A) Seller's obligation to sell the Acquired Assets to the First Offeror has terminated and (B) the First Offeror has no claim (and the Seller has no liability) with respect thereto, then in such a case, Seller will

accept Purchaser's highest and best offer made at the final sale hearing in accordance with the Bid Procedures (or if Purchaser does not make such a higher and better offer, then Purchaser's offer contained in this Agreement) and Seller and Purchaser will proceed to close the transaction contemplated under this Agreement in accordance with the terms and subject to the conditions set forth herein. In the event that a party other than Purchaser is determined by Bankruptcy Court Approval to be the highest and best offeror for the Acquired Assets, then notwithstanding anything to the contrary in this Agreement, Purchaser shall keep its highest prior offer open and available to close with Seller in the event that Seller is unable or unwilling to close with any other offeror that was previously determined, pursuant to a Bankruptcy Court Approval, to be a higher and better offer than Seller's highest and best offer. Notwithstanding anything set forth elsewhere in this Agreement, Purchaser must comply with this paragraph and maintain its highest offer until the closing of the sale of the Acquired Assets pursuant to the preceding paragraph to obtain the Breakup Fee. The provisions of this paragraph are shall expressly survive the termination of the Agreement.

4. **Title To Acquired Assets**. Purchaser's obligation to consummate this transaction is contingent upon the Seller conveying to the Purchaser marketable, fee interest title to the Acquired Assets, as defined by the title standards adopted by the Florida bar with respect to the Real Property, free and clear of all liens claims and encumbrances, except the Permitted Encumbrances and any other exceptions as permitted by the Purchaser. The Bankruptcy Court Approval shall contain all the elements required by Title Insurer to insure the Purchaser's marketable, fee interest title to the Real Property being transferred as part of the Acquired Assets.

5. **Ratification**. Except as modified by this Addendum, the terms and provisions of the Asset Agreement are ratified and confirmed by Seller and Purchaser and are incorporated in this Addendum by reference as if fully set forth herein. All terms not expressly defined herein shall have the meaning ascribed to them in the Asset Agreement. In the event of any conflict between the terms of the Asset Agreement and the terms of this Addendum, the terms of this Addendum shall control.

6. **Counterparts**. This Addendum may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

7. **Facsimile Signatures**. Facsimile signatures affixed to this Addendum shall be deemed originals for all purposes under this Addendum.

**[SIGNATURES CONTAINED ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, THE PARTIES HAVE ENTERED INTO THIS ADDENDUM AS OF THE DATES SET FORTH BELOW:

**PURCHASER:**

BLUE KEY INVESTMENTS, LLC
a Florida limited liability company

BY: ADFECTO, LLC
a Florida limited liability company, its Manager

By: _____
Jayne Keskinen, its Managing Member

Date: _____

**SELLER:**

THE VUE-ORLANDO, LLC
a Florida limited liability company

By: _____

Date: _____

### JOINDER BY ESCROW AGENT

The undersigned Escrow Agent agrees to hold and distribute the Deposit, if applicable, in escrow, pending consummation of the foregoing Addendum, in accordance with the terms hereof and as set forth in the Agreement.

_____

By: _____

Dated: _____