# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                              **Chapter 11**

**THE VUE-ORLANDO, LLC,**                           **Case No. 6:09-14833-KSJ**

                    **Debtor.**

_____/

## ORDER (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS; (B) APPROVING ASSET PURCHASE AGREEMENT; (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT AND REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) GRANTING OTHER RELIEF

**THIS CASE** came on for hearing on March 31, 2010 (the "Hearing") upon the motion (the "Sale Motion") of the Debtor,[1] pursuant to sections 105(a), 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Sale Order"): (a) authorizing the sale (the "Sale") of the Acquired Assets (as defined in the APA (as defined below)) free and clear of all liens, claims and interests to Condo Developer, LLC (together with its designees, the "Purchaser"); (b) approving the Asset Purchase Agreement, attached hereto as Exhibit 1, between the Debtor and the Purchaser (with the Addendum associated therewith, the "APA"); (c) authorizing the assumption and assignment to the Purchaser and/or the rejection of the executory contract designated by the Purchaser (the "Executory Contract"); and (d) granting certain related relief, all as more fully set forth in the

---

[1] Unless otherwise noted, Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Sale Motion.

Sale Motion (Doc. No. 55); the Court having entered an order dated December 28, 2009 (the "Bid Procedures Order," and, attached as Exhibit A thereto, the "Bid Procedures") approving the Bid Procedures, scheduling an Auction and Sale Hearing, approving the form and manner of notice in connection therewith and establishing procedures relating to the assumption and assignment and/or rejection of certain contracts; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334 (Doc. No. 106); and consideration of the Sale Motion, the relief requested therein, and the responses thereto being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and any such objections having been overruled, resolved or withdrawn, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its creditors, the estate and all other parties in interest; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT**:

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction over the Sale Motion and the transactions contemplated by the APA pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

D.     Good and sufficient notice of the Sale Hearing and Sale Motion and the relief sought therein has been given to all interested persons and entities, including, without limitation, (i) the U.S. Trustee; (ii) counsel to KeyBank, N.A. as Administrative Agent for the Pre-Petition Note A Lenders and the Pre-Petition Note B Lenders (the "Pre-Petition Lenders"); (iii) counsel to KeyBank, N.A. as Administrative Agent for the DIP Lenders (as defined under that certain Final Order (I) Authorizing the Debtor to obtain Post-Petition Second Financing, (II) Granting Certain Liens, (III) Granting Adequate Protection, (IV) Funding Segregated Account with Cash Collateral, (V) Modifying the Automatic Stay (Doc. No. 105)(the "DIP Order"), (hereinafter, the Pre-Petition Lenders and DIP Lenders may collectively be referred to as the "Lenders"); (iv) the 20 largest unsecured creditors for the Debtor on a consolidated basis as identified in the Debtor's chapter 11 petition; (v) all taxing authorities having jurisdiction over any of the Acquired Assets; (vi) all parties who are known to possess or assert a secured claim against the Acquired Assets; (vii) all contract and lease counterparties; (viii) all parties known or reasonably believed to have expressed an interest in the Acquired Assets; (ix) all other creditors of the Debtor (whether liquidated, contingent or unmatured) other than the creditors specifically excluded from such service, as agreed by the Debtor and Purchaser; (x) all parties to any governmental approvals or permits; (xi) any applicable state environmental agency; and (xii) all parties who have filed a request for notice in the above-captioned cases pursuant to Bankruptcy Rule 2002. No other or further notice of the Sale Hearing, the Sale Motion or this Sale Order is necessary or required.

E.    A sound business purpose justifies the Sale of the Acquired Assets outside of the ordinary course of business.

F.    The Bid Procedures set forth in the Bid Procedures Order were non-collusive and substantively and procedurally fair to all parties.

G.    The Debtor complied with the Bid Procedures and the Bid Procedures Order and the Debtor's publication of a notice in substantially the form of the Publication Notice in The Wall Street Journal, The New York Times, the Orlando Sentinel and the Tampa Tribune on multiple dates in January and February 2010, provided sufficient notice of the Sale.

H.    The Debtor solicited offers for, scheduled an auction of, and selected the Successful Bidder (as defined in the Bid Procedures) for the Sale of the Acquired Assets in accordance with the Bid Procedures Order.  The Debtor (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as a Qualified Bidder (as defined in the Bid Procedures) and submit their highest or otherwise best offer to purchase the Acquired Assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets and (iii) considered any bids submitted on or before the bid deadline.

I.    The Auction was held fairly and openly on March 15, 2010, and the Purchaser submitted the highest and best bid for the Acquired Assets.

J.    The consideration to be paid by the Purchaser to the Debtor pursuant to the APA: (i) is fair and reasonable; (ii) is the highest and/or best offer for the Acquired Assets; (iii) is in the best interests of the Debtor's creditors and the estate; and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any state fraudulent conveyance law applicable to the contemplated transactions.

K.     Entry into the APA and consummation of the transactions contemplated thereby constitute the exercise of the Debtor's sound business judgment and fiduciary duties and such acts are in the best interests of the Debtor, its creditors and the estate.

L.     The transactions contemplated by the APA are undertaken by the Debtor and the Purchaser at arms' length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby and otherwise has proceeded in good faith in all respects in connection with this proceeding in that:  (a) the Purchaser recognized that the Debtor was free to deal with any other party interested in acquiring the Acquired Assets; (b) the Purchaser in no way induced or caused the chapter 11 filing of the Debtor; (c) the Purchaser made the highest and/or otherwise best bid for the Acquired Assets; (d) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the transactions have been disclosed; and (e) the negotiation and execution of the APA and any other agreements or instruments related thereto was in good faith and an arms' length transaction between the Purchaser and the Debtor.

M.     The Debtor and the Purchaser have not engaged in any conduct that would permit the APA or the Sale to be avoided under Section 363(n) of the Bankruptcy Code.

N.     The Acquired Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.  The Debtor has all right, title and interest in, to and under the Acquired Assets to transfer and convey the Acquired Assets as contemplated by the APA.

O.    Except as permitted under the express terms of the APA and the Bid Procedures Order, and provided that the Debtor's obligations and liabilities as Developer owed to The Vue at Lake Eola Condominium Association, Inc. (the "Association") are paid to the Association, in the asserted amount of $562,716.00 out of the Purchase Price at Closing or paid into escrow at Closing subject to further order of the Court or agreement of the parties, the consummation of the Sale pursuant to the APA will be a legal, valid and effective Sale of the Acquired Assets and will vest the Purchaser (and its designees or assignees, as applicable) with all right, title and interest in and to the Acquired Assets free and clear of all (a) liens, mortgages, security interests, pledges, claims, encumbrances, liabilities, demands, judgments  and interests of whatever kind and nature, whether known or unknown, including but not limited to liens, claims, encumbrances, interests or liabilities asserted by any of the Debtor's creditors, vendors, suppliers, employees, existing condominium unit owners, the Association, executory contract counterparties, governmental units or interested parties in these proceedings; and (b) all debts arising under, relating to or in connection with any acts of the Debtor, claims (as that term is defined in 11 U.S.C. § 101(5)), obligations, demands, guarantees, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, in the case of (a) or (b), whether imposed by agreement, understanding, statute, regulation, law, equity or otherwise (collectively, only as they relate to the Debtor, the Business and the Acquired Assets, the "Interests"), except for: all debts, obligations and liabilities relating to the Business (as defined in the APA) or the Acquired Assets arising after the Closing Date (as defined in the APA) (other than those liabilities that may arise after the Closing Date but are a result of any act, omission or circumstance taking place prior to the Closing Date, including, without limitation, any liabilities with respect to environmental violations, employee plans or any other employment-related

matter), whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following: (a) all liabilities and obligations of Seller under the Executory Contract arising after the Closing Date; (b) subject to Section 3.2 of the APA, all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to an Acquired Asset and payable after the Closing Date, including but not limited to the Purchaser's prorated portion of the 2010 *ad valorem* taxes and each subsequent years' *ad valorem* taxes; (c) covenants, rights, and obligations set forth in paragraph 14 of the Bid Procedures Order; and (d) all debts, liabilities and obligations arising out of the ownership or operation by Purchaser of any Acquired Asset or the Business after the Closing Date (the "Assumed Liabilities"); provided, however, that notwithstanding any other provision hereof; the liens and claims of the Prepetition Lenders shall attach to the proceeds of the Sale (i.e. the Purchase Price) in order of their priorities as set forth in the Co-Lender Agreement (as defined by the Bid Procedures Order), the DIP Order and the pre-petition loan documents.

P.     A sale of the Acquired Assets other than one free and clear of the Interests (other than the Assumed Liabilities) would be of substantially less benefit to and would adversely affect the Debtor's bankruptcy estate and its creditors.

Q.     With respect to all parties asserting any Interests (other than the Assumed Liabilities) in, to, or against the Acquired Assets, the Sale complies with all the requirements of section 363(f) of the Bankruptcy Code. With respect to each such Interest in the Acquired Assets: (a) applicable non-bankruptcy law permits the sale free and clear of such Interest; (b) the holder of such Interest consents to the Sale free and clear of its Interest; (c) such Interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens

on the Acquired Assets; (d) such Interest is in bona fide dispute; or (e) the holder of such Interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Interest.

R.      All parties with Interests (other than the Assumed Liabilities) in the Acquired Assets, if any, who did not object to the Sale Motion and the relief requested therein, or who withdrew their objections to the Sale Motion, are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code; and all such parties who objected to the Sale Motion, but who did not withdraw any such objection, (a) fall within one or more of the subsections of 363(f) and are adequately protected by having their Liens, Claims and/or Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges an interest, in the same order and priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and the estate may possess with respect thereto, and (b) in each case, are enjoined from taking any action against the Acquired Assets, the Purchaser, its affiliates or any agent of the foregoing, to recover any claim which such person or entity has solely against the Debtor.

S.      The Sale and all transactions related thereto are not and do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor and the Debtor's estate, there is not substantial continuity between the Purchaser and the Debtor, there is no significant common identity between the Purchaser and the Debtor, there is no continuity of enterprise between the Purchaser and the Debtor, the Purchaser is not a mere continuation of the Debtor or the estate and the Purchaser does not constitute a successor to the Debtor or the estate.

T.      By virtue of the APA or otherwise, the Purchaser will not acquire any liabilities of the Debtor, other than the Assumed Liabilities specifically set forth or referenced herein.

U.      Without limiting the generality of the foregoing, other than the Assumed Liabilities, the Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, the estate and the creditors, if the Sale of the Acquired Assets to the Purchaser and the assignment of the Executory Contract to the Purchaser were not free and clear of the Interests, other than the Assumed Liabilities, or if the Purchaser would, or in the future could, be liable with respect to the Interests.

V.      Good and sufficient notice of the possible transfer, assumption and assignment of the Executory Contract has been given to the party to the Executory Contract and no other or further notice is required.  A reasonable opportunity to object or be heard has been offered to the party in interest.

W.      The Executory Contract is valid and binding, in full force and effect, and enforceable in accordance with its terms.

X.      With respect to the Executory Contract, the Debtor has met the requirements of section 365(b) of the Bankruptcy Code.

Y.      If the Purchaser elects to receive assignment of the Executory Contract, the cure costs (the "Determined Cure Costs") related thereto are deemed to be amounts necessary to "cure" (within the meaning of Section 365(b)(1) of the Bankruptcy Code) all "defaults" (within the meaning of Section 365(b) of the Bankruptcy Code) under the Executory Contract to the extent required by Section 365 of the Bankruptcy Code.

Z.      The Purchaser has demonstrated adequate assurance of future performance with respect to the Executory Contract pursuant to Section 365(b)(1)(C) of the Bankruptcy Code.

AA.     The Executory Contract is assignable notwithstanding any provisions contained therein to the contrary.  Failure to object to the assumption and assignment of the Executory Contract is deemed consent to assumption and assignment.

BB.     The rejection or assumption and assignment of the Executory Contract is integral to the APA and is in the best interests of the Debtor, its creditors, the estate and other parties-in-interest, and represents the exercise of sound and prudent business judgment by the Debtor.

CC.     The legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein.

DD.     Upon entry of this Sale Order, the Debtor shall have full power and authority to consummate the Sale contemplated by the APA.  The APA and the Sale have been duly and validly authorized by all necessary action of the Debtor and no shareholder vote, board resolution or other corporate action is required of Debtor for Debtor to consummate such Sale or the other transactions contemplated in the APA.

EE.     Cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rules 6004 and 6006.

FF.     The entry of this Sale Order is in the best interests of the Debtor, its creditors and the estate and other parties in interest.

GG.     The personal property identified in Schedule 2.1(b) of the APA ("Personal Property") constitutes or is ostensibly part of the common property of the Association and shall remain subject to the provisions of the Condominium Act, Administrative Rules and Declaration. Consequently, Purchaser (and its successors or assigns) shall not remove or cause to be removed all or any portion of the Personal Property from the premises.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Sale Motion, the APA and the transactions contemplated thereby shall be, and hereby are, granted and approved in all respects as modified by this Sale Order.

2.      All objections, responses and requests for continuance concerning the Motion are resolved in accordance with the terms of this Sale Order as set forth in the record of the Sale Hearing.   To the extent any such objection, response or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied with prejudice.

3.      Notice of the Auction and the Sale Hearing was fair and equitable under the circumstances and complied in all respects with 11 U.S.C. § 104(1) and Bankruptcy Rules 2002 and 6004.  The Sale Motion or notice thereof shall be deemed to provide sufficient notice of the Sale free and clear of all Interests except for the Assumed Liabilities, in accordance with Local Rule 6004-1.

4.      The Debtor is authorized and directed to close, consummate and comply with the APA and all other agreements and documents related to and contemplated thereby (collectively, the "Sale Documents") and to execute such other documents, including but not limited to an assignment with respect to the Condominium Declaration, and take such other actions as are necessary or appropriate to effectuate the Sale pursuant to the terms of the APA.

5.      The terms and provisions of this Order shall be binding in all respects upon the Purchaser and the Debtor, the estate and any trustees thereof, and all creditors and shareholders of the Debtor, all interested parties and their respective successors and assigns, including, but not limited to, any creditor asserting an Interest in the Acquired Assets.

6.       The Purchaser's offer for the Acquired Assets, as embodied in the APA, is the highest and/or best offer for the Acquired Assets and is hereby approved.

7.       Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Sale by the Debtor to the Purchaser of the Acquired Assets and the transactions related thereto, upon the Closing under the APA, are authorized and approved in all respects.

8.       Subject to the payment or delivery by the Purchaser of the consideration provided for in the APA pursuant to sections 363 and 365(a) of the Bankruptcy Code, the Sale of the Acquired Assets by the Debtor to the Purchaser shall constitute a legal, valid and effective transfer of the Acquired Assets and shall vest the Purchaser with all right, title and interest of Debtor in and to the Acquired Assets free and clear of the Interests (except the Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code, effective as of the Closing Date; with the liens and claims of the Prepetition Lenders attaching to the proceeds of the Sale as set forth in paragraph 12 herein.

9.       The Purchaser will not be subject to the Interests nor any other liabilities of the Debtor, other than the Assumed Liabilities expressly set forth in the APA, provided that the Debtor's obligations and liabilities as Developer owed to the Association in the asserted amount of $562,716.00 are paid to the Association out of the Purchase Price at Closing or paid into escrow at Closing, subject to further order of the Court or agreement of the parties.

10.      Upon the Closing Date, and in accordance with the APA, the Purchase Price shall be paid in immediately available funds as set forth in Section 3 of the APA.

11.      To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and

all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, authorized to be transferred to the Purchaser as of the Closing Date. Pursuant to Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the chapter 11 cases or the consummation of the transaction contemplated by the APA.

12. Pursuant to Section 363(f) of the Bankruptcy Code, the Sale of the Acquired Assets shall be free and clear of the Interests (except for the Assumed Liabilities), provided that the Debtor's obligations and liabilities as Developer owed to the Association in the asserted amount of $562,716.00 are paid to the Association out of the Purchase Price at Closing or paid into escrow at Closing subject to further order of the Court or agreement of the parties. The Purchaser shall not be liable in any way (as successor entity or otherwise) for any claims of any party or any other third party may have against the Debtor on account of the Interests (other than the Assumed Liabilities). Any and all valid and enforceable liens, claims and interests on, against or in the Acquired Assets, other than the Assumed Liabilities, shall be transferred, affixed and attached to the proceeds of the Sale with the same validity, priority, force and effect such liens, claims and interests had on the Acquired Assets immediately prior to the Sale and subject to the rights, claims, defenses and objections, if any, of the Debtor and all interested parties with respect to any such asserted liens, claims and interests. The Sale of the Acquired Assets to the Purchaser shall vest the Purchaser with all the right, title and interest of the Debtor to the Acquired Assets free and clear of the Interests, other than the Assumed Liabilities.

13.     The Purchaser has not assumed or otherwise become obligated for any of the Debtor's liabilities other than the Assumed Liabilities, and the Purchaser has not purchased any of the "Excluded Assets" as defined in Section 2.2 of the APA.

14.     Except for the Assumed Liabilities expressly set forth herein and Debtor's obligations and liabilities as Developer owed to the Association in the asserted amount of $562,716.00 are paid to the Association out of the Purchase Price at Closing or paid into escrow at Closing subject to further order of the Court or agreement of the parties, pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, all persons and entities, including, without limitation, the Debtor, all holders of Interests, the Lenders, all debt security holders, equity security holders, the Debtor's employees or former employees, governmental, tax, and regulatory authorities, lenders, parties to, beneficiaries under, sponsors of or contributors to any benefit plan, trade and other creditors or interested parties including but not limited to the HOA and any and all unit owners asserting or holding any liens, claims and interests, in or with respect to the Debtor or the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtor, the Acquired Assets, the operation of the Debtor's Business prior to the Closing Date under the APA or the transfer of the Acquired Assets to the Purchaser, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such liens, claims and interests against the Purchaser or any affiliate, successor or assign thereof and each of their respective members, officers, directors, financial advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Acquired Assets, including claims under section 365(n) of the Bankruptcy Code against the Purchaser with respect to the Acquired Assets.

15.     Except as otherwise expressly provided in the APA, the Purchaser shall have no liability for and no obligation to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees, independent contractors, or other construction-related creditors of the Debtor.  Except as otherwise expressly provided in the APA, the Purchaser shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtor is a party and relating to the Acquired Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement) and the Purchaser shall in no way be deemed a party to or assignee of such agreement and except for Assumed Liabilities, all parties to any such agreement are hereby enjoined from asserting against the Purchaser any and all Claims arising from or relating to such agreement.  Except for the Assumed Liabilities and provided that the Debtor's obligations and liabilities as Developer owed to the Association in the asserted amount of $562,716.00 are paid to the Association out of the Purchase Price at Closing or paid into escrow at Closing subject to further order of the Court or agreement of the parties, the Purchaser shall not acquire or assume, and shall have no liability or obligation for any liabilities of the Debtor, including any broker commission claims or other payments owing to the HOA or any condominium owners, as a successor in interest, successor-in-title or otherwise, including, without limitation any liability for any remedies sought by any Person under the WARN Act or similar state statute or ERISA or any liability with respect to COBRA Coverage for employees or consultants of the Debtor terminated prior to or as part of the consummation of the transaction set forth in the APA with regard to any conduct by the Debtor occurring prior to the Closing Date or any other liability to,

arising out of or related to the Excluded Assets, in each case whether arising prior to or after the Closing Date.

16. If any Person that has filed any financing statement, mortgage, mechanic's lien, *lis pendens* or other document or instrument evidencing liens with respect to any of the Acquired Assets shall have failed to deliver to the Debtor and the Purchaser at or prior to the Closing of the APA, in proper form for filing and executed by the appropriate entity or entities, termination statements, instruments of satisfaction and releases of any Interests with respect to the Acquired Assets, then (a) the Debtor is authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person and (b) the Purchaser is authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims and interests in the Acquired Assets as of the Closing of the Purchase Agreement, in each case, other than the Assumed Liabilities.

17. This Sale Order (a) is and shall be effective as a determination that, upon Closing, other than the Assumed Liabilities, any and all Interests existing as to the Acquired Assets conveyed to the Purchaser have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated, and (b) is and shall be sufficient evidence of the transfer of title to the Purchaser and the Sale shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other Persons who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the Acquired Assets conveyed to the Purchaser.

18.     The provisions of this Sale Order authorizing the sale of the Acquired Assets free and clear of the Interests, other than the Assumed Liabilities, shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments to effectuate, consummate and implement the provisions of this Sale Order.  However, the Debtor and the Purchaser, and each of their respective officers, employees and agents, are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtor or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Order.

19.     Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and this Sale Order.

20.     Other than with respect to the Assumed Liabilities provided that the Debtor's obligations and liabilities as Developer owed to the Association in the asserted amount of $562,716.00 are paid to the Association out of the Purchase Price at Closing or paid into escrow at Closing subject to further order of the Court or agreement of the parties, after the date of Closing of the APA, no Person, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect liens or a security interest against any of the Acquired Assets on account of, or (b) collect or attempt to collect from the Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by Debtor) (i) for any period commencing before and concluding prior to or on the Closing Date; (ii) assessed prior to and payable after the Closing;

(iii) related to or on account of the 2010 personal and real property taxes, which will be prorated as of the Closing as set forth in the APA; or (iv) any property-related expenses, including any assessment or other financial obligation owed by Debtor to the HOA pursuant to Section 14 of the Condominium Declaration or otherwise.

21.     Other than the Assumed Liabilities, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, all "persons" (as that term is defined in section 101(41) of the Bankruptcy Code) are hereby enjoined from taking any action against the Purchaser, the Purchaser's affiliates or the Acquired Assets to recover any claim which such "person" has against the Debtor.  In furtherance of the foregoing, the Lenders, respectively, shall be deemed to have consented to the sale of the Acquired Assets to Purchaser.

22.     The transactions contemplated under the APA and the Sale Documents do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor and/or the Debtor's estate.  Other than the Assumed Liabilities, the Purchaser shall not assume, nor be deemed to assume or in any way be responsible for any liability or obligation of the Debtor and/or the estate and neither the purchase of the Acquired Assets by the Purchaser, nor the fact that the Purchaser or its affiliates are using any Acquired Assets previously used by the Debtor, will cause the Purchaser or any of its affiliates to be deemed a successor in any respect to the Debtor's business.

23.     All Persons who are presently, or at the Closing of the APA will be, in possession of any of the Acquired Assets conveyed to the Purchaser hereunder are hereby directed to surrender possession of such Acquired Assets to the Purchaser at the Closing or such other period provided by the APA.

24.     From and after the date of the entry of this Sale Order, all persons and entities, including, but not limited to, the Debtor or any creditor or other party in interest shall not take or cause to be taken any action that would interfere with the transfer of the Acquired Assets to the Purchaser in accordance with the terms of this Sale Order.

25.     Pursuant to Section 365 of the Bankruptcy Code and in accordance with Section 2.1(i) of the APA, the Purchaser shall have a period beginning on the date the Confirmation Order is entered and ending on the date that is fourteen (14) days thereafter (the "Contract Option Period") to designate by written notice to the Debtor whether it (a) will accept the assumption and assignment of the Executory Contract or (b) declines to receive assignment of the Executory Contract (the "Assignment Notice").  In the event the Purchaser has elected not to accept assignment of the Executory Contract, the Executory Contract will be rejected by the Debtor under 11 U.S.C. §365(d)(2), effective the date of the Closing.  In the event the Purchaser delivers to the Debtor an Assignment Notice choosing to receive assignment of the Executory Contract, the Debtor will thereafter deliver such Assignment Notice to the counterparty to the Executory Contract, which will provide such counterparty with the opportunity to object to the proposed adequate assurance of future performance.  In the event that the counterparty objects to the proposed assumption of the Executory Contract, the Debtor will request a hearing, the sole issue of which will be the proposed adequate assurance of future performance.

26.     If the Purchaser determines to receive assignment of the Executory Contract, the Purchaser and the Debtor shall make provision for the payment of the cure amounts (the "Cure Amounts"), if any, to the counterparty to such Executory Contract.  Except as set forth herein, the Cure Amounts, when paid, shall be deemed the entire cure obligation of the Debtor due and owing under section 365 of the Bankruptcy Code.  The counterparty to the Executory Contract is

barred, enjoined and prohibited from asserting any claim against the Debtor or its property or estate other than the Cure Amount with respect to such Executory Contract or from offsetting, seeking to offset, recoup, deduct or set-off any claims such party may have against the Debtor from any amounts that may be or may become due in the future to the Purchaser under such Executory Contract.

27. The assumption and assignment of the Executory Contract, if such option is exercised by the Purchaser in accordance with paragraph 25 above, satisfies the requirements of the Bankruptcy Code including, *inter alia*, sections 365(b)(1) and (3) and 365(f) of the Bankruptcy Code to the extent applicable.

28. The party to the Executory Contract is forever barred and enjoined from raising or asserting against the Purchaser, the Purchaser's affiliates, the Acquired Assets, or the Debtor any assignment fee, default or breach under or any claim or pecuniary loss or condition to assignment, arising under or related to, the Executory Contract existing as of the Closing or arising by reason of the Closing.

29. The Executory Contract, if assumed and assigned to the Purchaser in accordance with paragraph 25 above, shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order and, pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability thereunder.

30. Any provision in the Executory Contract that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtor is unenforceable and is hereby nullified with respect to the sale and assignments authorized by this

Sale Order, and the Executory Contract shall remain in full force and effect, subject only to payment of the appropriate cure amounts, if any.

31. The Purchaser is a good faith purchaser entitled to the benefits and protections afforded by Section 363(m) of the Bankruptcy Code (including with respect to the transfer of the Executory Contract assigned as part of the Sale of the Acquired Assets pursuant to Section 365 of the Bankruptcy Code and this Sale Order); accordingly, the reversal, modification on appeal or vacatur by subsequent order of the Court of the authorization provided herein to consummate the Sale of the Acquired Assets shall not affect the validity of the Sale of the Acquired Assets to the Purchaser (including with respect to the transfer of the Executory Contract assigned as part of the Sale of the Acquired Assets pursuant to Section 365 of the Bankruptcy Code and this Sale Order).

32. The consideration provided by the Purchaser for the Acquired Assets under the APA is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any state fraudulent conveyance law and may not be avoided under Section 363(n) of the Bankruptcy Code.

33. This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the APA, the Bid Procedures Order and this Sale Order in all respects and further to hear and determine any and all disputes related thereto including between the Debtor and/or the Purchaser; *provided*, *however*, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the APA, the Bid Procedures Order and this Sale Order, such abstention, refusal or lack of jurisdiction shall have

no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

34.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, in accordance with the terms thereof without further order of the Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

35.     From and after the date hereof, each Debtor and the Purchaser shall act in accordance with the terms of the APA and the Debtor and the Purchaser, to the extent it already has not done so, shall execute any Sale Document at or prior to Closing.

36.     The failure specifically to include any particular provisions of the APA, the Sale Documents or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor and the Purchaser that the APA, the Sale Documents and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with the Sale Order prior to Closing.

37.     To the extent of any inconsistency between the provisions of this Sale Order and the APA, or any documents executed in connection therewith, the provisions contained in this Sale Order shall govern and control.

38.     This Sale Order shall inure to the benefit of the Purchaser, the Debtor and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee that may be appointed in the Debtor's cases and shall be binding upon any trustee, party,

entity or fiduciary that may be appointed in connection with these cases or any other or further case involving the Debtor, whether under chapter 7 or chapter 11 of the Bankruptcy Code.

39. Consistent with the provisions of the Bid Procedures, the entry of this Order shall have no impact on any and all rights and obligations of the parties under any enforceable agreement executed by and between the Pre-Petition Note A Lenders (as defined in the Bid Procedures) and the Note B Lender (as defined in the Bid Procedures), including but not limited to the Co-Lender Agreement (as defined in the Bid Procedures).

40. This Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the stay of (i) orders authorizing the sale, use or lease of property of the estate, as set forth in Bankruptcy Rule 6004(h); (ii) orders authorizing the assignment of an executory contract or unexpired lease, as set forth in Bankruptcy Rule 6006(d); and (iii) proceedings to enforce a judgment, as set forth in Bankruptcy Rule 7062, or otherwise shall not apply to this Sale Order.

41. The Debtor is authorized and directed (a) to close the Sale in accordance with the APA upon entry of this Sale Order and (b) to pay all Allowed Administrative Claims (as defined in the Plan) from the proceeds of the Sale.

**DONE AND ORDERED** on April 6, 2010.

_____
**KAREN S. JENNEMANN**
United States Bankruptcy Judge

Copies to:

The Vue-Orlando, LLC, Attn: Eric Moskowitz, WESTMINSTER PARTNERS II LLC, PO Box 624, Mundelein, IL 60060;

Sovereign Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Sovereign Bank, c/o Louis T. DeLucia, Schiff Hardin LLP, 900 Third Avenue, 23rd Floor, New York, NY 10022;

Comerica Bank, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Christopher G. Daniel, Charter One Bank, 53 State Street – MBS 970, Boston, MA 02109;

Mega International Commercial Bank Co., Ltd., NY Branch, c/o John B. Hutton III, Greenberg Traurig, 1221 Brickell Ave., Miami, FL 33131;

Jack Rubenbauer, Director, Great American Insurance Company, One East 4th St., 3rd Floor, Cincinnati, OH 45202;

Key Bank, c/o James S. Grodin, Foley & Lardner, P.O. Box 2193, Orlando, FL 32802-2193;

Churchill Development Group, c/o Robert S. Hoofman, P.O. Box 3146, Orlando, FL 32802-3146;

Richard B. Webber II, Zimmerman Kiser & Sutcliffe, 315 East Robinson St., Ste. 600, Orlando, FL 32801-4341;

First Bank & Trust Company, Attn: Jeffrey W. Warren, P.O. Box 3913, Tampa, FL 33601-3913;

the United States Trustee, 135 West Central Boulevard, Suite 620, Orlando, Florida 32801;

Francisco J. Gonzalez, Esq., Gonzalez & Henkman, P.L., 12012 S. Shoe Blvd., Ste. 107, Wellington, FL 33414;

Andre' LaBauve, C.F.O., Fisher Auction Co., Inc., 619 East Atlantic Boulevard, Pompano Beach, Florida 33060;

Mike Messersmith, Esq., Kaye Scholer LLP, a/f Condo Developer, LLC, Three First National Plaza 70 West Madison Street Suite 4100 Chicago, IL 60602; and

The Local Rule 1007-2 Parties-in-Interest List.

ASSET PURCHASE AGREEMENT

BETWEEN

THE VUE-ORLANDO, LLC

AS

"SELLER"

AND

CONDO DEVELOPER LLC, or one of its assignees

AS

"PURCHASER"

_____, 2010



## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made as of the _____ day of _____, 2010, by and between Condo Developer LLC, a Delaware limited liability company, or one of its assignees, as Purchaser (hereafter referred to as "Purchaser"), and **THE VUE ORLANDO, LLC**, a Delaware limited liability company, as Seller ("Seller").

## W I T N E S S E T H

**WHEREAS**, Seller is in the business of owning, operating and holding for sale units in the 36-story, 375 unit luxury residential condominium building located at 150 East Robinson Street, Orlando, Florida, all as more particularly described on Schedule 2.1(a) (the "Real Property") (such business as currently conducted, together with all ancillary functions and services performed by Seller being the "Business");

**WHEREAS**, in connection with its operation of the Business and ownership of the Real Property, Seller owns certain personal property assets, all as more fully described on Schedule 2.1(b) (the "Personal Property");

**WHEREAS**, pursuant to its Emergency Motion to Convert Case to Chapter 11, Seller has sought relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§101 *et seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Florida ("Bankruptcy Court") at Case No. 6:09-bk-14833-KSJ ("Bankruptcy Case");

**WHEREAS**, in connection with the Bankruptcy Case, on December 28, 2009 the Bankruptcy Court issued an Order Granting Debtor's Motion for Order Approving Bid Procedures, Sale Procedures and Bid Protections (the "Bid Procedures Order");

**WHEREAS**, pursuant to the Bid Procedures approved in the Bid Procedures Order (the "Bid Procedures"), Purchaser is submitting this Agreement as part of Purchaser's attempt to submit a Qualified Bid (as that term is defined in the Bid Procedures);

**WHEREAS**, in connection with Purchaser's submission of a Qualified Bid, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Acquired Assets (as defined in Section 2.1) upon the terms and subject to the conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the promises and of the mutual covenants, agreements, representations and warranties set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller do hereby agree as follows:

## ARTICLE 1

## DEFINED TERMS

**Section 1.1**   **Defined Terms**.  Capitalized terms as used in this Agreement will have the following meanings when used herein.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Act" shall mean the provisions of the Florida Condominium Act, Chapter 718, Florida Statutes.

"Adequate Assurance Information" shall mean financial and other information as may be requested by Seller to demonstrate to the Bankruptcy Court that non-debtor parties to Assigned Contracts are adequately assured of Purchaser's future performance under the Assigned Contracts as required by Section 365(f) of the Bankruptcy Code, including if appropriate, a guaranty of Purchaser's obligations under the Assigned Contracts by a guarantor with sufficient assets to provide adequate assurance of future performance.

"Administrative Rules" shall mean the provisions of Chapter 61 B, Florida Administrative Code.

"Affiliate" shall have the meaning set forth in Section 101(2) of the Bankruptcy Code.

"Agreement" means this Asset Purchase Agreement including all Schedules hereto.

"Approval Hearing" shall mean one or more hearings held by the Bankruptcy Court to consider entry of the Sale Order relating to a Successful Bid.

"Assigned Contracts" shall have the meaning set forth in Section 2.1(c).

"Assignment and Assumption Agreement" shall mean an assignment and assumption Agreement pursuant to which Seller will assign and Purchaser will assume, the Assumed Liabilities.

"Association" shall mean The Vue at Lake Eola Condominium Association, a Florida non-profit corporation.

"Assumed Liabilities" shall mean all debts, obligations and liabilities relating to the Business or the Acquired Assets arising after the Closing Date (other than those liabilities that may arise after the Closing Date but are a result of any act, omission or circumstance taking place prior to the Closing Date, including, without limitation, any liabilities with respect to environmental violations, employee plans or any other employment-related matter), whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following:

(a)     all liabilities and obligations of Seller under the Assigned Contracts arising after the Closing Date;

(b)     subject to Section 3.2, all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to an Acquired Asset and payable after the Closing Date, including but not limited to the Purchaser's prorated portion of the 2010 *ad valorem* taxes and each subsequent years' *ad valorem* taxes;

(c)    all covenants, rights, liabilities and obligations arising from or out of the Condominium Declarations, the Act and the Administrative Rules; and

(d)    all debts, liabilities and obligations arising out of the ownership or operation by Purchaser of any Acquired Asset or the Business after the Closing Date.

"Bankruptcy Case" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Code" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Court" shall have the meaning set forth in the recitals hereto.

"Bankruptcy Court Approval" shall mean the entry by the Bankruptcy Court of the Sale Order with respect to the Acquired Assets.

"Bankruptcy Exceptions" shall have the meaning set forth in Section 8.3.

"Bid Procedures" shall have the meaning set forth in the recitals hereto.

"Bid Procedures Order" shall have the meaning set forth in the recitals hereto.

"Bill of Sale" shall mean a bill of sale transferring from Seller to Purchaser all right, title and interest in the Acquired Assets other than the Real Property and the Assigned Contracts.

"Books and Records" shall have the meaning set forth in Section 2.1(d).

"Business" shall have the meaning set forth in the recitals hereto.

"Business Day" shall mean any day, other than Saturday, Sunday or any federal holiday recognized by businesses generally in Orlando, Florida.

"Closing" shall have the meaning set forth in Section 4.1.

"Closing Date" shall mean the date on which the Closing occurs as provided in, and determined pursuant to, Section 4.1.

"Closing Statement" shall mean a statement in such form as is prepared by Seller and reasonably acceptable to Purchaser reflecting applicable Purchaser's Closing Costs, Seller's Closing Costs, other prorated items and the net amount due Seller at Closing.

"Condominium Declarations" shall mean the Declaration and the Association's by-laws, articles of incorporation and rules and regulations.

"Contract Warranties" shall have the meaning set forth in Section 14.1.

"Declaration" shall mean that certain Declaration of Condominium of the Vue at Lake Eola, a Condominium, recorded at Official Records Book 09444, Page 3009, Public Records of Orange County, Florida, as amended.

"Deed" shall mean the quitclaim deed to be delivered by Seller at Closing transferring the Real Property to the Purchaser.

"Deposit" shall mean the "Minimum Deposit" as defined in, and to be paid pursuant to, the Bid Procedures, payable by certified or cashier's (bank) check, wire transfer or letter of credit reasonably acceptable to Seller and the Agent (as defined in the Bid Procedures).

"Encumbrance" shall mean any mortgage, deed of trust, lien, pledge, encumbrance, claim, lease, easement, license, option, right of first refusal, preemptive right, charge, security interest, conditional sales contract, restriction or other matter causing a defect or imperfection in title.

"Escrow Agent" shall mean Latham, Shuker, Eden & Beaudine, LLP, counsel to Seller, acting as escrow agent and closing agent.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HSR Filing" shall mean the filings, if any, required under the HSR Act related to this transaction.

"Indemnifiable Claim" shall have the meaning set forth in Section 12.3.

"Indemnified Party" shall have the meaning set forth in Section 12.3.

"Indemnifying Party" shall have the meaning set forth in Section 12.3.

"Initial Title Reports" shall mean those title reports, title insurance policies and/or title insurance commitments, if any, with respect to the Real Property that Seller has made available to Purchaser.  Purchaser understands that certain Initial Title Reports may be existing and previously issued title insurance policies or commitments covering property in addition to the Real Property, insuring the interests of parties other than Seller, or reflecting Seller's or an Affiliate's ownership of a fee simple estate no longer owned by Seller.

"Intellectual Property" shall mean, if any, all registered trademarks, registered service marks, trademark and service mark applications, unregistered trademarks and service marks, trade names, trade dress, logos and designs, all U.S. copyrights and copyright applications and all copyright renewals and extensions, and all websites and domain names, used or employed exclusively by Seller in the operation of the Business.

"Knowledge" shall mean in the case of Seller, the actual knowledge of Charles Johanns and Eric Moskowitz, both members of the managing member of Seller, without any requirement of investigation or inquiry, and in the case of Purchaser, the actual knowledge of Purchaser, without any requirement of investigation or inquiry.

"Losses" shall mean any and all damages, deficiencies, suits, claims, losses, penalties, expenses, obligations, liabilities, cost and expenses (including interest, penalties and reasonable attorneys' fees and disbursements).

"Permitted Encumbrances" shall mean (a) subject to Section 3.2, liens for current taxes and assessments not yet due and payable or that do not materially detract from the value thereof or the use to which such property is presently subject, (b) Encumbrances set forth in the Deed, (c) minor imperfections of title, if any, that, taken as whole, do not Materially detract from the value or impair the use of the property subject thereto, or impair the operations of the Business, (d) zoning laws, recorded easements, covenants, utility easements, building restrictions and other land use restrictions that do not impair the present or anticipated use of the Acquired Assets, and (e) subject to the provisions of Section 10.3(b), all other matters set forth in any additional Title Reports.

"Person" shall mean an individual, corporation, partnership, joint venture, association, joint-stock company, trust, limited liability company, non-incorporated organization or government or any agency or political subdivision thereof.

"Personal Property" shall have the meaning set forth in the recitals hereto.

"Purchase Price" shall have the meaning set forth in Section 3.1(b).

"Purchaser" shall mean Condo Developer LLC, a Delaware limited liability company.

"Purchaser's Closing Costs" shall mean: (a) fees and costs of Purchaser's counsel relating to the subject transaction; (b) fees and costs incurred by Purchaser to conduct Purchaser's due diligence investigations of the Acquired Assets; (c) recording fees payable in connection with recording any instruments in the appropriate public records; (d) cost of the Initial Title Reports, any additional Title Reports and the Title Policy; (e) any loan closing costs incurred by Purchaser, including costs of the lender's legal counsel, loan commitment fees, documentary stamp tax and intangible tax on the notes and mortgages; and (f) sales taxes, if any, payable in connection with the purchase and sale of the Acquired Assets.

"Purchaser Indemnified Party" shall have the meaning set forth in Section 12.2.

"Real Property" shall have the meaning set forth in the recitals hereto.

"Sale Order" shall mean an order of the Bankruptcy Court approving this Agreement and all of the terms and conditions hereof and authorizing Seller to consummate the transactions contemplated hereby.

"Seller" shall mean The Vue-Orlando, LLC, a Delaware limited liability company.

"Seller Indemnified Party" shall have the meaning set forth in Section 12.1.

"Seller's Closing Costs" shall mean: (a) fees and costs of Seller's counsel relating to the subject transaction; and (b) commissions payable to Seller's broker and auctioneer as provided in Section 8.7.

"Successful Bid" shall mean the highest or otherwise best offer to purchase the Acquired Assets as determined by Seller in its sole discretion in accordance with the Bid Procedures, to be submitted to the Bankruptcy Court at the Approval Hearing.

"Title Insurer" shall mean **[First American Title Insurance Company or Lawyers Title Insurance Corporation]** or any other nationally recognized title insurance company designated by Seller.

"Title Policies" shall have the meaning set forth in Section 10.3(b).

"Title Reports" shall mean, collectively, (a) the Initial Title Reports and (b) any additional title reports and/or title insurance commitments with respect to the Real Property that Seller has made available to Purchaser for review.

**Section 1.2** **Construction**. Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole, and the word "or" has the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. The section and other headings and Table of Schedules contained in this Agreement are for reference purposes only and shall not control or affect the construction of this Agreement or the interpretation thereof in any respect. Section, subsection, schedule and exhibit references are to this Agreement unless otherwise specified.

## ARTICLE 2

## SALE AND PURCHASE OF ASSETS

**Section 2.1** **Agreement to Sell and to Purchase**. On the terms and subject to the conditions of this Agreement, and pursuant to Section 363 of the Bankruptcy Code and the Sale Order, Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, at the Closing, as hereinafter defined, free and clear of any Encumbrances except Permitted Encumbrances and the Assumed Liabilities, the assets, rights and properties set forth in this Section 2.1, and any assets, rights and properties described in the categories set forth below in this Section 2.1 which are acquired by Seller prior to the Closing (collectively, the "Acquired Assets"), excepting, however, those assets, rights and properties described as Excluded Assets in Section 2.2 of this Agreement. The Acquired Assets shall be the following (except as aforesaid):

(a)     All of the Real Property owned by Seller as more fully described on Schedule 2.1(a);

(b)     All Personal Property owned and used by Seller in the Business and as set forth on Schedule 2.1(b) and the Intellectual Property, if any;

(c)     All of Seller's rights and incidents of interest in and to the contracts pertaining to the Business generally, which are identified on Schedule 2.1(c) and for which Purchaser has

delivered to Seller, no later than ten (10) Business Days prior to Closing, a notice of Purchaser's desire to assume (such contracts to be assumed, collectively, the "Assigned Contracts"); and

(d)     The books, documents, occupant lists, contacts/prospects list, financial reports, and any other records or files of Seller in the possession of Seller pertaining to the operation of the Business (collectively, the "Books and Records"); *provided, however*, that Seller shall have the right, at its expense, to make and retain copies of any Books and Records.

*Purchaser hereby agrees and acknowledges that Seller's obligations under this Agreement are subject to higher or otherwise better offers for the Acquired Assets and conditioned upon the entry of a Sale Order approving the sale of the Assets to Purchaser pursuant to the terms and conditions of this Agreement.*

**Section 2.2     Excluded Assets**.  Notwithstanding anything to the contrary contained in this Agreement, the following rights, properties and assets of Seller or others ("Excluded Assets") shall be retained by Seller or their rightful owner and shall be excluded from the Acquired Assets sold, transferred, assigned, conveyed and delivered to Purchaser pursuant to this Agreement:

(a)     All cash, bank balances, monies in possession of any bank, petty cash, other cash items and marketable securities of Seller;

(b)     Seller's limited liability company and tax books and records, other than the Books and Records, including, without limitation, Seller's articles of organization and operating agreement, membership certificates, if any, membership transfer records, minute books and Seller's tax returns and tax supporting information; *provided, however*, that Purchaser shall have the right, at its expense, to make and retain copies of any of the foregoing books and records not subject to attorney-client privilege;

(c)     All claims under insurance, surety or similar indemnity arrangements to the extent such claims do not relate to loss or liability with respect to the Acquired Assets;

(d)     All other claims, demands or causes of action of Seller against any other Person not specifically identified in this Agreement as Acquired Assets, including, without limitation, claims of Seller arising under Sections 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and claims for federal, state or local tax refunds;

(e)     common elements or Association property as defined in Section 718.103 of the Act, common areas, property of the existing unit owners or of the Association, personal property of the Association or in which a unit owner (other than Seller) has an individual interest or which may constitute an appurtenance, or such items which are or were required to be delivered to the Association at turnover in accordance with Section 718.301(4) of the Act; and

(f)     All other assets listed on Schedule 2.2.

**Section 2.3     Inspections; Warranties as to Condition**.  Purchaser will rely on the Sale Order approving this Agreement and authorizing the sale of the Acquired Assets pursuant to Section 363 of the Bankruptcy Code; and, subject to satisfaction of the conditions contained in

Articles 5 and 6 of this Agreement, Purchaser will accept the Acquired Assets as they exist on the Closing Date, and will accept the sale, conveyance, assignment, transfer and delivery of the Acquired Assets based upon its own inspection, examination and determination with respect thereto as to all matters, including, without limitation, (a) restrictions on and fitness for use, (b) condition and fitness for particular purposes, and based upon the representations and warranties of Seller set forth in Article 8 of this Agreement, which representations and warranties, and any cause of action based thereon, shall, except as provided in Section 13.2, terminate at the Closing.

**Section 2.4    Assumption of Liabilities**.

(a)    Purchaser shall not assume or be liable for any liabilities or obligations of any type or kind of Seller relating to the Business or the Acquired Assets, whenever arising and whether primary or secondary, direct or indirect, absolute or contingent, contractual, tortious or otherwise, and Purchaser shall have no obligation to perform and discharge any liabilities and obligations of Seller except for the Assumed Liabilities.

(b)    Except as otherwise provided in this Agreement or the Sale Order, Seller shall not be responsible for any liabilities or obligations arising out of the ownership, possession, use or operation of the Acquired Assets by Purchaser after the Closing.

## ARTICLE 3

## PURCHASE PRICE AND PAYMENT

**Section 3.1    Purchase Price and Adjustments**.

(a)    On the terms and subject to the conditions of this Agreement, Purchaser shall pay to Seller the Purchase Price.

(b)    The Purchase Price for the Acquired Assets, shall be **Twenty Million Dollars** and No/100 Dollars (**$20,000,00**) the ("Purchase Price"), which shall be payable by Purchaser to Seller as follows:

(i)    the Deposit shall be delivered to the Seller for holding by the Escrow Agent at the time of the submission of this Agreement as part of Purchaser's Qualified Bid.

(ii)    the balance of the Purchase Price, as adjusted to take into account the prorations and allocations as provided in Section 3.2 below and disclosed on the Closing Statement, shall be paid at the Closing.

**Section 3.2    Prorations**.    Any and all personal and real property taxes attributable to or measured with respect to any period (or portion thereof) on or prior to the Closing shall be attributable to Seller and payable out of the Purchase Price, and any and all such taxes subsequent to the Closing shall be attributable to Purchaser, and Seller shall furnish, at the request of Purchaser, proof of payment of any personal and real property taxes. The parties shall prorate the Seller's obligation as the Developer pursuant to Section 14.7 of the Declaration, all relevant rent, utilities and any other expenses to the Closing Date.

Articles 5 and 6 of this Agreement, Purchaser will accept the Acquired Assets as they exist on the Closing Date, and will accept the sale, conveyance, assignment, transfer and delivery of the Acquired Assets based upon its own inspection, examination and determination with respect thereto as to all matters, including, without limitation, (a) restrictions on and fitness for use, (b) condition and fitness for particular purposes, and based upon the representations and warranties of Seller set forth in Article 8 of this Agreement, which representations and warranties, and any cause of action based thereon, shall, except as provided in Section 13.2, terminate at the Closing.

### Section 2.4    Assumption of Liabilities.

(a)    Purchaser shall not assume or be liable for any liabilities or obligations of any type or kind of Seller relating to the Business or the Acquired Assets, whenever arising and whether primary or secondary, direct or indirect, absolute or contingent, contractual, tortious or otherwise, and Purchaser shall have no obligation to perform and discharge any liabilities and obligations of Seller except for the Assumed Liabilities.

(b)    Except as otherwise provided in this Agreement or the Sale Order, Seller shall not be responsible for any liabilities or obligations arising out of the ownership, possession, use or operation of the Acquired Assets by Purchaser after the Closing.

## ARTICLE 3

## PURCHASE PRICE AND PAYMENT

### Section 3.1    Purchase Price and Adjustments.

(a)    On the terms and subject to the conditions of this Agreement, Purchaser shall pay to Seller the Purchase Price.

(b)    The Purchase Price for the Acquired Assets, shall be **Twenty Million Dollars** and No/100 Dollars (**$20,000.00**) the ("Purchase Price"), which shall be payable by Purchaser to Seller as follows:

*[Handwritten annotations: "$25,900,000 Seven Million Purchase"; "Five Nine Hundred Thousand Million"; "Seven Million"]*

(i)    the Deposit shall be delivered to the Seller for holding by the Escrow Agent at the time of the submission of this Agreement as part of Purchaser's Qualified Bid.

(ii)    the balance of the Purchase Price, as adjusted to take into account the prorations and allocations as provided in Section 3.2 below and disclosed on the Closing Statement, shall be paid at the Closing.

### Section 3.2    Prorations.    Any and all personal and real property taxes attributable to or measured with respect to any period (or portion thereof) on or prior to the Closing shall be attributable to Seller and payable out of the Purchase Price, and any and all such taxes subsequent to the Closing shall be attributable to Purchaser, and Seller shall furnish, at the request of Purchaser, proof of payment of any personal and real property taxes. The parties shall prorate the Seller's obligation as the Developer pursuant to Section 14.7 of the Declaration, all relevant rent, utilities and any other expenses to the Closing Date.

**Section 3.3    Allocation of Purchase Price**.  Seller and Purchaser shall agree on an allocation of the Purchase Price among the Acquired Assets prior to the Closing and such allocation shall be set forth on Schedule 3.3 to be delivered at the Closing.

**Section 3.4    Sales Tax**.  Sales taxes, if any, resulting from the transfer of the Acquired Assets, or any particular category thereof, to the extent permitted by law, will be paid by Purchaser, unless such transfer is subject to an available exemption therefrom.

## ARTICLE 4

## CLOSING AND POSSESSION

**Section 4.1    Closing Date**.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place in the offices of the Escrow Agent, 390 North Orange Avenue, Suite 600, Orlando, Florida 32801, at 9:30 AM, Eastern Standard Time, on the first Business Day that the Sale Order is no longer subject to appeal by any party.

**Section 4.2    Seller's Deliveries at Closing**.  At the Closing, in addition to any other documents specifically required to be delivered pursuant to this Agreement, Seller shall deliver or cause to be delivered to Purchaser at or before Closing:

(a)    A certified copy of the Sale Order;

(b)    A receipt, executed by Seller, acknowledging the receipt from the Escrow Agent of the Deposit and receipt from the Purchaser of the balance of the Purchase Price;

(c)    The executed Assignment and Assumption Agreement;

(d)    The executed Bill of Sale;

(e)    The executed Deed; and

(f)    The agreed upon Schedule 3.3. (relating to the Purchase Price allocation).

**Section 4.3    Purchaser's Deliveries at Closing**.  At Closing, Purchaser shall deliver or cause to be delivered to Seller:

(a)    The balance of the Purchase Price as provided in Section 3.1(b)(ii);

(b)    The agreed upon Schedule 3.3 (relating to the Purchase Price allocation); and

(c)    The executed Assignment and Assumption Agreement.

**Section 4.4    Means of Payment**.  Except as otherwise provided with respect to the delivery of the Deposit, all payments required under this Agreement shall be made by certified or cashier's bank check or by wire transfer of immediately available funds to an account designated by the receiving party.

**Section 4.5     All Proceedings**.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously, and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 4.6     Possession**.  Seller will turn over to Purchaser exclusive physical possession of the Acquired Assets, including, to the extent in Seller's possession, control or custody, all keys, combinations to safes, security codes and passwords, on the Closing Date upon written confirmation to Seller by Escrow Agent that Escrow Agent has received, and has been authorized by Seller and Purchaser to transfer to Seller, the entire Purchase Price.

## ARTICLE 5

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BOTH PARTIES

**Section 5.1     Conditions Precedent to Obligations of Both Parties**.  The obligations of Seller and Purchaser to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions (unless expressly waived by both parties in writing):

(a)     _Order_.  A final, nonappealable Sale Order approving the transactions as set forth in this Agreement shall have been entered, and any conditions and directions contained in the Sale Order shall have been fully complied with in all material respects.

(b)     _Government Action_.  No court, arbitrator or governmental body, agency or official shall have issued any order, injunction or decree that has not been vacated restraining or prohibiting the effective operation of the Acquired Assets by Purchaser after the Closing.

## ARTICLE 6

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

**Section 6.1     Conditions Precedent to Obligations of Purchaser**.  The obligations of Purchaser to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions unless expressly waived by Purchaser in writing:

(a)     _Representations and Warranties True at Closing_.  Each of the representations and warranties of Seller set forth in Article 8 of this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though made on and as of such date (except in the case of representations and warranties made as of a specific date, which shall be true in all material respects as of such date).

(b)     _Performance_.  Seller shall have performed in all material respects each of the obligations of Seller to be performed on or prior to the Closing pursuant to the terms of this Agreement.

(c)    Inspection. Purchaser shall have inspected the Acquired Assets to verify Seller's ownership of the Acquired Assets. Except as provided in Section 10.3(b), within ten (10) days of execution of this Agreement, Purchaser may in its sole discretion terminate this Agreement if it determines Seller does not have ownership of the Acquired Assets. After such ten (10) day period, such condition will be deemed fulfilled.

**Section 6.2    Compliance or Waiver of Purchaser's Conditions**. Purchaser shall notify Seller at such time as any such condition is satisfied or at such time as Purchaser believes that any such condition cannot be satisfied.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

**Section 7.1    Conditions Precedent to Obligations of Seller**. The obligations of Seller to close and consummate the transactions contemplated by this Agreement are subject to the fulfillment of each of the following conditions (unless expressly waived by Seller in writing):

(a)    Representations and Warranties True at Closing. Each of the representations and warranties of Purchaser set forth in Article 9 of this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though made on and as of such date.

(b)    Performance. Purchaser shall have performed in all material respects each of the obligations of Purchaser to be performed on or prior to the Closing pursuant to the terms of this Agreement.

## ARTICLE 8

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

**Section 8.1    Limited Liability Company Existence and Power**. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has full limited liability company power and authority to enter into this Agreement and perform its obligations under this Agreement, subject only to Bankruptcy Court Approval and any further obligations imposed by the Bankruptcy Court.

**Section 8.2    Limited Liability Company Authorization**. Seller's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement, subject to Bankruptcy Court Approval, have been duly authorized by all requisite limited liability company action.

**Section 8.3    Binding Effect and Authority**. This Agreement has been duly executed and delivered by Seller, and subject to Bankruptcy Court Approval, this Agreement constitutes a valid and binding agreement of Seller, enforceable against Seller in accordance with the terms hereof except as enforceability may be limited by bankruptcy, insolvency, reorganization,

moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) (the "Bankruptcy Exceptions"). When delivered at the Closing, the agreements required to be executed and delivered by Seller will have been duly executed and delivered by Seller, and will be valid and binding agreements of Seller, enforceable against Seller in accordance with the respective terms thereof except as enforceability may be limited by the Bankruptcy Exceptions.

Section 8.4    **Governmental Authorization**.  Except as set forth in this Agreement, the execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated by this Agreement require no action by or in respect of, consent from, or filing with, any federal, state or foreign governmental body, agency, official or authority other than (a) those that have been taken, made or obtained, (b) approvals, if any, required under the HSR Act, and (c) Bankruptcy Court Approval.

Section 8.5    **Title to Acquired Assets**.  Upon entry of the Sale Order, Seller shall have the ability to convey, and at the Closing Seller shall convey, to Purchaser title to all of the Acquired Assets, free and clear of any Encumbrance other than Permitted Encumbrances.

Section 8.6    **No Actions**.  To the Knowledge of Seller, other than the Bankruptcy Case and related proceedings, there is no action, suit or proceeding pending against Seller, before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Seller, is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Seller) have a material adverse effect on the ability of Seller to perform its obligations under this Agreement or the closing documents to which Seller is or is to become a party.

Section 8.7    **Brokers**.  Seller has not engaged any brokers in connection with the transactions contemplated by this Agreement, except it has engaged Fisher Auction Company, Inc. in connection with Cushman & Wakefield, Inc. as its real estate auctioneer under the Bid Procedures.

## ARTICLE 9

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

Section 9.1    **Existence and Power**.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware, with full power and authority to enter into this Agreement and perform its obligations under this Agreement.

Section 9.2    **Authorization**.  The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated by this Agreement have been duly authorized by all requisite limited liability company action of Purchaser.

**Section 9.3** **Binding Effect**. This Agreement has been duly executed and delivered by, and constitutes the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with the terms hereof except as enforceability may be limited by the Bankruptcy Exceptions. When delivered at Closing, the Assignment of Assumption Agreement and other agreements required to be executed and delivered by Purchaser will have been duly executed and delivered by Purchaser, and will be valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with the respective terms thereof except as enforceability may be limited by the Bankruptcy Exceptions.

**Section 9.4** **Governmental Authorization; Consents**.

(a)     The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated by this Agreement require no action by or in respect of, filing with, or consent from, any federal, state or foreign governmental body, agency, official or authority other than (i) those that have been taken, made or obtained, and (ii) approvals, if any, required under the HSR Act.

(b)     No consent, approval, waiver or other action by any Person (other than the governmental authorities referred to in subsection (a) of this Section 9.4) under any contract, agreement, indenture, lease, instrument or other document to which Purchaser is a party or by which it is bound is required or necessary for the execution, delivery and performance of this Agreement by Purchaser or the consummation of the transactions contemplated by this Agreement.

**Section 9.5** **No Action**. There is no action, suit or proceeding pending or, to the Knowledge of Purchaser, threatened against or affecting Purchaser before or by any governmental authority (a) that questions the validity or enforceability of this Agreement or any closing document to which Purchaser is or is to become a party or (b) that, individually or in the aggregate, could (if adversely decided against Purchaser) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the closing documents to which Purchaser is or is to become a party.

**Section 9.6** **No Default**. Entry into this Agreement or any of the closing documents to which Purchaser is or is to become a party by Purchaser will neither constitute, nor with the giving of notice or lapse of time or both, constitute an event of default or a default by Purchaser under any indenture, mortgage, loan agreement, lease, order, decree, charter, bylaw, or other material agreement to which Purchaser is a party or by which it or any of its properties may be bound or subject that individually or in the aggregate could have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or any of the closing documents to which Purchaser is or is to become a party.

**Section 9.7** **Sufficient Funds**. As of the date hereof and at all times through and including the Closing Date, Purchaser has and will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

## ARTICLE 10

## COVENANTS, OTHER AGREEMENTS AND ACKNOWLEDGEMENTS

### Section 10.1    Covenants of Seller.

(a)    <u>Continue Business in Ordinary Course</u>.  From the date of this Agreement until Closing, Seller shall use commercial reasonable efforts to conduct the Business in the ordinary course of business consistent with current practice except as otherwise ordered by the Bankruptcy Court.

(b)    <u>Public Announcements</u>.  Except as and to the extent required by applicable law, Seller shall not make any public announcements in respect of this Agreement or the transactions contemplated in this Agreement, or otherwise communicate with any third party, including, without limitation, news media, without prior notification to the Purchaser, and the parties shall cooperate as to the timing and contents of any such announcement.

### Section 10.2    **Mutual Covenants**.

(a)    <u>Closing Conditions</u>.  Seller and Purchaser shall use all reasonable efforts to cause the conditions precedent to Closing to be fulfilled.

(b)    <u>Consents and Approvals</u>.  Prior to and after the Closing, each of Seller and Purchaser shall use all reasonable efforts to obtain the agreements, authorizations, consents, orders and approvals of federal, state and local regulatory bodies and officials, courts (including, without limitation, the Bankruptcy Court) and other third parties that may be or become necessary for the performance of their respective obligations pursuant to this Agreement and the consummation of the transactions contemplated by this Agreement, and shall cooperate fully with each other in seeking promptly to obtain such agreements, authorizations, consents, orders and approvals as may be necessary for the performance of their respective obligations pursuant to this Agreement.  Purchaser shall provide Adequate Assurance Information to Seller, the Bankruptcy Court and parties to the Assigned Contracts as may be reasonably requested.  Seller and Purchaser shall not take any action that is likely to have the effect of delaying, impairing or impeding the receipt of any required agreements or approvals, and shall use all reasonable efforts to secure such agreements or approvals as promptly as possible.

(c)    <u>Consent to Jurisdiction</u>.    THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING BUT NOT LIMITED TO ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT, AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION AND TO THE ENTRY OF FINAL ORDERS OR JUDGMENT BY THE BANKRUPTCY JUDGE IN ANY DISPUTE WITH RESPECT TO SUCH MATTERS.

Each of Purchaser and Seller further agrees that service of any process, summons, notice or document by United States registered mail to such party's respective address, with the

required copy to the Persons set forth in Section 13.5 of this Agreement, shall be effective service of process in any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Purchaser and Seller irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court or the United States District Court for the Middle District of Florida, Orlando Division, and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. In the event that a court should rule that subject matter jurisdiction is not available in the United States District Court for the Middle District of Florida, Orlando Division, Purchaser and Seller hereby agree to submit any and all disputes arising out of this Agreement to the jurisdiction and venue of any other competent court sitting in Orange County, Florida.

(d)     Further Action.  Each of the parties to this Agreement shall execute such documents and other papers and take such further actions as may be reasonably required or desirable to carry out the provisions of this Agreement and the transactions contemplated by this Agreement, or at or after the Closing, to evidence the consummation of the transactions consummated pursuant to this Agreement. Upon the terms and subject to the conditions of this Agreement, each of the parties to this Agreement shall take or cause to be taken all actions and to do or cause to be done all other things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement, to satisfy the conditions to this Agreement, and to obtain in a timely manner all necessary waivers, consents and approvals, and to effect all necessary registrations and filings.

**Section 10.3  Purchaser's Due Diligence**.

(a)     Acknowledgment.  In deciding to acquire the Acquired Assets pursuant to this Agreement, Purchaser acknowledges that it has had the opportunity to conduct due diligence regarding the Real Property and the other Acquired Assets and it has had the opportunity to consult with Purchaser's legal, financial and tax advisors with respect to the transactions contemplated by this Agreement. Purchaser confirms and acknowledges that Seller has given Purchaser and its representatives the opportunity for access to the Real Property and the opportunity to ask and have answered questions of representatives of Seller with respect to the Real Property and the other Acquired Assets and to acquire such additional information about the Real Property and the other Acquired Assets as Purchaser has reasonably requested. Purchaser agrees that any physical access to or inspection of the Real Property by Purchaser or its representatives shall comply in all respects with the written instructions and requirements of Seller.

(b)     Title.  Purchaser confirms and acknowledges that Seller has made the Initial Title Reports available to Purchaser, and intends to make additional Title Reports available to Purchaser, and Seller will negotiate with the Title Insurer to obtain title insurance policies with respect to the Real Property (the "Title Policies") at Closing, the cost of which is a Purchaser Closing Cost. Purchaser acknowledges receipt of the Title Reports and hereby waives any objection to title or otherwise to any Encumbrance disclosed thereon. If any matter set forth in any additional Title Report, individually or in the aggregate with other matters, interferes in a material and adverse way with the present use or occupancy of the Real Property, Purchaser may

object to such matter by delivery of written notice to Seller within three Business Days of the date such additional Title Report is delivered to Purchaser. If Purchaser timely notifies Seller of any valid objection to any such matter set forth in any additional Title Report with respect to the Real Property, and if Seller fails or is unable to cure any such objection, then Seller will have the right to terminate this Agreement at any time thereafter, with no liability to Purchaser, unless Purchaser waives such objection by written notice received by Seller no later than the earlier of (i) one Business Day following Purchaser's receipt of notice from Seller that it will not cure such objection or (ii) the Closing Date. If Purchaser closes the purchase of the Acquired Assets, then Purchaser will be deemed to have waived any objection made under this Section 10.3(b) to any matter and such matter shall constitute a Permitted Encumbrance.

## ARTICLE 11

## TERMINATION

**Section 11.1** **Termination by Mutual Consent**. At any time on or prior to the Closing, this Agreement may be terminated by the mutual written consent of Seller and Purchaser without liability on the part of Seller or Purchaser, in which case the Deposit shall be disbursed as provided in such written consent, but if such written consent does not provide for the disbursement of the Deposit, then Escrow Agent shall pay over the applicable Deposit to Seller as consideration for Seller's agreement to terminate this Agreement.

**Section 11.2** **Termination upon Breach or Default**.

(a) If the conditions precedent in Sections 5.1 and 6.1 have been satisfied and Purchaser shall default in any material respect in the observance or in the due and timely performance of any of the agreements or covenants contained in this Agreement, or if there shall have been a material breach by Purchaser of any of its representations or warranties set forth in this Agreement, Seller, provided it is not in material default with respect to any of its obligations under this Agreement, may terminate this Agreement upon five (5) days' written notice to Purchaser, during which time Purchaser shall have an opportunity to cure the default or breach. If such default or breach is not cured, the Deposit with Escrow Agent shall be released to Seller.

(b) If the conditions precedent in Sections 5.1 and 7.1 have been satisfied and Seller shall default in any material respect in the observance or in the due and timely performance of any of the agreements or covenants contained in this Agreement, or if there shall have been a material breach by Seller of any of its representations or warranties set forth in this Agreement, Purchaser, provided it is not in material default with respect to any of its obligations under this Agreement, may terminate this Agreement upon five (5) days' written notice to Seller, during which time Seller shall have an opportunity to cure the default or breach. If such default or breach is not cured, the Deposit with Escrow Agent shall be released to Purchaser.

**Section 11.3** **Termination as a Result of Loss by Fire or Other Casualty; Condemnation**. In the event that, prior to Closing, the Real Property or any material part thereof, is destroyed or materially damaged, or if condemnation proceedings are commenced against any material part of the Real Property, either party will have the right, exercisable by giving notice of such decision to the other within 5 Business Days after receiving written notice

of such damage, destruction or condemnation proceedings, to terminate this Agreement and thereafter neither of the parties will have any further rights or obligations hereunder; *provided, however*, that, if Purchaser is not in breach of this Agreement, Purchaser will be entitled to the return from the Escrow Agent of the Deposit. If neither party exercises its right of termination and the Real Property is sold to Purchaser pursuant to the terms of this Agreement, as Purchaser's sole remedies, Seller will assign to Purchaser any rights it may have, and is entitled to assign, to recover insurance proceeds or to receive condemnation compensation and will promptly pay over and deliver to Purchaser any such proceeds or compensation received by it.

Section 11.4 **Additional Termination**. This Agreement shall terminate if (a) the Bankruptcy Court approves the sale by Seller to any Person other than Purchaser of all or a substantial portion of the Acquired Assets (b) the Bankruptcy Court does not enter the Sale Order by April 15, 2010, or (c) the Bankruptcy Court enters an order converting the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code or an order appointing a Chapter 11 Trustee. If any of the above termination causes occur, Purchaser shall receive the refund of the Deposit.

## ARTICLE 12

## INDEMNIFICATION

Section 12.1 **Purchaser Indemnification**. Purchaser shall indemnify Seller and its officers, members, directors, Affiliates, employees, and assigns (each a "Seller Indemnified Party") and hold them harmless from and against and in respect of any and all Losses claimed, asserted or assessed against or incurred or suffered by any Seller Indemnified Party that arise after the Closing in connection with any misrepresentation or breach of warranty of Purchaser contained herein or in any certificate, schedule, document, or other writing delivered by the Purchaser pursuant to this Agreement or any breach of, or failure to satisfy, any covenant or obligation of Purchaser in the Agreement or in any other certificate, document, writing or instrument delivered by Purchaser pursuant to this Agreement.

Section 12.2 **Seller Indemnification**. Seller shall indemnify Purchaser and its officers, members, partners or shareholders, directors, Affiliates, employees and assigns (each a "Purchaser Indemnified Party") and hold them harmless from and against and in respect of any and all Losses claimed, asserted or assessed against or incurred or suffered by any Purchaser Indemnified Party arising from or in connection with any breach of the representation and warranty of the Seller contained in Section 8.5 of this Agreement or any breach of, or failure to satisfy, any covenant or obligation of the Seller in this Agreement or in any other certificate or ancillary agreement delivered by the Seller pursuant to this Agreement, including, without limitation, any Losses arising from any of Seller's liabilities not specifically assumed by Purchaser under the terms of this Agreement, and all actions or omissions of Seller's operation of the Business prior to the Closing.

Section 12.3 **Indemnification Claims**. If any Seller Indemnified Party or Purchaser Indemnified Party seeks indemnification (the "Indemnified Party") with respect to a claim resulting from the assertion of liability by a third party ("Indemnifiable Claim"), it shall give notice to the party that is to provide the indemnification (the "Indemnifying Party") within

fifteen (15) days after the Indemnified Party becomes actually aware of that Indemnifiable Claim. Such notice shall set forth a reasonable summary of such information with respect to the Indemnifiable Claim as is then reasonably available to the Indemnified Party together with copies of any pleadings. If any such liability is asserted against the Indemnified Party, and it notifies the Indemnifying Party thereof, the Indemnifying Party shall be entitled, if it so elects by written notice delivered to the Indemnified Party within twenty (20) days after receiving such notice of the Indemnifiable Claim, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party; *provided*, *however*, that by electing to assume the defense thereof, the Indemnifying Party will be deemed to have acknowledged its obligation to indemnify the Indemnified Party with respect to such Indemnifiable Claim, and shall thereafter be precluded from denying such obligation. Notwithstanding the foregoing, (i) the Indemnified Party shall also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; and (ii) the rights of the Indemnified Party to be indemnified hereunder in respect of any Indemnifiable Claim shall not be adversely affected by its failure to give notice pursuant to the foregoing, except to the extent that the Indemnifying Party is actually prejudiced by the failure to give such notice. With respect to any assertion of liability by a third party that results in an Indemnifiable Claim, the parties hereto shall make available to each other all relevant information, other than privileged information, in their possession material to any such assertion. In the event that the Indemnifying Party, within twenty (20) days after receipt of the aforesaid notice of an Indemnifiable Claim, fails to assume the defense of the Indemnified Party against such Indemnifiable Claim, the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account and risk of the Indemnifying Party.

## ARTICLE 13

## GENERAL

**Section 13.1  Cooperation in Claims and Litigation**.  Purchaser and Seller shall cooperate, to the extent reasonably requested by either of them, in the handling and disposition of any claims and litigation, including, without limitation, claims relating to environmental matters, workers' compensation claims, labor arbitrations, employee grievances and claims under the Equal Employment Opportunity Act, Civil Rights Act or similar statutes, whether or not listed on any Schedule to this Agreement and whether or not pending or threatened prior to the Closing, that arise out of or are related to any event or occurrence prior to or after the Closing.

**Section 13.2  Survival**.  Except Seller's warranties to Purchaser set forth in Section 8.5, the representations and warranties made by Seller in this Agreement shall not survive the Closing, and such representations and warranties, and any cause of action based on such representations and warranties, shall terminate and expire on the consummation of the Closing. Purchaser and Seller acknowledge that, except as aforesaid, all of Seller's representations and warranties contained in this Agreement are solely conditions to Closing, and after Closing there shall be no liability or obligations under this Agreement in respect of a breach or claimed breach thereto. All representations and warranties made by Purchaser in this Agreement shall survive Closing.

**Section 13.3  Binding Effect; Benefits; Assignment**.   All of the terms of this Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the successors and permitted assigns of Seller and Purchaser.  Purchaser may not assign or delegate any duties or obligations under this Agreement without the prior written consent of Seller, which consent may be granted or withheld in the sole discretion of Seller.  No assignment by Purchaser in accordance with this provision shall release or relieve Purchaser of its liabilities and obligations hereunder, which shall remain in full force and effect notwithstanding any such assignment.  Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies under or by reason of this Agreement except as expressly indicated in this Agreement.

**Section 13.4  Governing Law**.  Except to the extent inconsistent with the Bankruptcy Code, this Agreement shall be governed by the laws of the State of Florida without regard to principles or conflicts of law.

**Section 13.5  Notices**.  All notices, requests, demands, offers and other communications required or permitted to be given pursuant to this Agreement will conform to the requirements of this Section 13.5 and will be deemed have been given for all purposes (i) as of the date and time the same is personally delivered; (ii) if given by facsimile transmission, when the facsimile is transmitted to the recipient's facsimile number or by attachment to an e-mail transmission to the recipient's e-mail address and confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iii) if given by e-mail transmission when confirmation of complete receipt is received by the transmitting party during normal business hours for the recipient, or the next Business Day after confirmation is received by the transmitting party if not during normal business hours for the recipient; (iv) if delivered by United States Mail, three days after depositing with the United States Postal Service, postage prepaid by certified mail, return receipt requested, or (v) if given by nationally recognized or reputable overnight delivery service, on the next Business Day after receipted deposit with same, addressed to Seller or Purchaser at their respective addresses stated below:

    (a)    If to Purchaser:

    Condo Developer LLC
    c/o Kaye Scholer LLC
    Three First National
    70 West Madison
    Suite 4100
    Chicago, IL 60602
    Attn: Michael D. Messersmith
    Email:  mmessersmith@kayescholer.com
    Fax: 312.583.2360

(b)     If to Seller:

THE VUE-ORLANDO, LLC
Attention:  Charles Johanns
150 East Robinson Street
Orlando, FL 32801
Facsimile No.:_____

With a copy to:

LATHAM, SHUKER, EDEN & BEAUDINE, LLP
ATTN:  R. Scott Shuker, Esq.
390 N. Orange Avenue, Suite 600
Orlando, Florida 32801
Facsimile No.:  (407) 481-5801

Any party may change its address by prior written notice to the other parties.

**Section 13.6   Counterparts**.   This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

**Section 13.7   Expenses**.   Except as otherwise provided in this Agreement, Purchaser and Seller shall pay their own respective expenses, costs and fees (including, without limitation, attorneys' and accountants' fees) incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 13.8   Entire Agreement**.   This Agreement and Schedules to this Agreement, and the agreements referred to in this Agreement, taken together set forth the entire agreement and understanding of Seller and Purchaser in respect of the transactions contemplated by this Agreement and supersede all prior agreements, arrangements and understandings relating to the subject matter of this Agreement.  No representation, promise, inducement or statement of intention has been made by Seller or Purchaser that is not embodied in this Agreement or in the documents referred to in this Agreement, and neither Seller nor Purchaser shall be bound by or liable for any alleged representation, promise, inducement or statement of intention not so set forth.  The representations, warranties, covenants and agreements of Seller and Purchaser contained in this Agreement shall be as expressly set forth in this Agreement, and nothing in this Agreement is intended to imply to one party any obligations or responsibilities of any other party.

**Section 13.9   Amendment and Waiver**.   This Agreement may be amended, modified, superseded or cancelled, and any of the terms covenants, representations, warranties or conditions of this Agreement may be waived, only by a writing executed by Seller and Purchaser, or in the case of a waiver, by or on behalf of the party waiving compliance.  The failure of any party at any time to require performance of any provision of this Agreement shall in no manner affect the right of such party at a later time to enforce the same.  No waiver by any

party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or of any breach of any such term, covenant, representation or warranty or any other term, covenant, representation or warranty set forth in this Agreement.

**Section 13.10 <u>Headings</u>**.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Agreement.

**Section 13.11 <u>Execution</u>**.  This Agreement is being executed by Seller's and Purchaser's duly authorized officers or representatives solely on behalf of Seller and Purchaser, and not in a personal or any other capacity.

**Section 13.12 <u>No Third-Party Beneficiaries</u>**.  Nothing express or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties to this Agreement any rights or remedies under or by reason of this Agreement.

**Section 13.13 <u>Noncontinuity of Enterprise</u>**.  The parties hereto agree that the transaction set forth in this Agreement is not a merger or consolidation of Purchaser and Seller or a continuation of enterprise of Seller's Business by Purchaser.  Accordingly, the Purchaser is not a successor corporation for purposes of any liabilities of Seller.

**Section 13.14 <u>Access and Retention of Records</u>**.  Purchaser shall use all reasonable efforts to preserve and keep the Books and Records delivered to it pursuant to this Agreement, and shall make such records available to Seller as may be reasonably requested by Seller from time to time.  If Purchaser wishes to destroy such Books and Records at any time, Purchaser shall first give ninety (90) days' prior written notice to Seller, and Seller shall have the right, at Seller's option, upon prior written notice given to Purchaser within such ninety-day period, to take possession of such Books and Records with one hundred eighty (180) days after the date of notice by Seller to Purchaser under this Section 13.14.

**Section 13.15 <u>Notice of Certain Inquiries</u>**.  If any party is contacted, whether before or after Closing and whether orally or in writing, by the United States Department of Justice or the Federal Trade Commission, or any similar state governmental authority, with respect to any transactions contemplated by this Agreement, such party will promptly notify the other party of such contact and describe the facts and circumstances thereof.

**Section 13.16 <u>Time is of the Essence</u>**.  Time is of the essence of this Agreement.

**Section 13.17 <u>Radon Gas</u>.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to Persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your county health department.**

**Section 13.18 <u>Waiver of Jury Trial</u>**. Purchaser and Seller each acknowledge and agree that the nature of this Agreement makes a jury determination of any dispute arising out of this

Agreement or relating to the transactions contemplated herein undesirable. Accordingly, Purchaser and Seller each knowingly, voluntarily and intentionally waive any right to a trial by jury that either of them may have in any court with respect to any action relating to this Agreement or the transactions contemplated herein.

Section 13.19 **HSR Filings**. If the transactions contemplated hereby are not exempt from review and filing under the HSR Act, Seller and Purchaser shall each seek regulatory approval or HSR Act clearance and prepare and submit, in a timely manner, all necessary filings for Seller and Purchaser in connection with this Agreement under the HSR Act and the rules and regulations thereunder. Seller and Purchaser shall request expedited treatment of such HSR Filing by the Federal Trade Commission, and/or the Department of Justice, as applicable, shall make promptly any appropriate or necessary subsequent or supplemental filings, and shall furnish to each other copies of all HSR Filings at the same time as they are filed with the appropriate governmental authority except to the extent such party is legally restricted from providing or believes, based where appropriate on the advice of counsel, that it should not provide such copies.

## ARTICLE 14

## DISCLAIMERS AND WAIVERS

Section 14.1 **Disclaimers and Waivers**.

(a) **No Reliance on Materials, Data and Information**. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTION 8 HEREOF (THE "CONTRACT WARRANTIES"), SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO THE TRUTH, ACCURACY OR COMPLETENESS OF ANY MATERIALS, DATA OR INFORMATION DELIVERED TO PURCHASER BY OR ON BEHALF OF SELLER IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY. PURCHASER ACKNOWLEDGES AND AGREES THAT ALL MATERIALS, DATA AND INFORMATION DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED HEREBY (WHETHER DELIVERED OR MADE AVAILABLE ORALLY, IN WRITING OR IN ELECTRONIC FORMAT) ARE PROVIDED TO PURCHASER AS A CONVENIENCE ONLY AND THAT ANY RELIANCE ON OR USE OF SUCH MATERIALS, DATA OR INFORMATION BY PURCHASER SHALL BE AT THE SOLE RISK OF PURCHASER. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES AND AGREES THAT (1) ANY TITLE, ENVIRONMENTAL, ENGINEERING, SALES, FINANCIAL OR OTHER REPORT WITH RESPECT TO THE ASSETS WHICH IS DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE SHALL BE FOR GENERAL INFORMATIONAL PURPOSES ONLY, (2) PURCHASER SHALL NOT HAVE ANY RIGHT TO RELY ON ANY SUCH REPORT DELIVERED TO PURCHASER BY SELLER OR ANY, BUT RATHER WILL RELY ON ITS OWN INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AND ANY REPORTS COMMISSIONED BY PURCHASER WITH RESPECT THERETO, AND (3) NEITHER SELLER, ANY AFFILIATE OF SELLER

NOR THE PERSON WHICH PREPARED ANY SUCH REPORT DELIVERED OR MADE AVAILABLE TO PURCHASER BY SELLER OR ANY AFFILIATE SHALL HAVE ANY LIABILITY TO PURCHASER FOR ANY INACCURACY IN OR OMISSION FROM ANY SUCH REPORT.

(b) <u>Disclaimers</u>. EXCEPT FOR THE CONTRACT WARRANTIES, PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESSED OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, LATENT OR PATENT PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, THE COMPLIANCE OF THE ASSETS WITH LAWS, THE ABSENCE OR PRESENCE OF HAZARDOUS MATERIALS OR OTHER TOXIC SUBSTANCES (INCLUDING WITHOUT LIMITATION MOLD OR ANY MOLD CONDITION), COMPLIANCE WITH ENVIRONMENTAL LAWS, THE TRUTH, ACCURACY OR COMPLETENESS OF ANY DOCUMENTS, MATERIALS, REPORTS OR OTHER INFORMATION PROVIDED OR MADE AVAILABLE TO PURCHASER BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY OTHER MATTER OR THING REGARDING THE ASSETS. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND NEITHER SELLER NOR ANY AFFILIATE IS LIABLE FOR OR BOUND BY, ANY EXPRESSED OR IMPLIED WARRANTIES, GUARANTIES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO PROVIDED OR MADE AVAILABLE TO PURCHASER BY OR ON BEHALF OF SELLER OR ANY AFFILIATE, OR ANY REAL ESTATE BROKER, AUCTIONEER OR AGENT REPRESENTING OR PURPORTING TO REPRESENT SELLER OR ANY AFFILIATE, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY, IN WRITING, IN ELECTRONIC FORMAT OR OTHER THAN THE CONTRACT WARRANTIES.

PURCHASER REPRESENTS TO SELLER THAT PURCHASER HAS CONDUCTED SUCH INVESTIGATIONS OF THE ASSETS, INCLUDING BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AS PURCHASER DEEMS NECESSARY TO SATISFY ITSELF AS TO THE CONDITION OF THE ASSETS AND THE EXISTENCE OR NONEXISTENCE OR CURATIVE ACTION TO BE TAKEN WITH RESPECT TO ANY HAZARDOUS MATERIALS OR TOXIC SUBSTANCES ON OR DISCHARGED FROM THE ASSETS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION), AND WILL RELY SOLELY UPON SAME AND NOT UPON ANY INFORMATION PROVIDED TO PURCHASER BY OR ON BEHALF OF SELLER OR ITS AGENTS OR EMPLOYEES WITH RESPECT THERETO, OTHER THAN THE CONTRACT WARRANTIES. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE

**MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED ALL SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT OR UNDER ANY ENVIRONMENTAL LAW), LOSSES, DAMAGES, LIABILITIES (WHETHER BASED ON STRICT LIABILITY OR OTHERWISE), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH PURCHASER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER INDEMNIFIED PARTIES AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE ASSETS.**

**PURCHASER AGREES THAT SHOULD ANY INVESTIGATION, CLEANUP, REMEDIATION OR REMOVAL OF HAZARDOUS SUBSTANCES OR OTHER ENVIRONMENTAL CONDITIONS (INCLUDING WITHOUT LIMITATION ANY MOLD OR MOLD CONDITION) ON OR RELATED TO THE ASSETS BE REQUIRED AFTER THE DATE OF CLOSING, NO SELLER INDEMNIFIED PARTY SHALL HAVE ANY LIABILITY TO PURCHASER TO PERFORM OR PAY FOR SUCH INVESTIGATION, CLEAN-UP, REMOVAL OR REMEDIATION, AND PURCHASER EXPRESSLY WAIVES AND RELEASES ANY CLAIM TO THE CONTRARY.**

**PURCHASER FURTHER ACKNOWLEDGES THAT (1) ECXEPT AS SET FORTH IN SECTION 13.2, THE CONTRACT WARRANTIES SHALL NOT SURVIVE THE CLOSING, AND SHALL HAVE NO FURTHER FORCE OR EFFECT AFTER THE CLOSING AND (2) THE LIABILITY OF SELLER UNDER OR WITH RESPECT TO THE CONTRACT WARRANTIES SHALL BE LIMITED TO THE EXPRESS REMEDIES OF PURCHASER SET FORTH IN THIS AGREEMENT.**

**PURCHASER REPRESENTS AND WARRANTS THAT THE TERMS OF THE DISCLAIMERS, WAIVERS AND RELEASES CONTAINED HEREIN AND THEIR CONSEQUENCES HAVE BEEN COMPLETELY READ AND UNDERSTOOD BY PURCHASER, AND PURCHASER HAS HAD THE OPPORTUNITY TO CONSULT WITH, AND HAS CONSULTED WITH, LEGAL COUNSEL OF PURCHASER'S CHOICE WITH REGARD TO THE TERMS OF SUCH DISCLAIMERS, WAIVERS AND RELEASES.  PURCHASER ACKNOWLEDGES AND WARRANTS THAT PURCHASER'S EXECUTION OF THESE DISCLAIMERS, WAIVERS AND RELEASES IS FREE AND VOLUNTARY.**

(c)    Effect and Survival of Disclaimers.  Seller and Purchaser acknowledge that the provisions of this Article 14 are an integral part of the transactions contemplated in this Agreement and a material inducement to Seller to enter into this Agreement and that Seller

would not enter into this Agreement but for the provisions of this Article 14. Seller and Purchaser agree that the provisions of this Article 14 shall survive Closing or any termination of this Agreement.

## ARTICLE 15

## ESCROW AGENT

**Section 15.1  Duties**.  By signing a copy of this Agreement, Escrow Agent agrees to comply with the terms hereof insofar as they apply to Escrow Agent.  Upon its receipt of funds from Purchaser, Escrow Agent will receive and hold such funds, and interest, if any, accrued thereon, in trust to be disposed of in accordance with the provisions of this Agreement.

**Section 15.2  Indemnity**.  Escrow Agent will not be liable to any party except for claims resulting from the gross negligence or willful misconduct of Escrow Agent.  If the escrowed funds or interest, if any, accrued thereon is involved in any controversy or litigation, the parties hereto will jointly and severally indemnify and hold Escrow Agent free and harmless from and against any and all Losses to which Escrow Agent may be subjected or which it may incur by reason of or in connection with such controversy or litigation, except to the extent it is finally determined that such controversy or litigation resulted from Escrow Agent's gross negligence or willful misconduct.  If the indemnity amounts payable hereunder result from the fault of Purchaser or Seller (or their respective agents), the party at fault will pay, and hold the other party harmless against, such amounts.  Otherwise, Purchaser and Seller each will be responsible for one-half of such amounts.

**Section 15.3  Dispute**.  If a written objection is filed within the time allowed or if Escrow Agent is in doubt as to its duties, Escrow Agent may continue to hold the escrowed funds and interest, if any, accrued thereon until the matter is resolved either by joint written direction from the parties or by the Bankruptcy Court, or Escrow Agent may interplead the same in such court and be relieved of any and all liability therefor.  In any action or proceeding regarding the escrowed funds or interest, if any, accrued thereon brought by Escrow Agent or to which Escrow Agent is made a party, the Escrow Agent will be entitled to recover its reasonable costs and attorneys' fees (through appeal) from whichever of Seller or Purchaser is not the prevailing party in such action or proceeding.  If there is no prevailing party, Seller and Purchaser each shall be responsible for one-half of such costs and fees.

**Section 15.4  Execution by Escrow Agent**.  Escrow Agent has executed this Agreement solely for the purpose of acknowledging and agreeing to the provisions of this Article 15. Escrow Agent's consent to and execution of any modification or amendment of this Agreement other than this Article 15 shall not be required.  Purchaser acknowledges that Escrow Agent is counsel for the Seller and agrees that its service as Escrow Agent and closing agent will not preclude Escrow Agent from representing Seller in any dispute with Purchaser.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, each of Seller and Purchaser has executed this Agreement as of the day and year first above written.

SELLER:

**THE VUE-ORLANDO, LLC, a Delaware
limited liability company**

By: _____

Name: _____Charles A. Johanus_____

Title: _____Member_____

PURCHASER:

**CONDO DEVELOPER LLC, a Delaware
limited liability company, or one of its
assignees**

By: _____

Name: ___MICHAEL D. MESSERSMITH___

Title: __Attorney-in-Fact ad with permission__

Acknowledged and agreed this 15th day of MARCH, 2010 for the limited purposes set forth in Article 15 of this Agreement:

ESCROW AGENT:

**LATHAM, SHUKER, EDEN &
BEAUDINE, LLP**

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF**, each of Seller and Purchaser has executed this Agreement as of the day and year first above written.

> **SELLER:**
>
> **THE VUE-ORLANDO, LLC, a Delaware limited liability company**
>
> By:_____
> Name:_____
> Title:_____
>
>
> **PURCHASER:**
>
> **CONDO DEVELOPER LLC, a Delaware limited liability company, or one of its assignees**
>
> By: _____
> Name: MICHAEL D. MESSERSMITH
> Title: Attorney-in-Fact and with Permission

Acknowledged and agreed this 15th day of MARCH, 2010 for the limited purposes set forth in Article 15 of this Agreement:

> **ESCROW AGENT:**
>
> **LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
>
> By: _____
> Name: R. SCOTT SHUKER
> Title: FINANCE DIRECTOR

ADDENDUM
TO

ASSET PURCHASE AGREEMENT

BETWEEN

THE VUE-ORLANDO, LLC

AS

ΑSELLER@

AND

CONDO DEVELOPER LLC, or one of its assignees

AS

ΑPURCHASER@

March 15, 2010

# ADDENDUM TO
# ASSET PURCHASE AGREEMENT

**THIS ADDENDUM TO ASSET PURCHASE AGREEMENT** (the "Addendum") is an Addendum to that certain Asset Purchase Agreement purposed to be entered by Purchaser and Seller (as such terms are defined below) (the "Agreement") and is made as of the 15th day of March, 2010, by and between **CONDO DEVELOPER LLC**, a Delaware limited liability company, as Purchaser (hereafter referred to as "Purchaser"), and **THE VUE-ORLANDO, LLC**, a Delaware limited liability company, as Seller ("Seller").

**WHEREAS**, pursuant to its Emergency Motion to Convert Case to Chapter 11, Seller has sought relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. ' '101 *et seq.* ("Bankruptcy Code"), in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, Florida ("Bankruptcy Court") at Case No. 6:09-bk-14833-KSJ ("Bankruptcy Case");

**WHEREAS,** in connection with the Bankruptcy Case, on December 28, 2009 the Bankruptcy Court issued an Order Granting Debtor's Motion for Order Approving Bid Procedures, Sale Procedures and Bid Protections (the "Bid Procedures Order");

**WHEREAS**, pursuant to the Bid Procedures approved in the Bid Procedures Order (the "Bid Procedures"), Purchaser previously has submitted the Agreement as part of Purchaser's effort to submit a Qualified Bid (as that term is defined in the Bid Procedures);

**WHEREAS**, in connection with the submission of bids in accordance with the Bid Procedures, certain bidders who have submitted bids (collectively, "Bidders" and individually, a "Bidder") have requested certain changes to the standard form of the Agreement that was included as part of the bid package made available to prospective bidders; and

**WHEREAS**, as an accommodation to certain of the Bidders, Seller is willing to make certain changes to the Agreement and each of the other asset purchase agreements submitted by Bidders, some of which changes will be mandatory for all Bidders who wish to participate in the Auction (as that term is defined in the Bid Procedures) to be held on March 15, 2010, and some of which changes will be made at the option of the Bidder.

**NOW, THEREFORE**, in consideration of the promises and of the mutual covenants, agreements, representations and warranties set forth in this Addendum, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller do hereby agree as follows:

**Section 1.**     **Defined Terms.**  Unless otherwise defined herein, capitalized terms as used in this Addendum will have the meanings ascribed to them in the Agreement.

**Section 2.**     **Assumed Liabilities**.  The definition of "Assumed Liabilities" in Section 1.1 of the Agreement is hereby deleted in its entirety and replaced with the following language:

"Assumed Liabilities" shall mean any and all debts, obligations and liabilities relating to the Acquired Assets arising after the Closing Date (other than those liabilities that may arise after the Closing Date but are a result of any act, omission or circumstance taking place prior to the Closing Date, including, without limitation, any liabilities with respect to environmental violations, employee plans or any other employment related matter), whether known or unknown, fixed, absolute, contingent, material or immaterial, matured or unmatured, and in any case including the following:

(a)     all liabilities and obligations of Seller under the Assigned Contracts arising after the Closing Date;

(b)     subject to Section 3.2, all debts, liabilities and obligations for state and local real and personal property taxes that are imposed directly with respect to an Acquired Asset and payable after the Closing Date, including but not limited to the Purchaser's prorated portion of the 2010 *ad valorem* and personal property taxes and each subsequent years' *ad valorem* and personal property taxes;

(c)     all covenants, rights and obligations arising from or out of the Condominium Declarations, the Act and the Administrative Rules; and

(d)     all debts, liabilities and obligations arising out of the ownership or operation by Purchaser of any Acquired Asset after the Closing Date.

**Section 3.**     **Title Insurer**. The definition of "Title Insurer" in Section 1.1 of the Agreement is hereby deleted in its entirety and replaced with the following language:

"Title Insurer" shall mean Lawyers Title Insurance Company or any other nationally recognized title insurance company designated by Seller.

**Section 4.**     **Closing Date**. Section 4.1 of the Agreement is hereby deleted in its entirety and shall be replaced with the following language:

**Section 4.1**     **Closing Date**. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place in the offices of the Escrow Agent, 390 North Orange Avenue, Suite 600, Orlando, Florida 32801, at 9:30 AM, Eastern Standard Time, on the later of (i) first Business Day that the Sale Order is no longer subject to appeal by any party (the "Scheduled Closing Date") or (ii) such later date as selected by Purchaser but in no event later than May 17, 2010 (the "Purchaser Selected Closing Date"); provided however, that if Purchaser desires to extend the Closing Date, then on or before the Scheduled Closing Date, Purchaser shall deliver notice to Seller of its intent to extend the Closing Date, and provided further, that at the same time Purchaser delivers such notice to Seller it shall deliver to Seller an amount, representing increased purchase price, equal to Ten Thousand and NO/100 Dollars ($10,000.00) times the number of days from the Scheduled Closing Date to and including May 17, 2010. In the event that the Purchaser

Closing Date occurs prior to May 17, 2010, Purchaser shall be entitled to a prorated credit at Closing for the total number of days occurring between the actual Closing Date and May 17, 2010.

**Please sign A or B below (Do not sign either if choosing Purchaser Signature Option 1 below):**

    **A.**    **The Undersigned chooses not to make any changes to Section 4.1 of the Agreement.**

        By: _____
        **(Do not sign if choosing Purchaser Signature Option 1 below)**

    **B.**    **The Undersigned choose to amend Section 4.1 of the Agreement as provided in this Addendum.**

        By: _____
        **(Do not sign if choosing Purchaser Signature Option 1 below)**

If Option B is chosen the following definitions will be deemed to be added to Section 1.1:

"Purchaser Selected Closing Date" shall have the meaning set forth in Section 4.1 hereof.

"Scheduled Closing Date" shall have the meaning set forth in Section 4.1 hereof.

    **Section 5.**    **Title**.  As a result of an updated Title Certificate being made available to Bidders, no modifications to Section 10.3(b) of the Agreement will be permitted.  In addition, any Bidder who participates in the Auction shall be deemed to have waived any objection under Section 10.3(b) to any matter in the Title Report or additional Title Report and all such matters shall constitute Permitted Encumbrances.

    **Section 6.**    **Estoppel**.  Notwithstanding anything to the contrary contained in the Agreement, Seller shall not be required or obligated to obtain, in connection with the Closing or otherwise, any estoppel or other certificate from the Association.

    **Section 7.**    **Limitation of Developer Rights; Parking and Storage Spaces**.  If this option is selected by Purchaser all of the following Sections and Schedules will be modified as follows:

    Section 2.1 of the Agreement shall be modified by adding the following language after Section 2.1(d):

        "As a condition to Purchaser's obligation to close under this Agreement, Seller shall cause (i) a sufficient amount of unassigned parking spaces (the "Parking Spaces") to be assigned to those condominium units (the "Condo Units") that constitute Real Property, such that, upon Closing, there shall be assigned to each Condo Unit the minimum number of Parking Spaces as required

pursuant to the Declaration, (ii) the transfer from Seller to Purchaser, of Seller's right to assign all remaining unassigned Parking Spaces, (iii) at Purchaser's option, the transfer from Seller to Purchaser of all of Seller's rights in the Community Systems and the appurtenant rights associated therewith, and (iv) all unassigned storage units/spaces (the "Storage Units") to be assigned to Purchaser at Closing, all for no additional consideration. Prior to Closing, Purchaser shall advise Seller which Parking Spaces and Storage Units are to be assigned to specific Condo Units."

Section 2.2 of the Agreement shall be modified by adding the following language as new subsection (f) and renaming existing subsection (f) as subsection (g):

"(f) Except as otherwise set forth in Section 2.1(d) above, all of Seller's rights, interests and obligations as the Developer pursuant to the Declaration, provided however, nothing in this Agreement or in the Sale Order will serve as, or be deemed to contain, a finding that Purchaser is not a Developer for purposes of Section 718 of the Act."

Section 1.1 shall be modified by adding each of the following as defined terms:

"Condo Units" shall have the meaning set forth in Section 2.1(d).

"Parking Spaces" shall have the meaning set forth in Section 2.1(d).

"Storage Spaces" shall have the meaning set forth in Section 2.1(d).

Schedule 2.1(a), Item 2 shall be deleted in its entirety and replaced with the following language:

"Parking Spaces and Storage Units, as contemplated in Section 2.1 of the Agreement."

**Please sign A or B below (Do not sign either if choosing Purchaser Signature Option 1 below):**

A.   **The Undersigned chooses not to make any changes to Section 4.1 of the Agreement.** ~~2.1/2.2/~~ *2.1/2.2/SCH.2.1*

   **By:** _____
   **(Do not sign if choosing Purchaser Signature Option 1 below)**

B.   **The Undersigned choose to amend Section 4.1 as provided in this Addendum.** *2.1/2.2 SCH.2.1*

   **By:** _____
   **(Do not sign if choosing Purchaser Signature Option 1 below)**

**Section 8.**   **Assignment**.   Section 14.3 is hereby amended by adding the following language at the end of the second sentence thereof:

pursuant to the Declaration, (ii) the transfer from Seller to Purchaser, of Seller's right to assign all remaining unassigned Parking Spaces, (iii) at Purchaser's option, the transfer from Seller to Purchaser of all of Seller's rights in the Community Systems and the appurtenant rights associated therewith, and (iv) all unassigned storage units/spaces (the "Storage Units") to be assigned to Purchaser at Closing, all for no additional consideration. Prior to Closing, Purchaser shall advise Seller which Parking Spaces and Storage Units are to be assigned to specific Condo Units."

Section 2.2 of the Agreement shall be modified by adding the following language as new subsection (f) and renaming existing subsection (f) as subsection (g):

"(f) Except as otherwise set forth in Section 2.1(d) above, all of Seller's rights, interests and obligations as the Developer pursuant to the Declaration, provided however, nothing in this Agreement or in the Sale Order will serve as, or be deemed to contain, a finding that Purchaser is not a Developer for purposes of Section 718 of the Act."

Section 1.1 shall be modified by adding each of the following as defined terms:

"Condo Units" shall have the meaning set forth in Section 2.1(d).

"Parking Spaces" shall have the meaning set forth in Section 2.1(d).

"Storage Spaces" shall have the meaning set forth in Section 2.1(d).

Schedule 2.1(a), Item 2 shall be deleted in its entirety and replaced with the following language:

"Parking Spaces and Storage Units, as contemplated in Section 2.1 of the Agreement."

**Please sign A or B below (Do not sign either if choosing Purchaser Signature Option 1 below):**

A.  The Undersigned chooses not to make any changes to Section 2.1/2.2 of the Agreement.

By: _Jul D. hunt_

(Do not sign if choosing Purchaser Signature Option 1 below)

B.  The Undersigned choose to amend Section 2.1/2.2 as provided in this Addendum.

By: _____

(Do not sign if choosing Purchaser Signature Option 1 below)

Section 8.    **Assignment**.  Section 14.3 is hereby amended by adding the following language at the end of the second sentence thereof:

"; provided however, that Seller's consent shall not be required to an assignment by Purchaser of its rights hereunder to any Person that is controlled by Purchaser or is under common control with Purchaser."

**Section 9.**     **Otherwise Unchanged**.  This Addendum is limited precisely as written and shall not be deemed to be an amendment to any other term or condition of the Agreement.  Wherever the "Agreement" is referred to therein or in any other agreements, documents or instruments, such reference shall be to the Agreement, as amended hereby.  Except as expressly and specifically set forth in this Addendum, the Agreement shall remain unchanged.  Notwithstanding the foregoing, in the event Purchaser is the Successful Bidder, Seller reserves the right (but shall not be obligated) to accept such other suggested changes to the Agreement, if any, previously submitted by Purchaser but only to the extent that, in Seller's opinion, such changes are not inconsistent with any of the provisions of this Addendum and are of a non-material nature.

**Section 10.**     **Governing Law**.  Except to the extent inconsistent with the Bankruptcy Code, this Addendum shall be governed by the laws of the State of Florida without regard to principles or conflicts of law.

**Section 11.**     **Counterparts**.  This Addendum may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

**Section 12**     **Headings**.  The headings of the sections and paragraphs of this Addendum have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Addendum.

**Section 13.**     **Execution**.  This Addendum is being executed by Seller=s and Purchaser=s duly authorized officers or representatives solely on behalf of Seller and Purchaser, and not in a personal or any other capacity.

*[Signature Pages Follow]*

## PURCHASER'S SIGNATURE OPTION PAGES:

OPTION 1 of 2

The Undersigned chooses not to accept any of the foregoing modifications to the Agreement and hereby notifies Seller that it is hereby terminating its interest in becoming a Qualified Bidder. The Undersigned requests the return of its Deposit previously delivered to Escrow Agent.

**IN WITNESS WHEREOF**, Purchaser has executed this Addendum as of the day and year first above written.

**PURCHASER:**

_____, a

_____

**By:** _____
**Name:**_____
**Title:**_____

**PURCHASER'S SIGNATURE OPTION PAGES:**

OPTION 2 of 2

    The Undersigned hereby agrees to and accepts all of the foregoing mandatory modifications and has selected those optional provisions as indicated by its signature(s) above. (If no options are indicated, Purchaser shall be deemed to have not accepted any optional provision.)

    **IN WITNESS WHEREOF**, Purchaser has executed this Addendum as of the day and year first above written.

                        **PURCHASER:**

                        Condo Developer LLC , a Delaware limited liability company

                        **By:** _Michael D. Messersmith_

                        **Name:** Michael D. Messersmith

                        **Title:** Attorney

**IN WITNESS WHEREOF**, Seller has executed this Addendum as of the day and year first above written.

SELLER:

**THE VUE-ORLANDO, LLC, a Delaware limited liability company**

By: _____

Name: _____Charles D. Johuns_____

Title: _____Member_____